1
2
3
4
5
6
7

EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
GRACE JUN: SBN 287973
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
TEL: (619) 233-1525
FAX: (619) 233-3221
Attorneys for Plaintiffs

James P. Frantz, Esq., SBN 87492
William P. Harris III, Esq., SBN 123575
George T. Stiefel, Esq., SBN 297611
FRANTZ LAW GROUP, APLC
402 West Broadway, Suite 860
San Diego, CA 92101
Tel: (619) 233-5945
FAX: (619) 525-7672

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

THE ESTATE OF PAUL SILVA by
and through its successors-in-
interest LESLIE ALLEN and
MANUEL SILVA, MANUEL
SILVA, and LESLIE ALLEN,

          Plaintiffs,

v.

CITY OF SAN DIEGO, SHELLEY
ZIMMERMAN in her individual
capacity, ANDREW MURROW in
his individual capacity, COUNTY
OF SAN DIEGO, WILLIAM
GORE in his individual capacity,
ALFRED JOSHUA, an individual,
LIBERTY HEALTHCARE
CORPORATION, a Pennsylvania
Corporation, COMMUNITY
RESEARCH FOUNDATION, a
California Corporation, and DOES
1-100

          Defendants.

CASE NO.

COMPLAINT   '18CV2282 MMAKSC

**(1)** **Arrest without Probable Cause (42 U.S.C. §1983)**
**(2)** **Deliberate Indifference to Serious Medical Needs (42 U.S.C. §1983)**
**(3)** **Excessive Force (42 U.S.C. §1983)**
**(4)** **Wrongful Death (42 U.S.C. §1983)**
**(5)** **Right of Association (42 U.S.C. §1983)**
**(6)** **Failure to Properly Train (42 U.S.C. §1983)**
**(7)** **Failure to Properly Supervise and Discipline (42 U.S.C. §1983)**
**(8)** **Failure to Properly Investigate (42 U.S.C. §1983)**
**(9)** **Monell (42 U.S.C. §1983)**
**(10)** **Wrongful Death (CCP §377.60)**
**(11)** **Negligence**
**(12)** **Violation of Cal Civ Code §51 (Unruh Act)**
**(13)** **Violation of Cal Civ Code §52.1 (Bane Act)**
**(14)** **Violation of 42 U.S.C. §12101 et seq. (ADA)**
**(15)** **Violation of 29 U.S.C. §794(a) (Rehabilitation Act)**

**JURY TRIAL DEMANDED**

COME NOW, the ESTATE OF PAUL SILVA by and through its successors-in-interest LESLIE ALLEN and MANUEL SILVA, MANUEL SILVA, and LESLIE ALLEN, by their attorneys of record, and allege and complain as follows:

## I.
## INTRODUCTION

At the time of his death, Paul Silva was 39 years old. He had suffered from schizophrenia his entire adult life. On the morning of February 20, 2018, Paul's mother, Leslie Allen, called the San Diego Police Department's PERT (Psychiatric Emergency Response Team) to request help for Paul. Ms. Allen called the police to assist for a mental health emergency and to invoke Welfare and Institutions Code section 5150. Ms. Allen advised the police of Paul's psychiatric condition. Defendant officer Andrew Murrow claimed that Paul must have used narcotics, despite Ms. Allen's statement that Paul did not use illicit drugs. Defendant Murrow refused to follow policy and brought Paul to the County Jail, rather than to a designated medical facility, as required under the Lanterman-Petris-Short Act. Murrow arrested Paul for being under the influence of a controlled substance despite repeated denials by Ms. Allen that Paul had not taken any drugs.

During his intake at the Central Jail, Paul was described as being anxious and hyper-verbal. The following day, on February 21, 2018, deputies saw Paul acting erratically, running in his cell, throwing himself to the ground and yelling incoherently. He was seen staring out the window with mouth wide open, holding his arms out pointing toward the window and walls, crawling and rolling on the floor. Deputies pepper sprayed Paul. Deputies called for a Tactical Team (TT) to remove Paul from his cell. Paul remained non-verbal with bizarre behavior for approximately 22 minutes while deputies observed Paul as they waited for the Tactical Team to arrive. When the Tactical Team arrived, they shot Paul with water balls. They repeatedly Tasered Paul. Paul was Tasered for

- 1

at least 22 seconds while six other members of the Tactical Team held him down with a body shield pressing down on his torso.  At least six members were on or around his body with a shield placed on top of his torso, with two officers pushing down on the shield.  One deputy instructed the other members to use "downward pressure with the shield, get your body weight on it."  These deputies heard Paul yell "no, don't do it, sir."  Paul's voice then became faint and unintelligible.  Paul became unresponsive.  Paul was taken to UCSD Hospital unconscious.

Medical examination would later show a collapsed lung.  This was caused by the Deputy Sheriffs' excessive force. According to the Medical Examiner, there were visible injuries of the head including blood on his forehead, eyebrows and nose; laceration with abrasion on the right eyebrow; contusion to the right eye; upper lip edema; puncture wounds to the torso (possibly from the Taser); abrasions to the wrist, knuckles and forearm; puncture wound to the inner thigh; and contusions to the left knee and left thigh.

Paul sustained serious and permanent brain damage, neurological injuries, kidney failure and other life-threatening injuries.  Paul was in a coma for several weeks before he ultimately succumbed to his injuries.  Paul's lab results were negative for any alcohol, amphetamines, opiates, methadone, barbiturates or cocaine.  The Medical Examiner determined that the cause of death was restraint, which caused Paul's heart to stop.  The Medical Examiner determined that the manner of death was homicide.

## II.
## GENERAL ALLEGATIONS

1.     Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §1331 and 28 U.S.C. § 1343(3) and (4), *et. seq*.

2.     Venue is proper in the Southern District of California because the acts or omissions which form the basis of the Plaintiffs' claims occurred in San Diego, California, within the Southern District.

3.     At all times relevant to this complaint, decedent Paul Silva was an individual residing in San Diego County, California.

4.     Leslie Allen, Decedent's mother, and Manuel Silva, Decedent's father, are the successors-in-interest of the Estate of Paul Silva. This action on behalf of the Estate of Paul Silva is brought through Plaintiffs, the mother and father of Paul Silva, as the successors-in-interest.

5.     Leslie Allen and Manuel Silva have filed declarations with this Court that no proceeding for the administration of the estate is pending and that they are the successors in interest under California law and succeeds to the decedent's interest. There is no other person with a superior right to commence the action.

6.     Manuel Silva and Leslie Allen bring this action in their own right, as well, for the loss of their son, Paul.

7.     Plaintiffs have properly complied with the Government Claim Act. Plaintiffs' claim was submitted to the California Government Claims Board on April 3, 2018.

8.     The County of San Diego rejected Plaintiffs' claim on May 31, 2018. The City of San Diego rejected Plaintiffs' claim on July 9, 2018.

9.     Defendant City of San Diego is a public entity, duly organized and existing under the laws of the State of California. At all relevant times mentioned herein, the City of San Diego was responsible for the actions and/or inaction, and the policies, procedures and practices/customs of its employees and/or agents.

10.     Defendant Shelley Zimmerman was, at all relevant times, the Chief of the City of San Diego Police Department and it policy maker.   Chief Zimmerman was responsible for the hiring, screening, training, retention,

supervision, discipline, counseling, and control of all San Diego Police employees and/or agents, and Doe Defendants 1-50.

11.    At all times relevant to this complaint, Defendant Andrew Murrow was a police officer employed by the City of San Diego and the San Diego Police Department.

12.    Defendant County of San Diego is a public entity, duly organized and existing under the laws of the State of California. Under its authority, Defendant County of San Diego operates and manages the San Diego Central Jail, and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures and practices/customs of the Central Jail, and its respective employees and/or agents.

13.    Defendant William Gore was, at all relevant times, the Sheriff of the County of San Diego, the highest position in the San Diego County Sheriff's Department. As Sheriff, Defendant Gore was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all San Diego County Sheriff's Department custodial employees and/or agents, medical staff and Doe Defendants.

14.    At all times relevant to this complaint, Defendant William Gore was a policy-maker for the San Diego Sheriff's Department (hereinafter "Sheriff's") and responsible for promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Sheriff's Department alleged herein were committed, as well as the supervision and control of officers who are or were employed by the Sheriff's, who are under his command and/or who report to him, including the Defendants to be named.

15.    Defendants Zimmerman and Gore are sued in their individual capacity for their own personal action or inaction.

16.    At all times relevant to this complaint, Defendant Alfred Joshua was the Medical Director for the Sheriff's Department.  He supervised the medical

- 4

staff and directed and oversaw the development and implementation of quality assurance and utilization review policies and procedures. All medical and psychiatric doctors worked under the direction of Joshua.

17.     At all times relevant to this complaint, all individual defendants and Does 51-90 were San Diego sheriff deputies or medical personnel and agents of Defendant County of San Diego.

18.     San Diego Central Jail is owned and operated by County of San Diego and staffed by County of San Diego Sheriff's deputies.

19.     At all times relevant to this complaint, Defendant Liberty Healthcare Corporation, a Pennsylvania Corporation, was a vendor of the County and provided, under written contract, psychiatric services to inmates incarcerated in County detention facilities.

20.     Community Research Foundation, a San Diego corporation, operates PERT (Psychiatric Emergency Response Team).

21.     The City and County utilize and sanction PERT officers and clinicians trained in responding to psychiatric emergencies as their agents acting under their authority in responding to situations involving mental health issues.

22.     Plaintiffs are truly ignorant of the true names and capacities of Does 1 through 100, inclusive, and/or is truly ignorant of the facts giving rise to their liability and will amend this complaint once their identities have been ascertained as well as the facts giving rise to their liability.

23.     These defendants were agents, servants and employees of each other of the other named defendants and were acting at all times within the full course and scope of their agency and employment, with the full knowledge and consent, either expressed or implied, of their principal and/or employer and each of the other named defendants and each of the defendants had approved or ratified the actions of the other defendants thereby making the currently named defendants

herein liable for the acts and/or omissions of their agents, servants and/or employees.

### III.
### FACTS

24.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

25.    At the time of his death, Paul Silva was 39 years old.

26.    Paul had suffered from schizophrenia his entire adult life.

27.    Paul lived with his father, Manuel Silva.  Each morning, Paul would go to his mother Leslie Allen's home to have breakfast and visit with her.

28.    On February 19, 2018, Paul was acting out and refusing to come home.

29.    Paul's mother, Leslie Allen, called the San Diego Police Department's PERT (Psychiatric Emergency Response Team) to request help for Paul.  Ms. Allen called the police to assist for a mental health emergency (also known as a Welfare and Institutes Code section 5150 psychiatric hold).

30.    PERT is administered by Community Research Foundation, a San Diego corporation.

31.    Because it was President's Day, PERT was not available to assist.

32.    PERT provides emergency assessment and referral for individuals with mental illness. PERT pairs licensed mental health clinicians with uniformed law enforcement officers/deputies. Clinicians work out of individual law enforcement divisions and respond in the field with their law enforcement partners. The PERT team evaluates the situation, assesses the individual's mental health condition and needs, and, if appropriate, transports individuals to a hospital or other treatment center, or refers him/her to a community-based resource or treatment facility.

33. Ms. Allen had called PERT on previous occasions to assist Paul in calming down. On each of the previous occasions, a PERT officer would speak to Paul calmly, and Paul would comply with all of their requests.

34. Because PERT members are trained in dealing with mental illness, Ms. Allen decided to wait until they became available the following day.

35. After Ms. Allen called for the PERT team on February 20, 2018, the PERT unit arrived along with a patrol unit. Ms. Allen advised the PERT members of Paul's psychiatric condition.

36. The advantage of the PERT team is that while in route to the scene of the call, a clinician can look up any information in the County's electronic health record about the person's previous contact in the mental health system, including diagnosis, medications, current providers, case managers, and information regarding family members. The clinician, as a part of PERT, can start to contact those people to get information, which gives the clinician a head start before arriving at the scene.

37. Because Ms. Allen had previously contacted PERT, its team members had full access to Paul Silva's prior history of acting out when off his medication.

38. Despite the fact that members of the PERT team were present and dealing with Paul, Defendant Andrew Murrow interfered with their appropriate treatment of Paul Silva.

39. Defendant Murrow decided that Paul must have used narcotics despite Ms. Allen's statement that Paul did not use illicit drugs.

40. Defendant Murrow was aware that PERT team had successfully dealt with Paul before for his mental illness.

41. Defendant Murrow refused to follow policy and brought Paul to the County Jail, rather than a designated medical facility, as required under the Lanterman-Petris-Short Act.

- 7

42.     Defendant Murrow arrested and booked Paul for being under the influence of a controlled substance despite repeated denials by Ms. Allen that Paul had taken any drugs.

43.     There was no probable cause to believe that Paul had committed a crime.

44.     Paul was symptomatic of being schizophrenic.  Ignoring all evidence of the need to treat Paul's mental condition, Defendant Murrow placed Paul under arrest for a crime Paul did not commit

45.     The SDPD call logs indicated that PERT was called for a "5150 hold," which allows County Mental Health to hold a person for up to 72 hours for mental health concerns under California Penal Code 5150.

46.     Members of PERT, despite the information in the County system regarding Paul's previous hospitalization and 5150 holds, did nothing to intervene.

47.     Members of PERT did nothing to take Paul to a hospital or a mental health treatment facility.

48.     The "vision" of PERT is that "Persons living with mental illness will have access to and be referred to programs at the appropriate level of service and no person will be hospitalized or incarcerated unnecessarily."  Its "Mission" is to "contribute to the well-being of individuals with mental illness by actively and compassionately assisting individuals in crisis who come to the attention of law enforcement to access appropriate services and to optimize outcomes through on-scene assessments and referrals."  PERT's core values are:

> A belief that persons with mental illness must be compassionately assessed regarding their unique needs and be referred to assistance that is appropriate to those needs.

> A belief that law enforcement and mental health workers have a duty and responsibility to collaboratively work

together with persons living with mental illness, their family and support persons, and the community as a whole to ensure that people receive the level of service they require.

A belief that on-scene partnership of mental health and law enforcement contributes to the well-being of persons living with mental illness and to the well-being and protection of the community.

A belief that outreach efforts to marginalized groups in the community assist persons to meet identified needs and assist communities to recognize and address larger issues related to community health and safety.

49.    The members of the PERT team adhered to none of the vision, mission, or core values of PERT in the case of Paul Silva.

50.    During his intake at the Central Jail, Paul was described as anxious and hyper-verbal.

51.    The intake staff at the Central Jail knew that Paul suffered from schizophrenia.

52.    The following day, on February 21, 2018, deputies saw Paul acting erratically, running in his cell, throwing himself to the ground and yelling incoherently.  He was seen staring out the window with mouth wide open, holding his arms out pointing toward the window and walls, crawling and rolling on the floor.

53.    Deputies realized that Paul needed medical attention.  But they failed to call for psychiatric nursing staff or anyone from the Medical Unit.

54.    Deputies pepper sprayed Paul.

55.    Deputies called for Tactical Team (TT) to remove Paul from his cell.

56.    Paul remained non-verbal, exhibiting bizarre behavior for approximately 22 minutes while deputies observed Paul as they waited for the Tactical team to arrive.

57.     When the Tactical Team arrived, they shot him with water balls.

58.     They repeatedly Tasered Paul.

59.     Paul was Tasered for at least 22 seconds while six other members of the Tactical Team held him down with a body shield over his torso.

60.     At least six members were on or around his body with a shield placed on top of his torso with two officers pushing down on the shield.   One deputy instructed the other members to use "downward pressure with the shield, get your body weight on it."

61.     These deputies heard Paul yell "no, don't do it, sir."   Paul's voice then became faint and unintelligible.

62.     Paul became unresponsive.   Paul was taken to UCSD Hospital unconscious.

63.     Medical tests would later show a collapsed lung was caused by the Sheriff's excessive force.   According to the Medical Examiner, there were visible injuries of the head including blood on forehead, eyebrows and nose; laceration with abrasion on the right eyebrow; contusion to the right eye; upper lip edema; puncture wounds to the torso possibly from the Taser; abrasions to the wrist, knuckles and forearm; puncture wound to the inner thigh, and contusions to the left knee and left thigh.

64.     Paul sustained serious and permanent brain damage, neurological injuries, kidney failure and other life-threatening injuries.

65.     Paul was in a coma for several weeks before he ultimately succumbed to his injuries.

66.     Paul's hospital lab results were negative for any alcohol, amphetamines, opiates, methadone, barbiturates or cocaine.

67.     The Medical Examiner determined that the cause of death was restraint, which caused Paul's heart to stop, which resulted in Paul's inability to breathe.

68.     The Medical Examiner determined that the manner of death was homicide.

69.     Despite the fact that Paul was visibly symptomatic of schizophrenia, no medical staff tended to Paul.

70.     During the 36 hours Paul was in jail, he received no medication for his schizophrenia or any other mental health services.

71.     Despite the fact that the deputies determined that Paul needed medical attention, no medical care provider was consulted or called for diagnosis or treatment.

72.     All medical staff worked under the direction and supervision of Defendant Joshua, who set the policies and procedures with respect to medical services.

73.     There had been a systemic failure to adhere to the written policies and procedures with respect to providing adequate health care to inmates in the San Diego County jails.

74.     There had been a systemic failure in San Diego County to investigate incidents of medical neglect, staff misconduct, excessive force, and deaths in the Jail.

75.     Deaths of sixty (60) inmates in the San Diego County jails in a span of five (5) years prompted a series of articles by Citybeat, a local newspaper. Citybeat reported that San Diego County had the highest mortality rate among California's largest jail systems based on data from 2007 to 2012.

76.     Citybeat reported that between 2007 and 2012, San Diego County averaged ten (10) deaths a year, with a high of twelve (12) in 2009 and a low of eight (8) in both 2007 and 2012.

77.     Citybeat reported in a follow-up article that twelve (12) people died in 2013.  In 2014, sixteen (16) county-jail inmates died.

78.    San Diego County officials, including Defendant Gore, were aware of the systemic problems with preventable deaths in the jails, but took no action to prevent further Constitutional violations.

79.    At the time of Paul Silva's death, there had been a long-standing custom and practice of improper and inadequate investigations; cover-up of misconduct; and failure to discipline and train deputies and medical staff.

80.    Defendant Joshua was well aware of these problems when he became the medical director.  Joshua told reporters that staff would be trained to be more attentive to signs that might indicate mental distress, like the condition of an inmate's cell or whether someone was refusing meals.

81.    County Defendants were aware of the following examples of failure to coordinate and share critical medical information among personnel, and other widespread problems at the San Diego County jails, such as the following:

82.    Inmates Jeff Dewall (2008) and Tommy Tucker (2009) died at the hands of jail deputies due to oxygen deprivation when guards attempted to restrain them.  In the case of Tommy Tucker (who suffered from serious psychiatric conditions), deputies who were involved in the use of force sat together in the supervisor's office at the Central Jail and discussed what happened before writing a report.   The deputy statements were inconsistent with the video of the event and the physical evidence.  Upon information and belief, none of the deputies were reprimanded.   The Citizens' Law Enforcement Review Board ("CLERB") did not investigate Tommy Tucker's death.

83.    Between 2007 and 2012, there were eight deaths in San Diego's jails that were drug-related.  They were either overdoses or physical complications due to withdrawal.   Richard Diaz, a 40-year-old addict, died from a stomach obstruction after three days of seizures and vomiting due to heroin withdrawal.

84.    In 2008, after the suicide of Adrian Correa, a 21-year-old paranoid schizophrenic who had threatened to kill himself multiple times, CLERB

- 12

expressed concern about a breakdown in communication during shift changes: "A checklist that includes the status of at-risk inmates and the Department's response plan would enhance continuity of care, monitoring and housing."

85.    In response to CLERB, Earl Goldstein, the Sheriff's medical director at that time, rejected the recommendation, saying that the jail's suicide rate was low—only four suicides total during the 2007-2008 and 2008-2009 fiscal years (July 1, 2007, through June 30, 2009).  There were actually six suicides during that period.  Goldstein wrote: "Based on . . . the low incidences of completed suicides in our facilities, it is not practical to add these systems to the current program."

86.    In a March 2011 letter to the sheriff, the CLERB expressed concern that the department did not have formal policies regarding when it would alert CLERB of an inmate's death, despite the County Code's endowing the board with clear oversight responsibilities. Per state law, CLERB is allowed one year to initiate an investigation. There were cases in 2009 and 2010 that the Board didn't find out about in time in order to timely begin an investigation. CLERB identified five areas in which it wanted to be included in the notification process; the Sheriff declined to initiate all of them.

87.    "We strive to respond with professionalism and a spirit of cooperation to recommendations for improvement to the policies and procedures," Sheriff's Department Executive Manager John Madigan wrote in response. "CLERB has significantly contributed to the enhancement [of] these important documents and we appreciate the Board's insight."  But, he concluded: "After due consideration, Sheriff Gore respectfully declines to modify the policies and procedures as suggested by CLERB."

88.    On June 25, 2011, Daniel Sisson died from an acute asthma attack made worse by drug withdrawal. The San Diego County Medical Examiner estimated in an autopsy report that Sisson had been dead for several hours when a

fellow inmate found him.  The jail staff had failed to monitor him despite his exhibiting signs of withdrawal and his vomiting in his cell.

89.    In September 2012, Bernard Victorianne suffered for five days from drug overdose because the staff ignored his medical information that he had ingested a baggie of methamphetamine, and that he was to return to the hospital immediately if he became symptomatic of overdose.  Bernard Victorianne was placed in segregation instead of Medical, where he was found dead face-down, naked in his cell.

90.    In 2014, Hector Lleras told jail staff that he was suicidal.  He was placed in a safety cell for a day.  Twenty-four hours after he was released from a safety cell, he hanged himself.

91.    In 2014, Christopher Carroll, who was mentally ill, was placed in segregation.  He was found dead with a noose around his neck.  Mr. Carroll had smeared blood on the wall of his cell.  He had urinated on the floor and food and feces were stuck to the ceiling.

92.    In 2014, Kristopher NeSmith committed suicide after the jail staff failed to treat Mr. NeSmith for his significant and known mental illness and a history of suicide attempts.  When Mr. NeSmith was last seen alive about 10:00 p.m., a guard noticed a bedsheet fashioned into a rope as he was making a routine safety throughout the detention center.  The deputy, without breaking stride, said something to the effect of, "Nesmith, what are you trying to do? Kill yourself? Take that thing down."  No other jail staff took any further action.  Mr. NeSmith was found dead, having hung himself.

93.    In 2015, Ruben Nunez, a schizophrenic mental health patient transferred from Patton State Hospital, died when jail doctors failed to treat a potentially lethal condition for water intoxication and the jail staff left Mr. Nunez in the cell in his own vomit and urine.

94.     These are just a few examples of the customs and/or policies of the Sheriff's Department which sent the message to staff that negligence, dishonesty and improprieties will be tolerated by the Department, even when a death results.

95.     The County's investigative body, CLERB, which has the responsibility to investigate all in-custody deaths, had just three paid employees: an executive officer, an investigator, and an administrative assistant.

96.     CLERB consists of eleven volunteers, who are not required to have previous special training or experience in investigations or any other relevant topics related to jail operations, Constitutional requirements, or law.

97.     CLERB members are appointed by the County Board of Supervisors.

98.     CLERB does not control its budget.  It cannot hire investigative staff itself, even when required to complete its work.

99.     While CLERB has the authority to annually inspect county adult detention facilities and annually file a report of such visitations together with pertinent recommendations on issues including detention, care, custody, training and treatment of inmates, CLERB has never inspected a single jail facility in the 25 years of its existence.

100.    By October of 2017, CLERB had 59 open in-custody death investigations, including a death going back six years.

101.    On November 11, 2017, CLERB announced that it was summarily dismissing 22 death cases without review.  CLERB dismissed these cases based on a one-year time limitation for imposing officer discipline for misconduct.  This is despite the fact that CLERB has publicly stated that "death cases and other complex investigations often take more than one year to complete."

102.    The County failed to invest available state funding for mental health services, including over $100 million of Mental Health Services Act (MHSA) funding in 2017, with an additional $42 million in reserves.

103.   In June of 2016, a Grand Jury documented the County's under-utilization of MHSA monies. The Grand Jury recommended that the County "appropriate a larger percentage of MHSA funds each year in order to improve services to a larger number of seriously mentally ill and at-risk county residents."

104.   At the time of Paul Silva's death in 2018, the County had failed the implement the recommended changes from the Grand Jury.

105.   In 2018, Disability Rights California (DRC), the largest disability rights group in the United States, issued the findings from a study of San Diego County Jails, which reviewed suicide deaths from December 2014 to 2016.

106.   According to DRC, its experts identified several deficiencies in San Diego County's clinical referral and evaluation practices.  These experts also found that San Diego County Jail inmates do not receive an adequate individualized mental health treatment plan, a violation of state law.

107.   DRC experts found that San Diego County has lacked an effective system for custodial staff, mental health staff, and other health care staff to communicate about an inmate's decompensating condition, potential risk of suicide or self-harm, and mental health treatment needs.

108.   DRC reported:

> Our investigation found that there are a large number of San Diego County Jail inmates with significant mental health needs. With few exceptions, enhanced mental health treatment programming is provided only to those with critically acute needs. In many cases, inmates remain in harsh, non-therapeutic settings without adequate treatment until their condition deteriorates. Only when they reach the point of engaging in acts of self-harm or having an acute breakdown do they receive an enhanced level of care. Such a system is cruel and counterproductive, and does not meet constitutional and legal requirements.

109.  DRC experts found problematic the number of inmates in mental health crisis who are not referred for placement in the PSU (Psychiatric Security Unit), where the patient can be monitored. DRC reported that there are large numbers of inmates cycling in and out of Safety Cells, many remaining in those cells for extended periods of time. But Safety Cells are harsh, barren, and isolating. They are not designed to facilitate clinical evaluation or treatment.

110.  DRC reported that in its investigation, a major theme that emerged was that inmates do not have timely access to adequate mental health care, including counseling, psychiatric medications, and other treatment programming.

111.  DRC found that access to mental health treatment remains extremely limited outside the inpatient PSUs. It generally consists of medication management and brief, non-confidential "check-ins" with mental health staff, often through a cell door. Non-confidential clinical contacts undermine treatment, as prisoners are often reluctant to disclose sensitive information about their mental health history or current situation. What is more, effective communication through the thick metal cell doors is extremely difficult – people must speak very loudly to be heard at all.

112.  The DRC experts found a significant number of failures on the part of San Diego County Jails from intake of inmates, housing placements, communication between custodial staff and mental health staff, monitoring of the mentally ill, to coordination of care.  The experts found that San Diego County has no functioning quality improvement program to improve health care by identifying problems, and by implementing and monitoring corrective actions.

113.  Paul Silva was a disabled individual suffering from a mental impairment that substantially limited one or more major life activities.  Paul Silva was a "qualified individual with a disability" for purposes of the Americans with Disabilities Act and the Rehabilitation Act.

114. The City of San Diego and the County of San Diego are "public entities" for purposes of the Americans with Disabilities Act and the Rehabilitation Act.

115. It was well documented that Paul Silva was diagnosed with schizophrenia and he was unable to care for himself.

116. Defendants denied Paul Silva benefits of the services, programs or activities of the City of San Diego and the San Diego County Jail because of his disability and subjected him to discrimination.

**FIRST CAUSE OF ACTION**
**(Arrest without Probable Cause (42 U.S.C. §1983))**
**[By the Estate of Paul Silva Against Defendant Murrow and Does 1-60]**

117. Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

118. 42 U.S.C. § 1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory subjects, or causes to be subjected, any person of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit at equity or other proper proceeding for redress.

119. Paul Silva had a firmly established right under the Fourth Amendment to be free from arrest without probable cause. Defendant Murrow arrested Paul without probable cause despite the fact that he had committed no crime.

120. Defendant Murrow was performing his duties as an officer for Defendant City of San Diego.

121. There was no basis to believe that Paul had committed a crime.

122.   All indications were that Paul was acting out as a result of his failure to take his medication.

123.   Murrow was specifically informed by Leslie Allen that Paul did not take street drugs; that Paul was schizophrenic; that Paul's conduct and demeanor were the result of schizophrenia, not drug consumption.

124.   Murrow was specifically informed by Leslie Allen that Paul's family had previously contacted PERT team members who had successfully dealt with Paul's schizophrenia.

125.   PERT team members were at the scene dealing with Paul, who was already calming down and speaking with PERT members.

126.   Murrow had no reason and no legal basis to arrest Paul Silva.

127.   Despite having access to the County's record system with respect to Paul Silva's prior contact with PERT and County Mental Health, PERT team members did nothing to intercede.  These PERT Does were well aware that Paul's behavior was symptomatic of Paul being off of his psychotropic medication. They were aware that Paul's behavior was not symptomatic of illicit drug use.

128.   Having the opportunity to intercede, these PERT Doe Defendants failed to do so and allowed a schizophrenic patient to be unnecessarily and unlawfully incarcerated.

**SECOND CAUSE OF ACTION**
**(Deliberate Indifference to Serious Medical Needs (42 U.S.C. §1983))**
**[By the Estate of Paul Silva Against Defendants Murrow, Joshua, Liberty Health Care and Does 1-100]**

129.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

130.   Defendants violated Paul Silva's Fourteenth Amendment right to medical care.

131.   Defendants knew that Paul Silva faced a serious medical and mental health need.

132.   Defendant Murrow was made aware that Paul suffered from schizophrenia and that he needed to go to a proper mental health facility to receive medical care.

133.   Instead of allowing PERT members to assess Paul's mental condition and take Paul to receive medical care, Murrow instead took him to the Central Jail for a crime Paul did not commit.

134.   Doe Defendants who were PERT members knew that Paul was in need of care for his mental health condition.  Instead of taking him to County Mental Health as requested by Ms. Allen, they allowed Defendant Murrow to arrest Paul and deny him medical care.

135.   Doe PERT team members failed to assess and treat Paul's mental condition despite their knowledge that Paul suffered from schizophrenia.

136.   Murrow and Does failed to adequately communicate to the Jail Staff that Paul suffered from schizophrenia and that Paul required mental health care.

137.   Once at the Central Jail, the jail medical staff failed to take proper intake to assess whether Paul required mental health care.

138.   These defendants failed to house Paul in an area where he could be observed and monitored.

139.   Defendants were deliberately indifferent to a known and serious medical need.

140.   Defendants failed to properly communicate to other medical and security staff the necessary medical information so that Paul would receive medical attention.

141.   Defendants were deliberately indifferent to Paul Silva's serious medical need, which caused harm to the decedent.

142.   Defendant Joshua was deliberately indifferent to Paul Silva's serious medical need by failing to properly set forth policies and procedures for proper care of inmates in medical distress.

143.   Joshua knew that a significant number of inmates booked in Central Jail suffered from serious mental health conditions.

144.   Defendants Liberty Healthcare and Joshua knew that the policies they had implemented with respect to medical care of inmates suffering from mental health conditions were grossly inadequate.   Defendants were aware of the disproportionately high number of deaths in San Diego County Jails.

145.   Defendant Joshua knew that the jail staff were failing to read the patients' medical charts or that they were ignoring the information contained in the medical records.   Joshua was deliberately indifferent in failing to implement policies and providing oversight to ensure that their subordinates were complying with the constitutional requirements in treating patient/inmates.

146.   Defendants Liberty Health Care and Joshua acted with deliberate indifference in failing to implement policies with respect to evaluation and treatment of inmates suffering from mental health conditions.

147.   Defendants Does 51-100 acted under the direction and supervision of Defendants Liberty Health Care and Joshua who set forth the standards, policies and procedures on treatment of inmates, including Paul Silva.

148.   Pursuant to the policies and procedures set by Defendants Liberty Healthcare and Joshua, Paul Silva received no medical care despite obvious signs that he was suffering from schizophrenia.

149.   By failing to set forth procedures on proper care of inmates, including mandates that inmates who suffer from schizophrenia be observed in Medical; that they be monitored regularly by a medical doctor; that the inmate be transported to a hospital when exhibiting obvious signs of schizophrenia,

Defendants Liberty Healthcare and Joshua were deliberately indifferent to Paul Silva's serious medical need.

150.   As a direct and proximate result of all Defendants' deliberate indifference to Paul's serious medical need, Paul Silva experienced physical pain, severe emotional distress, and mental anguish for days, as well as loss of his life and other damages alleged herein.

151.   The conduct alleged herein caused Paul Silva to be deprived of his civil rights that are protected under the United States Constitution which has also legally, proximately, foreseeably and actually caused Paul Silva to suffer emotional distress, pain and suffering and further damages according to proof at the time of trial.

152.   The conduct alleged herein was done in deliberate or reckless disregard of decedent's constitutionally protected rights; justifying the award of exemplary damages against defendants in an amount according to proof at the time of trial in order to deter the defendants from engaging in similar conduct and to make an example by way of monetary punishment.  Plaintiff is also entitled to attorney fees and costs of suit herein.

### THIRD CAUSE OF ACTION
### (Excessive Force (42 U.S.C. §1983))
### [By the Estate of Paul Silva against Defendants Does 51-100]

153.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

154.   Defendants committed wrongful acts which proximately caused the death of Paul Silva.

155.   During his intake at the Central Jail, Paul was described as anxious and hyper-verbal.  The Jail staff were aware that Paul suffered from schizophrenia.

156.   The following day, on February 21, 2018, deputies saw Paul acting erratically, running in his cell, throwing himself to the ground and yelling incoherently.   He was seen staring out the window with mouth wide open, holding his arms out pointing toward the window and walls, crawling and rolling on the floor.

157.   Doe Deputies knew that Paul needed medical attention.

158.   Instead of calling for psychiatric assistance, Doe Deputies used force to subdue Paul.

159.   Paul had not harmed anyone or threatened to harm anyone.

160.   Doe Deputies pepper sprayed Paul.

161.   Deputies called for Tactical Team (TT) to remove Paul from his cell.

162.   Paul remained non-verbal, exhibiting bizarre behavior for approximately 22 minutes while deputies observed Paul as they waited for the Tactical Team to arrive.

163.   When the Tactical Team arrived, they shot Paul with water balls.

164.   They repeatedly Tasered Paul.   Paul was Tasered for at least 22 seconds while six other members of the Tactical Team held him down with a body shield over his torso.

165.   At least six members were on or around his body with a shield placed on top of his torso with two officers pushing down on the shield.

166.   One deputy instructed the other members to use "downward pressure with the shield, get your body weight on it."

167.   These deputies heard Paul yell "no, don't do it, sir."   Despite hearing his pleas, these Doe defendants continued to use force on Paul Silva, who was prone and helpless on the ground.

168.   Paul's voice became faint and unintelligible.

169.   Paul became unresponsive.

170.   Paul was taken to UCSD Hospital unconscious, where he died from the injuries inflicted by Doe Sheriff Deputies.

171.   The acts of these Doe defendants as described above amounted to deliberate indifference to decedent's Constitutional Rights.

172.   As a direct and proximate result of the unlawful acts, excessive force, unlawful seizure and recklessness described above, plaintiffs' decedent Paul Silva suffered severe injuries and loss of his life. His estate is entitled to general and compensatory damages in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION
### (Wrongful Death (42 U.S.C. §1983))
### [By the Estate of Paul Silva against Defendants Murrow, Liberty Health Care and Does 1-100]

173.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

174.   Defendants committed wrongful acts which proximately caused the death of Paul Silva.  Defendants were deliberatively indifferent to Paul Silva's serious medical needs, health and safety; they violated Paul Silva's civil rights; they falsely arrested him and used excessive and unnecessary force, all causing the untimely and wrongful death of Paul Silva.

175.   Defendants Murrow and Does 1-100 saw Paul Silva in medical distress but failed to render aid, call for a doctor, or transport him to the hospital.

176.   Defendants deprived Paul Silva of his rights under the Fourteenth Amendment to the United States Constitution.

177.   These wrongful acts were done with a deliberate indifference to the safety and welfare of Paul Silva.

178.   The conduct alleged herein violated Paul Silva's rights alleged above thereby resulting in a deprivation of Plaintiffs' rights alleged above which has legally, proximately, foreseeably and actually caused Plaintiff to suffer emotional

distress, pain and suffering, and further general and special damages according to proof at the time of trial.

## FIFTH CAUSE OF ACTION
### (Right of Association (42 U.S.C. §1983))
### [By Plaintiffs Manuel Silva and Leslie Allen against Defendant Murrow and Does 1-100]

179.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

180.   Defendants deprived Paul Silva of his rights under the United States Constitution to be free denial of medical care and denial of due process.

181.   The aforementioned acts and/or omissions of Defendants in being deliberatively indifferent to serious medical needs, health and safety; violating Paul Silva's civil rights; falsely arresting him and using excessive and unnecessary force caused the untimely and wrongful death of Paul Silva, and deprived Plaintiffs Manuel Silva and Leslie Allen of their liberty interest in the parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

182.   There was no legitimate penological interest in failing to communicate critical medical information and denying access to medical care to an inmate in obvious medical distress.  Defendants' actions shock the conscience.

183.   The deprivation of the rights alleged above has destroyed the Constitutional rights of Paul Silva's parents, Manuel Silva and Leslie Allen, to the society and companionship of their son which is protected by the substantive due process clause of the Fourteenth Amendment.

184.   The conduct alleged herein violated Paul Silva's rights alleged above thereby resulting in a deprivation of Plaintiffs' rights alleged above which has legally, proximately, foreseeably and actually caused Plaintiffs to suffer

emotional distress, pain and suffering, and further damages according to proof at the time of trial.

## SIXTH CAUSE OF ACTION
### (Failure to Properly Train (42 U.S.C. § 1983))
**[By the Estate of Paul Silva against the City of San Diego, Zimmerman, County of San Diego, Gore, Community Research Foundation, Joshua, Liberty Healthcare, and Supervisory Doe Defendants 1-100]**

185.   Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

186.   Defendants City of San Diego, Zimmerman, Community Research Foundation and Doe supervisors failed to properly train defendant Murrow and Doe officers in the performance of their duties.  They failed to properly train officers on how to deal with a call made to PERT for assistance with the mentally ill.

187.   They failed to properly train officers on arresting and charging the mentally ill citizens with crimes based on no evidence of a crime.  They failed to properly train their officers on arrests without probable cause.

188.   Defendant Community Research Foundation failed to train its officers and medical staff on how to properly deal with citizens in mental health crisis.  It failed to properly train its subordinates or staff or officers on how to distinguish mental illness from signs of substance abuse.  It failed to properly train its subordinates, staff or officers on how to deal with other law enforcement officials to ensure that the citizen is given mental health care instead of incarceration.

189.   Defendants City of San Diego, Zimmerman and Doe supervisors failed to properly train their employees with regard to the need to communicate critical medical information to jails that would house their patients.

190. Officials of the San Diego Sheriff's Department, acting under color of law, have subjected decedent Paul Silva and other persons similarly situated to a pattern of conduct consisting of continuing, widespread and persistent pattern of unconstitutional misconduct.

191. Defendants Gore, Joshua, Liberty Healthcare and Does 31-40 have failed to maintain adequate and proper training necessary to educate deputies and medical staff as to the Constitutional rights of inmates; to prevent the consistent and systematic failure to provide medical care.

192. There has been an official policy of acquiescence in the wrongful conduct. Defendants failed to promulgate corrective policies and regulations in the face of repeated Constitutional violations.

193. Gore, Joshua and Liberty Healthcare failed to train medical and psychiatric doctors and nurses on the necessary care of inmates suffering from serious medical conditions, and they failed to implement policies and procedures with respect to proper training.

194. Gore, Joshua and Liberty Healthcare failed to train medical and psychiatric doctors and nurses on documenting and reading critical information on medical charts to ensure continuity of care.

195. Defendants County of San Diego, Gore, Joshua, Liberty Healthcare and Doe supervisors, with deliberate indifference, disregarded a duty to protect the public from official misconduct.

196. Despite their knowledge of previous instances of wrongful deaths in the jails, Defendants failed to properly train or retrain their deputies and medical staff to prevent deaths of inmates.

197. The failure of all supervisory defendants to promulgate or maintain constitutionally adequate training was done with deliberate indifference to the rights of Paul Silva and others in his position.

198. As a result, decedent Paul Silva suffered physical and psychological injuries and death.

199. As a direct consequence of the failure of Defendants to properly train their officers and medical staff, Paul Silva suffered unconstitutional treatment and inhumane conditions during his detention.

200. As a result of the Defendants' historical failure to properly train, Defendants were deliberately indifferent to the needs of Plaintiff.

## SEVENTH CAUSE OF ACTION
### (Failure to Properly Supervise and Discipline (42 U.S.C. §1983))
### [By the Estate of Paul Silva against the City of San Diego, Zimmerman, Community Research Foundation, the County of San Diego, Gore, Joshua, Liberty Healthcare and Supervisory Doe Defendants 1-100]

201. Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

202. Defendants City of San Diego, Zimmerman, Community Research Foundation and Doe supervisors failed to properly supervise and discipline defendant Murrow and Does in the performance of their duties in making false arrests.

203. These Defendants failed to properly supervise their employees with regard to the need to communicate critical medical information to jails that would house their patient/arrestee.

204. As a result of the Defendants' historical failure to properly supervise and discipline their employees, Defendant Murrow and Does were deliberately indifferent to the serious medical needs of Plaintiff.

205. All defendants failed to supervise their subordinates so that persons living with mental illness will have access to and be referred to programs at the appropriate level of service and no person will be hospitalized or incarcerated unnecessarily. All defendants failed to supervise their subordinates so that they contribute to the well-being of individuals with mental illness by

actively and compassionately assisting individuals in crisis who come to the attention of law enforcement to access appropriate services and to optimize outcomes through on-scene assessments and referrals.

206. All Defendants failed to properly supervise their subordinates with regard to the need to communicate critical medical information and the need to provide adequate care. As a result, police officers, PERT members, deputies and medical care providers denied care to Paul Silva.

207. Defendants County of San Diego, Gore, Joshua, Liberty Healthcare and Doe supervisors failed to provide adequate supervision and discipline to the medical staff who are required to render medical care that meet the standards of the Constitution.

208. Defendants County of San Diego, Gore, Joshua, Liberty Healthcare and Doe supervisors failed to promulgate and enforce adequate policies and procedures related to misconduct and the violation of citizens' civil rights by deputies and medical staff.

209. Defendants County of San Diego, Gore and Joshua have a widespread history of ratifying employee misconduct by failing to conduct appropriate investigations.

210. Defendants were aware of previous instances of untimely and wrongful deaths in the San Diego County Jails and failed to properly supervise and discipline their employees or agents.

211. Defendants County of San Diego, Gore, Joshua, Liberty Healthcare and Doe supervisors refused to investigate misconduct and/or took no remedial steps or action against deputies and medical staff.

212. Upon information and belief, supervising officers were made aware of the misconduct or witnessed the Constitutional violations committed by the deputies and medical staff but failed to supervise or discipline them.

213.   There has been an official policy of acquiescence in the wrongful conduct. Defendants failed to promulgate corrective policies and regulations in the face of repeated Constitutional violations.

214.   Defendants condoned and acquiesced in the abusive behavior of their subordinates by refusing to retrain them, discipline them, or correct their abusive behavior.

215.   Defendants were, or should have been, aware that the policy regarding supervision and discipline of staff who violated the civil rights of inmates or citizens was so inadequate that it was obvious that a failure to correct it would result in further incidents of dangerous and lawless conduct perpetrated by their subordinates.

216.   As a result of all Defendants' historical failure to properly supervise and discipline deputies, Defendants were deliberately indifferent to the needs of Plaintiff.  The failure to supervise and discipline was the moving force behind the misconduct of the deputies, the denial of medical care on the Plaintiff, and the resulting pain and suffering and death.

**EIGHTH CAUSE OF ACTION**
**(Failure to Properly Investigate (42 U.S.C. §1983))**
**[By the Estate of Paul Silva against the City of San Diego, Zimmerman, Community Research Foundation, County of San Diego, Gore, Joshua, Liberty Healthcare and Supervisory Doe Defendants]**

217.   Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

218.   Defendants maintained a longstanding pattern of failing to properly investigate misconduct.

219.   Upon information and belief, City of San Diego Defendants maintained a *de facto* policy of failing to adequately investigate instances of Constitutional violations, including wrongful arrests.

- 30

220. Upon information and belief, Community Research Foundation maintained a *de facto* policy of failing to adequately investigate instances of Constitutional violations, including wrongful arrests, and failure to intercede by its subordinates or employees.

221. Upon information and belief, all Defendants maintained a *de facto* policy of not obtaining accurate and timely reports from witnesses and staff alleged to have been involved in misconduct or witnessed misconduct.

222. Upon information and belief, County of San Diego Defendants maintained a *de facto* policy of allowing homicide investigators to intimidate witnesses; to ask leading questions, suggesting the answers; and to summarize the interviews of inmates in their investigation files in a manner that distort the actual recorded statements of witnesses.

223. Upon information and belief, County of San Diego, Gore, Joshua, Liberty Healthcare and Doe supervisors gave families of inmates limited information regarding the deaths of their loved ones.  On one occasion, they waited 1½ years to provide information on how an inmate died.  In another case, the family found out the facts of their son's death from reading reports of CLERB made publicly available.

224. Defendants County of San Diego, Gore, Joshua, Liberty Healthcare and Doe supervisors historically and systematically engaged in a pattern of failure to properly investigate misconduct of deputies and medical staff.

225. County of San Diego Defendants maintained a *de facto* policy of failing to investigate in-custody deaths by CLERB.

226. County of San Diego Defendants maintained a *de facto* policy of failing to notify CLERB of in-custody deaths.

227. County of San Diego Defendants maintained a *de facto* policy of failing to adequately fund CLERB; properly staff CLERB; to properly train

CLERB on how to conduct proper investigations; and to allow summary dismissal of in-custody deaths without any investigation.

228.   The longstanding pattern of failing to properly investigate staff misconduct led to the actions or inactions of the deputies and medical staff who denied medical care to Paul Silva.  Defendants' pattern of failing to investigate created a culture of unconstitutional acts and acts that violate the Jail's own policies and procedures.

229.   Defendant Gore was personally aware of these failures but took no action to prevent harm to inmates, including Paul Silva.

230.   Defendants Joshua and Liberty Healthcare failed to properly investigate the misconduct of the medical staff despite a history of medical neglect and preventable deaths in the San Diego jails.

231.   The individual defendants in this case knew that their actions would not be investigated and that they would not be disciplined for their actions.

232.   The systemic failures by all defendants to properly investigate led to the misconduct of the police officers, deputies and medical staff in this case.

233.   As a result of all Defendants' historical failure to properly investigate, Defendants were deliberately indifferent to the needs of Plaintiff Paul Silva.  The failure to investigate was the moving force behind the denial of medical care, and cruel and unusual punishment on the decedent Paul Silva and the resulting pain and suffering and death.

**NINTH CAUSE OF ACTION**
**(*Monell* Municipal Liability Civil Rights Action (42 U.S.C. §1983))**
**[By all Plaintiffs Against Defendants the City of San Diego and the County of San Diego]**

234.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

235.   Defendant City of San Diego maintained an unconstitutional policy, ordinance or regulation which allowed their officers to falsely arrest citizens, including those who need medical help.

236.   Defendant City of San Diego maintained an unconstitutional policy, ordinance or regulation which allowed their officers to deny medical care to the mentally ill.

237.   During the relevant period, all Defendant police officers and Does 1-50 were acting pursuant to the policies of Defendant City of San Diego.

238.   There was a custom and practice of not properly funding and utilizing PERT.  There was a custom and practice of not properly training PERT staff.

239.   Defendants, the City of San Diego and the County of San Diego, failed to set forth any policies or conduct any self-evaluation of procedures and training under the Americans with Disability Act and the Rehabilitation Act for its personnel about how to handle encounters with persons who have mental illness or another disability.

240.   Defendants, the City of San Diego and the County of San Diego, maintained a *de facto* policy of permitting unconstitutional and lawless conduct by their employees.

241.   Defendant County of San Diego maintained an unconstitutional policy, ordinance or regulation which allowed their deputies and medical staff to deny medical care to inmates.

242.   There were longstanding and systemic deficiencies in San Diego jails' treatment to inmates.  Deficiencies included improper cell checks, inadequate medical staffing, lack of required training on screening, diagnosis and treatment of medical and psychiatric conditions, lack of communication of necessary and critical medical information among staff, and non-compliant medical policies and procedures.

243. These deficiencies included allowing the use of unlawful and unnecessary force and failing to investigate and discipline deputies for the use of such force. There was a custom and practice of resorting to use of force on mentally ill patient/inmates who needed psychiatric help, not use of force.

244. The County's failure to train its deputies and medical staff on treatment of inmates in medical distress gives inference of a municipal custom that authorized or condoned deputy misconduct.

245. Upon information and belief, the permanent, widespread, well-settled practice or custom of Defendant was to deny treatment to inmates in serious medical distress and to place inmates in administrative segregation or general population instead of the medical ward when inmates are in need of medical care.

246. There was a custom and practice of disbelieving complaints of inmates when they request medical attention and denying them access to medical care.

247. There was a custom and practice of not properly screening inmates for medical care or treatment.

248. There was a custom and practice of failing to communicate the medical needs of inmates between the medical staff and deputies.

249. There was a custom and practice of not properly checking on the welfare of inmates, even those inmates known to have serious physical or psychiatric needs.

250. There was a custom and practice of failing to conduct proper cell checks as required by County's own written policies.

251. There was a custom and practice of not properly investigating misconduct of deputies and medical staff.

252.   There was a custom and practice of falsifying information during investigations of misconduct and misleading the investigations by the independent citizens' review board.

253.   There were longstanding and systemic deficiencies in San Diego County of failing to investigate in-custody deaths by Homicide Division of San Diego County and by CLERB.

254.   Defendant County of San Diego was deliberately indifferent to the widespread unconstitutional acts by its staff and failed to set forth appropriate policies regarding the treatment of inmates.

255.   During the relevant period, all Defendant deputies, medical staff, and Does 51-100 were acting pursuant to the policies of Defendant County of San Diego.

256.   Death of sixty (60) inmates in the San Diego County jails in a span of five (5) years prompted a series of articles by a local newspaper.  Citybeat reported that San Diego County had the highest mortality rate among California largest jail systems based on data from 2007 to 2012.  This rate continued through 2013 and 2014.

257.   This pattern of tragic deaths supports an inference that Defendants are promoting and maintaining a culture of deliberate indifference to human life at the Jail.

258.   Defendant County of San Diego was deliberately indifferent to the right of the plaintiff and others to be free from, and protected from, harm by the misconduct of its employees.

259.   The Sheriff Department's longstanding practice or custom was unconstitutional in that it was deliberately indifferent to a substantial risk of serious harm to inmates.

260.   As a direct result of the practice or custom of the City of San Diego, and the County of San Diego, Defendants, including Doe Defendants, denied

medical care, denied transportation to the hospital, failed to place Paul Silva in a medical wing, and used unlawful and excessive force, causing Paul Silva's death.

261.   The unlawful and illegal conduct of Defendant deprived Paul Silva of the rights, privileges and immunities secured to him by the Constitutions of the United States.

262.   As a direct, proximate and foreseeable result, Plaintiff suffered damages in an amount according to proof at the time of trial.

## TENTH CAUSE OF ACTION
### (Wrongful Death – CCP § 377.60, *et seq.*)
### [By All Plaintiffs against All Defendants]

263.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

264.   Plaintiffs allege all California state law claims as basis for state law wrongful death cause of action and incorporate later torts by reference.

265.   Defendants committed wrongful acts which proximately caused the death of Paul Silva.  Specifically, Defendants, including Does 1-100, deprived Paul Silva of his rights under the United States Constitution to be free from the punishment without due process and cruel and unusual punishment.

266.   Defendant Murrow's decision to deviate from the City of San Diego's own protocol as to the treatment of psychiatric patients was a substantial factor in causing Paul's death.  It was reasonably foreseeable that failure to notify the Jail of Paul's schizophrenia would lead to the lack of treatment.

267.   These acts resulted in the death of Paul Silva.

268.   The City of San Diego, Community Research Foundation, and County of San Diego are responsible for the act of individual and Doe Defendants under the theory of *respondeat superior*.

269.   The wrongful acts alleged above has destroyed the relationship between Plaintiffs and Paul Silva and has legally, proximately, foreseeably and

actually caused severe emotional damages, including the loss of society, companionship, emotional distress, and further economic and non-economic damages according to proof at the time of trial.

## ELEVENTH CAUSE OF ACTION
### (Negligence)
### [By All Plaintiffs against All Defendants]

270.  Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

271.  Defendants had a duty to Plaintiff to act with ordinary care and prudence so as not to cause harm or injury to another.

272.  In evaluating, assessing and handling Paul Silva's medical condition, Defendants failed to comply with professional and legal standards.

273.  Defendants improperly, negligently, wrongfully, and recklessly subjected Paul Silva to arrest for a criminal charge instead of taking him to a mental health care facility.

274.  Defendants improperly, negligently, wrongfully, and recklessly failed to provide necessary medical documentation and information to San Diego Central Jail regarding Paul's serious medical need.

275.  Defendants improperly, negligently, wrongfully, and recklessly failed properly document's serious medical and psychiatric condition; failed to communicate to the other jail staff regarding the need to monitor; and failed to provide any medical care for a life-threatening condition.

276.  Defendants improperly, negligently, wrongfully, and recklessly failed to take any action to monitor Paul Silva despite his obvious symptoms of a serious illness.

277.  Defendants improperly, negligently, wrongfully, and recklessly failed to render medical care to Paul Silva who was in obvious physical distress and in acute need of psychiatric care.

- 37

278.   Defendants improperly, negligently, wrongfully, and recklessly failed to transport Paul Silva to a psychiatric care facility and instead booked him in jail for a crime Paul did not commit.

279.   Members of PERT failed to obtain critical psychiatric information or ignored the information in the County electronic system, which alerted or would have alerted them to Paul Silva's psychiatric history, diagnosis, medication, and treatment providers.

280.   Defendants improperly, negligently, wrongfully, and recklessly failed to take any action to summon help or transport Paul Silva to the hospital despite their knowledge that he needed medical assistance.

281.   Defendants Zimmerman, Gore, Joshua and Liberty Healthcare improperly, negligently, wrongfully, and recklessly failed to set forth policies regarding medical treatment of inmates suffering from serious mental health conditions, including schizophrenia.

282.   Defendants Zimmerman, Gore, Community Research Foundation and Joshua improperly, negligently, wrongfully, and recklessly failed to set forth policies regarding proper screening, evaluation, treatment, and transportation of inmates suffering from a serious medical condition.

283.   Defendants Zimmerman, Gore, and Joshua improperly, negligently, wrongfully, and recklessly failed to conduct any self-evaluation of procedures and training under the Americans with Disability Act and the Rehabilitation Act for its personnel about how to handle encounters with persons who have mental illness or another disability.

284.   Defendants improperly, negligently, wrongfully, and recklessly failed to conduct any self-evaluation of procedures and training under the Americans with Disability Act and the Rehabilitation Act for its personnel about how to handle protocols for patients who suffer from schizophrenia.

285.   By engaging in the acts alleged herein, Defendants failed to act with ordinary care and breached their duty of care owed to Paul Silva.

286.   The City of San Diego, Community Research Foundation and the County of San Diego are responsible for the act of individuals and Doe Defendants under the theory of *respondeat superior*.

287.   Liberty Healthcare is responsible for the act of Doe Defendants under the theory of *respondeat superior*.

288.   Plaintiffs are informed and believe that Defendants, the City of San Diego, Community Research Foundation, the County of San Diego, Gore, Joshua, Liberty Healthcare, and Does maintained policies, practices and procedures that allowed for and encouraged the denial of care which ultimately caused the death of Paul Silva.  These policies, practices and procedures include without limitation Defendants' training procedures and practices with respect to supervision of the officers and policies and procedures with regard to providing necessary medical attention.

289.   By engaging in the acts alleged herein, all defendants failed to act with ordinary care and breached their duty of care owed to plaintiffs.

290.   As a direct and proximate result of the Defendants' negligent conduct as herein described, Paul Silva suffered physically and mentally in the amount to be determined at the time of trial.

291.   As a further proximate result of the Defendants' negligent conduct, Paul Silva died.

292.   As a further proximate result of the Defendants' negligent conduct, Plaintiffs Manuel Silva and Leslie Allen have lost their son and suffered great emotional and mental harm in the amount to be determined at the time of trial.

293.   The conduct of the Defendants also amounts to oppression, fraud or malice within the meaning of Civil Code Section 3294 et seq. and punitive

damages should be assessed against each defendant for the purpose of punishment and for the sake of example.

## TWELFTH CAUSE OF ACTION
### (Violation of Cal. Civ. Code § 51)
### [By the Estate of Paul Silva against Murrow, the City of San Diego, County of San Diego and Does 1-100]

294. Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

295. Pursuant to the Unruh Civil Rights Act, all persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

296. Defendant Murrow violated the Unruh Act by denying Paul Silva the full and equal accommodations, advantages, facilities, privileges or services as other citizens who do not suffer from his disability.

297. Paul Silva was experiencing a medical emergency and required assistance by medical care professionals. Paul Silva was denied these services on the basis of his disability.

298. Paul Silva required the accommodations and services provided to all inmates at intake, which was a proper and accurate assessment of all conditions which may pose a risk of harm. Paul Silva required the accommodations and services of a proper designation for housing. The County of San Diego and Does 51-100 denied Paul Silva these services on the basis of his disability.

299. As a direct and proximate result of Defendants' actions, as alleged herein, Plaintiff was injured as set forth above and is entitled to damages,

including compensatory and punitive damages, in an amount to be proven at trial and in excess of the jurisdictional amount required by this Court.

300.   In conducting himself as alleged herein, Murrow and Does 1 to 50 were acting within the course and scope of their employment with Defendant City of San Diego. Thus, the City is responsible for Murrow's and Doe Defendants' actions.

301.   Does 51 to 100 were acting within the course and scope of their employment with Defendant County of San Diego. Thus, the County is responsible for Doe Defendants' actions.

302.   In doing the foregoing wrongful acts, Defendants acted in reckless and callous disregard for Plaintiffs' constitutional rights. The wrongful acts, and each of them, were willful, oppressive, fraudulent and malicious, thus warranting the imposition of punitive damages against each individual Defendant in an amount adequate to punish the wrongdoers and deter future misconduct.

### THIRTEENTH CAUSE OF ACTION
### (Violation of Cal. Civ. Code § 52.1)
### [By the Estate of Paul Silva against Murrow, the City of San Diego, the County of San Diego and Does 1-100]

303.   Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

304.   Defendants interfered by threats, intimidation, or coercion, with the exercise or enjoyment by Paul Silva of rights secured by the Constitution or laws of the United States.

305.   The Fourth and Fourteenth Amendments to the U.S. Constitution, and Article I, section 13 of the California Constitution, guarantee (a) an individual's right to be free from excessive force and (b) parents' rights to the companionship of their child.

306.   Paul Silva had a Constitutional right not to be arrested without probable cause.  Murrow and Doe Defendants arrested Paul through the use of intimidation and coercion.

307.   California Civil Code section 43 confers a right to be secure in one's bodily integrity from assault and excessive force.  By engaging in the acts alleged above, Defendants denied those rights to Plaintiff, thus giving rise to claims for damages pursuant to California Civil Code section 52.1.

308.   As a direct and proximate result of Defendants' actions, as alleged herein, Plaintiff was injured as set forth above and is entitled to damages, including compensatory and punitive damages, in an amount to be proven at trial and in excess of the jurisdictional amount required by this Court.

309.   As Paul Silva's successor-in-interest, the Estate is entitled to claim Paul Silva's pre-death damages.

310.   In conducting himself as alleged herein, DOES were acting within the course and scope of their employment with Defendants City of San Diego and County of San Diego. Thus, the City and the County are responsible for Doe Defendants' actions.

311.   In doing the foregoing wrongful acts, Defendants acted in reckless and callous disregard for Plaintiffs' constitutional rights. The wrongful acts, and each of them, were willful, oppressive, fraudulent and malicious, thus warranting the imposition of punitive damages against each individual Defendant in an amount adequate to punish the wrongdoers and deter future misconduct.

**FOURTEENTH CAUSE OF ACTION**
**(Violation of the Americans With Disability Act of 1990**
**42 U.S.C. 12101, *et seq*.)**
**[By the Estate of Paul Silva against the City of San Diego and County of San Diego]**

312.   Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

313.   Pursuant to 42 U.S.C. § 12132, "Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

314.   Under Title II of the Americans with Disability Act, public entities are required to make reasonable modifications to avoid discrimination on the basis of disability.  The ADA sets an affirmative requirement to act appropriately with respect to prisoners with mental disabilities.

315.   ADA creates an affirmative duty in some circumstances to provide special, preferred treatment, or "reasonable accommodation."

316.   Facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced.

317.   Discrimination includes a defendant's failure to make reasonable accommodations to the needs of a disabled person based on his mental health. These accommodations include training on how to deal with the mentally ill, specialized training of jail staff, heightened level of medical care, and diligent surveillance.

318.   Defendants failed to make reasonable accommodations to Paul Silva's medical needs based on his mental health.

319.   Defendants denied Paul Silva benefits of the services, programs or activities including a transfer to a mental health facility, which is the services, programs or activities they provide.

320.   The failure to provide critical medical information was a denial of the services program or activity based on his disability.

321.   Defendant San Diego failed to make reasonable accommodations to Paul Silva's medical needs based on his mental health.  Defendants failed to provide any treatment for Paul's schizophrenia.  Defendants ignored Paul Silva's signs of obvious medical distress.

322.   Defendants failed to provide Paul with any access to mental health programs and services and failed to accommodate his mental disabilities.

323.   There was an outright denial of services when Paul was exhibiting obvious symptoms of medical distress.  This demonstrates that Defendants were discriminating against Paul Silva because of his disability.

324.   Defendants were deliberately indifferent to Paul Silva's serious medical condition.  Defendants had actual knowledge of the substantial risk of harm to Paul Silva from his serious diagnosed condition and they responded with deliberate indifference by failing to communicate or document his condition; failing to place him in Medical where he could be watched; and failing to provide him medical care when Paul was in medical distress.

325. The regulations promulgated by the Department of Justice to implement Part A of Title II of the ADA require each government entity to conduct a self-evaluation of its programs and services (or the lack thereof) related to persons with disabilities:

> (a)    A public entity shall, within one year of the effective date of this part [that is, by January 26, 1993], evaluate its current services, policies, and practices, and the effects thereof, that do not or may not meet the requirements of this part and, to the extent modification of any such services, policies, and practices is required, the public entity shall proceed to make the necessary modifications.

> (b)    A public entity shall provide an opportunity to interested persons, including individuals with disabilities or organizations representing individuals with

- 44 -

disabilities, to participate in the self-evaluation process by submitting comments.

326.   Defendants failed to conduct any self-evaluation of procedures and training for its personnel about how to handle encounters with persons who have mental illness or another disability.

327.   Defendants failed to conduct any self-evaluation of procedures and training for its personnel about how to handle communication with jails regarding schizophrenia.

328.   The Estate of Paul Silva is entitled to a declaratory judgment concerning the City of San Diego and the County of San Diego's failure to conduct a self-evaluation plan under the Rehabilitation Act and the Americans with Disabilities Act and injunctive relief, requiring it to modify its programs and services to accommodate persons with disabilities.

329.   Defendants violated Paul Silva's clearly established rights under the ADA with deliberate indifference.

330.   The violation of Paul Silva's rights resulted from a municipal policy or custom adopted or maintained with deliberate indifference.

331.   As a direct and proximate result of the Defendants' conduct as herein described, Paul Silva suffered in the amount to be determined at the time of trial.

332.   Plaintiff is entitled to injunctive and declaratory relief.

## FIFTEENTH CAUSE OF ACTION
### (Violation of the Rehabilitation Act 29 U.S.C. § 794(a))
### [By the Estate of Paul Silva against the City of San Diego and the County of San Diego]

333.   Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

334.   The Rehabilitation Act of 1973 ("Section 504") states in pertinent part, provides that "No otherwise qualified individual with a disability in the

United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a).

335.   Defendants the City of San Diego and the County of San Diego are programs that receive federal financial assistance as defined in 29 U.S.C. § 794(b).

336.   Paul Silva was a "qualified individual with a disability" under the Rehabilitation Act.

337.   Defendants violated the Rehabilitation Act by failing to make reasonable accommodations to the needs of Paul Silva, a disabled person.  It was a reasonable accommodation to transfer a schizophrenic patient to a mental health facility where he could receive necessary services.

338.   Employees of Defendant City of San Diego were deliberately indifferent to Paul Silva's serious medical condition.  They failed to consider obvious symptoms of Paul Silva's mental health condition when they transferred Paul to a jail instead of a hospital.

339.   Defendant City of San Diego failed to communicate critical medical information to the San Diego Central Jail.

340.   Instead of providing Paul Silva with adequate medical services and fair treatment, Defendants the City of San Diego and the County of San Diego refused to provide him with medical and psychiatric care as his condition deteriorated.

341.   Defendant the County of San Diego failed to accommodate Paul Silva with the services and programs available to mental health patients.  There were services readily available to Paul Silva, which was a placement in a mental health hospital or a unit within the Central Jail where mental health care was

available.  Defendant the County of San Diego failed to house Paul Silva in the PSU, where Paul could be monitored and medicated.

342.   Defendants knew of the substantial risk of harm to Paul Silva from his serious, diagnosed condition and they responded with deliberate indifference by failing to communicate or document his condition; failing to place him in Medical where he could be watched; and failing to provide him medical care when Paul was in medical distress.

343.   Defendants violated the Rehabilitation Act by failing to conduct any self-evaluation of procedures and training for its personnel about how to handle communications with jails regarding patients who have mental illness or another disability.

344.   Defendants violated the Rehabilitation Act by failing to conduct any self-evaluation of procedures and training for its personnel about how to handle encounters with persons who have mental illness or another disability.

345.   As a direct and proximate result of the Defendants' conduct as herein described, Paul Silva suffered in the amount to be determined at the time of trial.

346.   Plaintiff is entitled to injunctive and declarative relief.

**WHEREFORE**, Plaintiffs pray as follows:

1. For general and special damages according to proof at the time of trial;

2. For attorneys' fees and costs of suit and interest incurred herein;

3. For punitive damages;

4. Injunctive and declaratory relief; and

5. Any other relief this court deems just and proper.

# DEMAND FOR A JURY TRIAL

Pursuant to Rule 38 of the Federal Rues of Civil Procedure and the Seventh Amendment to the Constitution, Plaintiffs hereby demand a jury trial of this action.

Respectfully Submitted,

**IREDALE AND YOO, APC**

Dated:  October 2, 2018                    s/ *Julia Yoo*

JULIA YOO
Attorney for Plaintiffs
THE ESTATE OF PAUL SILVA by and
through its successor-in-interest, MANUEL
SILVA, and LESLIE ALLEN

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
The Estate of Paul Silva by and through its successors-in-interest Leslie Allen and Manuel Silva, Manual Silva, and Leslie Allen

**(b)** County of Residence of First Listed Plaintiff   San Diego
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Iredale and Yoo, APC, 105 West F Street, 4th Floor
San Diego, CA 92101
(619) 233-1525

## DEFENDANTS
City of San Diego, Shelley Zimmerman, Andrew Murrow, County of San Diego, William Gore, Alfred Joshua, Liberty Healthcare Corporation, Community Research Foundation, Does 1-100

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**'18 CV 2282 MMA KSC**

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government   Plaintiff
- ☐ 2   U.S. Government   Defendant
- ☒ 3   Federal Question   *(U.S. Government Not a Party)*
- ☐ 4   Diversity   *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*     *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983, Monell, 42 U.S.C. § 12101, 29 U.S.C. § 794(a)
Brief description of cause:
False arrest, deliberate indifference to a serious medical need, excessive force, wrongful death

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.    **DEMAND $** 10,000,000.00    CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE   10/2/18     SIGNATURE OF ATTORNEY OF RECORD   *[signature]*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.