EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
GRACE JUN: SBN 287973
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
TEL: (619) 233-1525
FAX: (619) 233-3221
Attorneys for Plaintiffs

James P. Frantz, Esq., SBN 87492
William P. Harris III, Esq., SBN 123575
George T. Stiefel, Esq., SBN 297611
FRANTZ LAW GROUP, APLC
402 West Broadway, Suite 860
San Diego, CA 92101
Tel: (619) 233-5945
FAX: (619) 525-7672

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

THE ESTATE OF PAUL SILVA by and through its successors-in-interest LESLIE ALLEN and MANUEL SILVA, MANUEL SILVA, and LESLIE ALLEN,

Plaintiffs,

v.

CITY OF SAN DIEGO; SHELLEY ZIMMERMAN in her individual capacity; ANDREW MURROW; THOMAS DERISIO; LOUIS MAGGI; COUNTY OF SAN DIEGO; WILLIAM GORE, in his individual capacity; BARBARA LEE, in her individual capacity; ALFRED JOSHUA, in his individual capacity; ANTHONY ADRANEDA; KERI CAVALLO; MARK O'BRIEN; LAURA COYNE; MICHAEL LAWSON; JOHN DOUTHITT; JULIO RODRIGUEZ; CHARLES DELACRUZ; DIEGO LOPEZ; AARON VRABEL; JORGE

CASE NO. 18-cv-02282-L-MSB

## FIRST AMENDED COMPLAINT

(1) **Arrest without Probable Cause (42 U.S.C. §1983)**
(2) **Violation of Due Process (42 U.S.C. §1983)**
(3) **Deliberate Indifference to Serious Medical Needs (42 U.S.C. §1983)**
(4) **Excessive Force and Failure to Intercede (42 U.S.C. §1983)**
(5) **Wrongful Death (42 U.S.C.§1983)**
(6) **Right of Association (42 U.S.C. §1983)**
(7) **Failure to Properly Train (42 U.S.C. §1983)**
(8) **Failure to Properly Supervise and Discipline (42 U.S.C.§1983)**
(9) **Failure to Properly Investigate (42 U.S.C. §1983)**
(10) *Monell* **– Failure to Train (42 U.S.C. §1983)**
(11) *Monell* **– Unconstitutional Policy, Custom, or Practice (42 U.S.C. § 1983)**
(12) **Wrongful Death (CCP §377.60)**
(13) **Negligence**
(14) **Violation of Cal. Civ. Code §51 (Unruh Act)**
(15) **Violation of Cal. Civ. Code §52.1 (Bane Act)**

ENCISO; TANNER SHERMAN; CHRISTOPHER SIMMS; RYAN SEABORN; HARVEY SEELEY; CESAR CEBALLOS; SGT. NAVARRO; TRI-CITY MEDICAL CENTER; COAST HOSPITALIST MEDICAL ASSOCIATES, INC.; COAST CORRECTIONAL MEDICAL GROUP; and DOES 24-100

Defendants.

**(16) Violation of 42 U.S.C. §12101 et seq. (ADA)**
**(17) Violation of 29 U.S.C. §794(a) (Rehabilitation Act)**

**JURY TRIAL DEMANDED**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Table of Contents**

I.  INTRODUCTION ........................................................................................1

II. JURISDICTION AND PARTIES ............................................................6

III.  FACTS.......................................................................................................11

  A. Despite Reports that Paul Silva Suffered from Schizophrenia and Required
     Hospitalization, SDPD Officers Arrest Paul for Being Under the Influence. 11

  B. Although SDPD Officers and Medical Staff at Central Jail Recognized Paul
     Suffered from Schizophrenia, Paul was Given No Treatment. .....................14

  C. Paul Begins to Severely Decompensate as He Is Ignored and Neglected For
     36 Hours in Temporary Holding Cells. .........................................................16

    i. Paul Silva is housed in a cold temporary holding cell with no bed, no
       blanket, and no clean clothes. .....................................................................16

    ii.Deputies ignore Paul as he shows signs of psychiatric distress and
       schizophrenic decompensation. ..................................................................17

  D. After 32 Hours of Confinement in Temporary Holding Cells Without Food,
     Sleep, or Psychiatric Care, Paul Stops Communicating and Acts Bizarre and
     Erratic.............................................................................................................20

    i. Jail deputes escalate the use of force against Paul, who is uncommunicative
       and acting bizarre...........................................................................................20

    ii.Nurse practitioner Keri Cavallo recognizes that Paul Silva may be suffering
       from psychosis but provides no medical aid to Paul Silva. ...........................21

    iii.The Sheriff Department's Tactical Team uses extreme force on Paul Silva
       as he pleads for help.......................................................................................23

IV.  *MONELL* ALLEGATIONS....................................................................27

- i -

A.    The San Diego County Sheriff Department's Pattern and Practice of Killing Inmates by Denying Medical Care to Those Inmates Who Are Known to Suffer from Serious Medical Needs.....................................................27

B.    The Sheriff's Department's Pattern and Practice of Harming Inmates by Failing to Conduct Proper Cell Checks ..........................................32

C.    The Sheriff's Department's Pattern and Practice of Harming Inmates by Failing to Investigate, Supervise, and Discipline Staff for Misconduct.........33

D.    The Sheriff's Department's Pattern and Practice of Harming Individuals by Failing to Investigate, Supervise, and Discipline Sheriff's Deputies for Use of Excessive Force................................................................36

E.    The County's Failure to Adequately Fund CLERB and Services That Monitor and Assist Mentally Ill Inmates. .......................................................40

V.     FIRST CAUSE OF ACTION ..............................................................41

VI.    SECOND CAUSE OF ACTION .........................................................43

VII.   THIRD CAUSE OF ACTION ............................................................44

VIII.  FOURTH CAUSE OF ACTION .........................................................51

IX.    FIFTH CAUSE OF ACTION ..............................................................53

X.     SIXTH CAUSE OF ACTION ..............................................................55

XI.    SEVENTH CAUSE OF ACTION .......................................................56

XII.   EIGHTH CAUSE OF ACTION ..........................................................59

XIII.  NINTH CAUSE OF ACTION ............................................................62

XIV.   TENTH CAUSE OF ACTION ............................................................64

A.    City of San Diego's Failure to Train ............................................64

B.    County of San Diego's Failures to Train........................................66

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

XV.   ELEVENTH CAUSE OF ACTION ....................................................68

XVI.  TWELFTH CAUSE OF ACTION ....................................................73

XVII. THIRTEENTH CAUSE OF ACTION ..........................................74

XVIII.  FOURTEENTH CAUSE OF ACTION ......................................77

XIX. FIFTEENTH CAUSE OF ACTION ...............................................78

XX.   SIXTEENTH CAUSE OF ACTION ...............................................79

XXI. SEVENTEENTH CAUSE OF ACTION .....................................83

COME NOW, the ESTATE OF PAUL SILVA by and through its successors-in-interest LESLIE ALLEN and MANUEL SILVA, MANUEL SILVA, and LESLIE ALLEN, by their attorneys of record, and allege and complain as follows:

## I.    INTRODUCTION

Paul Silva did not need to die. Had *any* of the defendants done their job properly, he would have lived.  Police became involved because his mother sought help to deal with his mental illness.  Instead of helping, the police defendants arrested Paul without probable cause for a crime he did not commit.

On the morning of February 20, 2018, Paul's mother, Leslie Allen, called the San Diego Police Department to request the assistance of PERT (Psychiatric Emergency Response Team).  Ms. Allen requested PERT to assist Paul with a mental health emergency and to invoke Welfare and Institutions Code § 5150.  San Diego police dispatch classified Ms. Allen's request for assistance as a "5150" call. Ms. Allen advised the police of Paul's psychiatric condition.  She explained that Paul was not under the influence of any drug or alcohol.  No PERT officer responded.  Instead, SDPD officers unreasonably concluded that Paul must have used narcotics, despite Ms. Allen's statement that Paul did not use illicit drugs, suffered from schizophrenia, and had not been taking his medication.  Defendant SDPD officers arrested Paul for being under the influence of methamphetamine. They took him to the County Jail, rather than to a designated medical facility as required by the Lanterman-Petris-Short Act.   SDPD officers ignored repeated statements by Ms. Allen that Paul suffered from schizophrenia and was in his current condition because he had not been taking his medication.

During his intake at the Central Jail, Paul was described as being anxious and hyper-verbal.  For the following 36 hours, the jail staff left Paul in temporary holding cells with no shower, no toilet paper, no soap, no clean clothes, and no bed. Jail staff, many of whom were wearing winter jackets, gave Paul no blankets, sheets

- 1

or pillows.  Jail staff left Paul in a cold concrete cell in February weather with metal benches with nowhere to rest.  For the last 29 hours before his death, Paul remained in a release holding cell, designed only to temporarily hold inmates awaiting release from Jail, with constant bright light and noise.  Paul remained in this cell and no one let him out a single time until his death.  The following photos depict the conditions of Paul's cell:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





Paul, who was diabetic, did not appear to eat in the last 24 hours of his life. When Paul arrived at the hospital, he was hypoglycemic with a blood glucose level at 30.  During these 36 hours in the Sheriff's custody, multiple deputies, sergeants and corporals saw Paul living in these conditions.  Paul was continuously pacing back and forth for 36 hours.  Paul was acting erratically, putting items under the cell door and to the side of the door.  No jail staff placed Paul in a housing unit, the sobering unit, or called for medical or psychiatric help.  The cell in which he died is a temporary cell where inmates wait to be called by clerks for an interview and verification of identity before being released from the Jail.  It is not a housing unit. There is no camera inside the Release Holding units. Only the hallway is visible via a camera. The hallway camera showed a small view of Paul's window, through which he can be seen constantly moving and pacing back and forth and appearing to speak to the wall for the duration of his stay.[1] Multiple Jail staff encountered Paul during this time.  No one released him.  No one helped him.  No one called for medical or psychiatric help.  No one allowed Paul to use the telephone.  The emergency button in Paul's cell was broken.

On February 21, 2018 at 7:40 p.m., approximately 33 hours after Paul was booked into the Jail, Corporal Julio Rodriguez, Deputy Seabron and Deputy Suarez visited Paul Silva to complete book and release paperwork at Release Holding 1. Paul was exhibiting symptoms of a psychotic break.  They failed to release Paul or provide him medical care.  They failed to move Paul to a housing unit.  They did nothing for the following three hours.

On February 21, 2018, at 10:55 p.m., approximately 36 hours after Paul was booked in Jail, Rodriguez, Seabron and Suarez returned to "re-evaluate" Paul Silva for release.  They saw Paul acting erratically, running in his cell, throwing himself

---

[1] The photographs provided above, taken after Paul's death, do not depict the vantage point of this hallway camera.  The sheets depicted in the photographs were brought into the cell after Paul Silva's death.

to the ground and yelling incoherently.  He was seen staring out the window with mouth wide open, holding his arms out pointing toward the window and walls, crawling and rolling on the floor.  Deputies pepper sprayed Paul.  Deputies called for a Tactical Team (TT) to forcibly remove Paul from his cell.  Paul remained non-verbal with bizarre behavior for approximately 22 minutes while deputies observed Paul as they waited for the Tactical Team to arrive.  When the Tactical Team arrived, they shot Paul with water balls.  They repeatedly Tased Paul.  Paul was Tased between four to nine times while six other members of the Tactical Team held him down with a body shield and pressed down on his torso.  At least six members were on or around his body with a shield placed on top of his torso, with two officers pushing down on the shield.  One deputy instructed the other members to use "downward pressure with the shield, get your body weight on it."  These deputies heard Paul yell "no, don't do it, sir."  Paul's voice then became faint and unintelligible.  Paul became unresponsive.  Paul was taken to UCSD Hospital unconscious.

When the decompensation, schizophrenia and hypoglycemia caused Paul to lose contact with reality, the supervisors failed to consider his mental illness, ignoring information in the medical record, and eschewing any assessment or advice from a psychiatrist or a doctor, they decided that Paul was in a state of "excited delirium" caused by methamphetamine consumption.  "Excited delirium" carries with it, according to experts, the danger of sudden apnea and death.  Consequently, officials must monitor vital signs closely and constantly.  This was not done.  By shooting water filled "pepper" balls into his diaphragm, defendants insured that their later repeated use of the Taser would have increased effect and caused additional pain and cardiac distress.  Any restraint technique must allow patient monitoring, and must be removed rapidly should apnea or cardiac distress occur.  This was not done.  Excited delirium mimics several medical conditions, including hypoglycemia.  These other causes should be ruled out before force is

- 5

applied.  This was not done.  Any restraint should avoid pressure on the diaphragm, the imposition of excessive weight on the back, or placing the subject in a face down position.  This is necessary to avoid positional asphyxia.  The supervisors and officers here did the exact opposite: throwing Paul face down, placing weight and force to compromise his breathing, and ignoring his cries that he could not breathe.  The chaotic swarming and violent use of force by seven armored, helmeted men involved obstruction of Paul's airway.  When the combined effect of this unnecessary force resulted in Paul's sudden collapse and apnea, the defendants failed to timely begin resuscitation efforts.

Even after all this, Paul Silva wanted to live.  He struggled to survive, remaining in a coma for weeks before the trauma inflicted on his body caused his death.

Paul sustained serious and permanent brain damage, neurological injuries, kidney failure, a collapsed lung, and other life-threatening injuries.  Paul was in a coma for several weeks before he ultimately succumbed.  Paul's lab results were negative for any alcohol, amphetamines, opiates, methadone, barbiturates or cocaine.  The Medical Examiner determined that the cause of death was restraint, which caused Paul's heart to stop.  The Medical Examiner determined that the manner of death was homicide.

## II.   JURISDICTION AND PARTIES

1.     Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. §1331 and 28 U.S.C. § 1343(3) and (4), *et. seq*.

2.     Venue is proper in the Southern District of California because the acts or omissions which form the basis of the Plaintiffs' claims occurred in San Diego, California, within the Southern District.

3.     At all times relevant to this complaint, decedent Paul Silva was an individual residing in San Diego County, California.

4.      Leslie Allen, Decedent's mother, and Manuel Silva, Decedent's father, are the successors-in-interest of the Estate of Paul Silva. This action on behalf of the Estate of Paul Silva is brought through Plaintiffs, the mother and father of Paul Silva, as the successors-in-interest.

5.      Leslie Allen and Manuel Silva have filed declarations with this Court that no proceeding for the administration of the estate is pending and that they are the successors in interest under California law and succeeds to the decedent's interest. There is no other person with a superior right to commence the action.

6.      Manuel Silva and Leslie Allen bring this action in their own right, as well, for the loss of their son, Paul.

7.      Plaintiffs have properly complied with the California Tort Claims Act. Plaintiffs' claims were submitted on April 3, 2018.  The County of San Diego rejected Plaintiffs' claim on May 31, 2018. The City of San Diego rejected Plaintiffs' claim on July 9, 2018.

8.      Defendant City of San Diego is a public entity, duly organized and existing under the laws of the State of California. At all relevant times mentioned herein, the City of San Diego was responsible for the actions and/or inaction, and the policies, procedures and practices/customs of its employees and/or agents.

9.      Defendant Shelley Zimmerman was, at all relevant times, the Chief of the City of San Diego Police Department and its policy maker.  Chief Zimmerman was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all San Diego Police employees and/or agents, and Doe Defendants.

10.      At all times relevant to this complaint, Defendants Thomas Derisio, Andrew Murrow, and Louis ("Lou") Maggi were police officers employed by the City of San Diego and the San Diego Police Department.  Lou Maggi was a sergeant and supervisor.

11.     Defendant County of San Diego is a public entity, duly organized and existing under the laws of the State of California. Under its authority, Defendant County of San Diego operates and manages the San Diego Central Jail, and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures and practices/customs of the Central Jail, and its respective employees and/or agents.

12.     Defendant William Gore was, at all relevant times, the Sheriff of the County of San Diego, the highest position in the San Diego County Sheriff's Department. As Sheriff, Defendant Gore was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all San Diego County Sheriff's Department custodial employees and/or agents, medical staff and Doe Defendants.

13.     At all times relevant to this complaint, Defendant William Gore was a policy-maker for the San Diego Sheriff's Department (hereinafter "Sheriff's") and responsible for promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the Sheriff's Department alleged herein were committed, as well as the supervision and control of officers who are or were employed by the Sheriff's, who are under his command and/or who report to him, including the Defendants to be named.

14.     At all times relevant to this complaint, Defendant Barbara Lee was the Medical Administrator and in charge of the Medical Services Division at the San Diego County Sheriff's Department.  Barbara Lee supervised all departments within the Medical Services Division, including administrative services, the medical records unit, mental health services, nursing services, pharmacy, and all contract staff.  She was responsible for developing, implementing, and monitoring all policies and procedures applicable to the Medical Services Division.  Barbara Lee was the superior of Defendant Alfred Joshua.  All medical staff at the San Diego County Sheriff's Department were under the direction of Barbara Lee.

15.     At all times relevant to this complaint, Defendant Alfred Joshua was the Medical Director for the Sheriff's Department.  He supervised the medical staff and directed and oversaw the development and implementation of quality assurance and utilization review policies and procedures. All medical and psychiatric doctors worked under the direction of Joshua.

16.     Defendants Zimmerman, Joshua, Lee and Gore are sued in their individual capacity for their own personal action or inaction.

17.     At all times relevant to this complaint, Defendant Anthony Adraneda was a registered nurse (RN) employed by the San Diego County Sheriff's Department who worked at the Central Jail and completed a medical intake of Paul Silva.

18.     At all times relevant to this complaint, Defendant Keri Cavallo was a nurse practitioner employed by a private contractor called Coast Correctional Medical Group ("CCMG").  Plaintiffs are informed and believe that CCMG is a subsidiary of a company called Coast Hospitalist Medical Associates, Inc. ("CHMA").  CHMA is a sub-contractor of Tri-City Medical Center.  Tri-City and CHMA had a contract with the San Diego County Sheriff's Department to provide nurse practitioners to work at the County jails.

19.     At all times relevant to this complaint, Mark O'Brien is the President and CEO of CHMA and CCMG who supervised nurse practitioner Keri Cavallo.

20.     At all times relevant to this complaint, Defendant Laura Coyne was a lieutenant with the San Diego County Sheriff's Department and the watch commander at the Central Jail.

21.     At all times relevant to this complaint, Defendant Michael Lawson was a sergeant at the San Diego County Sheriff's Department and a supervisor at the Central Jail.

22.    At all times relevant to this complaint, Defendant John Douthitt was a sergeant at the San Diego County Sheriff's Department and commanded the "Tactical Team" at the Central Jail.

23.    At all times relevant to this complaint, Defendants Harvey Seeley, Sgt. Ceballos, Sgt. Navarro, and Laura Coyne were employees of the San Diego County Sheriff's Department

24.    At all times relevant to this complaint, Defendants Julio Rodriguez, Charles DelaCruz, Diego Lopez, Aaron Vrabel, Jorge Enciso, Tanner Sherman, Christopher Simms, and Ryan Seabron were all San Diego County Sheriff's deputies who worked at the Central Jail and were members of the "Tactical Team" tasked with extracting Paul Silva from his jail cell.

25.    At all times relevant to this complaint, all individual defendants and DOES were San Diego sheriff deputies, medical personnel, contractors, sub-contractors, and/or agents of Defendant County of San Diego, or in a contractual relationship with the County of San Diego.

26.    The video of the hallway outside of Paul Silva's holding cell shows deputies who approach and observe Paul.  Their names and purposes of the visits are not listed in the discovery provided by the County.  Plaintiffs would seek leave to file a second amended complaint when this information becomes available.

27.    San Diego Central Jail is owned and operated by County of San Diego and staffed by County of San Diego Sheriff's deputies.

28.    Plaintiffs are truly ignorant of the true names and capacities of Does 24 through 100, inclusive, and/or is truly ignorant of the facts giving rise to their liability and will amend this complaint once their identities have been ascertained as well as the facts giving rise to their liability.

29.    These defendants were agents, servants and employees of each other of the other named defendants and were acting at all times within the full course and scope of their agency and employment, with the full knowledge and consent,

either expressed or implied, of their principal and/or employer and each of the other named defendants and each of the defendants had approved or ratified the actions of the other defendants thereby making the currently named defendants herein liable for the acts and/or omissions of their agents, servants and/or employees.

## III.  FACTS

**A. Despite Reports that Paul Silva Suffered from Schizophrenia and Required Hospitalization, SDPD Officers Arrest Paul for Being Under the Influence.**

30.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

31.    At the time of his death, Paul Silva was 39 years old.

32.    Paul suffered from schizophrenia.

33.    Paul lived with his father, Manuel Silva.  Each morning, Paul would go to his mother's home to have breakfast and visit with her.

34.    On February 19, 2018, Paul was acting in an irrational manner.  Paul's mother, Leslie Allen, believed that Paul was acting this way because he had not taken his medication.

35.    Leslie Allen called the San Diego Police Department to request the assistance of PERT (Psychiatric Emergency Response Team) for Paul's mental health emergency.  Ms. Allen wished to institute a Welfare and Institution Code §5150 psychiatric hold.  Because February 19th was President's Day, PERT was not available to assist.

36.    PERT provides emergency assessment and referral for individuals with mental illness. The PERT team evaluates the situation, assesses the individual's mental health condition and needs, and, if appropriate, transports individuals to a hospital or other treatment center, or refers him/her to a community-based resource or treatment facility.

- 11

37.     Interacting with the mentally ill is a recurring situation for the San Diego Police Department.  Between February 20, 2015 to February 20, 2018, SDPD dispatch received 31,226 calls classified as "5150."

38.     Ms. Allen had called PERT on previous occasions to assist Paul.  On each of the previous occasions, a PERT officer would speak to Paul calmly, and Paul would comply with all of their requests.  Because PERT members are trained in dealing with mental illness, Ms. Allen decided to wait until they became available the following day.

39.     On Tuesday, February 20, 2018, Ms. Allen again called the San Diego Police Department (SDPD) to request the assistance of PERT for her schizophrenic son.  The dispatch log for Ms. Allen's phone call shows that it was classified as a "5150 Mental Case" and that the "type" of call was "CW – CHECK THE WELFARE."  A "5150" hold allows County Mental Health to detain a person for up to 72 hours due to mental health concerns under California Welfare and Institutions Code § 5150.

40.     During this phone call, Ms. Allen told Police Dispatch that her son had no weapons, was not drunk, and was not under the influence of a controlled substance.  Ms. Allen stated that Paul was schizophrenic, had been taken to the hospital before, and was a danger to himself.  Ms. Allen told Police Dispatch that Paul was cooperative with police because he was scared of officers, and had been cooperative in the past when interacting with the police.

41.     The computer dispatch records state, "RP (reporting person) REQ PERT // SON PAUL SILVA . . . NO WPNS, NO 647F (drunk in public) OR 11550 (under the influence of a drug) // DIAGNOSED SCHIZOPHRENIC, SHOULD BE ON MEDS, BUT RP THINKS HE IS OFF THEM . . ."

42.     As Ms. Allen waited for PERT to respond, Ms. Allen called Police Dispatch again to advise that Paul was schizophrenic and needed to be taken to the hospital soon because he was running in between cars in the middle of the

street and "acting irrational."  Ms. Allen stated again that Paul did not have any weapons, but was off his medication.

43.     Ms. Allen spoke to San Diego Police Dispatch a third time before SDPD officers arrived.  She stated that Paul was having a schizophrenic episode and getting worse.  Ms. Allen said that Paul had not hurt her and that Paul was not violent.  She emphasized that she was fine.  She informed Dispatch that Paul needed to go to the hospital.  Ms. Allen asked the dispatch operator to tell officers to refrain from hurting Paul.

44.     SDPD officers eventually responded to the street on which Leslie Allen lives.  No PERT personnel responded.  Ms. Allen spoke to Defendant SDPD officer Thomas Derisio.  She told him that Paul suffered from schizophrenia, was not taking his medication, and needed to be hospitalized.  She requested officers take Paul to the hospital for treatment.  Ms. Allen informed Defendant Derisio that Paul was not under the influence of drugs, but was suffering from a schizophrenic episode.

45.     Despite Ms. Allen's statements that Paul did not use illicit drugs and required hospitalization to treat his schizophrenia, Defendants Derisio, Murrow, and Maggi decided that Paul must have used narcotics.  Murrow administered a field sobriety test where he asked Paul to count to 30.  As he moved an object from one side to the other side, Murrow asked Paul to follow an object with his eyes without moving his head.  Paul failed the field sobriety test.  As the sergeant and supervisor, Maggi made the decision to arrest Paul for being under the influence of a controlled substance.

46.     Defendants Derisio, Maggi, and Murrow arrested Paul for being under the influence of a controlled substance despite repeated denials by Ms. Allen that Paul had taken any drugs.  Although Ms. Allen had asked Derisio to take Paul to a hospital for mental health treatment, Defendants decided instead to arrest Paul for being under the influence of methamphetamine.

- 13

47.     Derisio told Ms. Allen that Paul was being arrested for being under the influence of a controlled substance.  Ms. Allen disagreed that Paul was under the influence of drugs and reiterated that Paul needed to be hospitalized due to his schizophrenia.

48.     There was no probable cause to believe that Paul had committed a crime.  Paul was symptomatic of being schizophrenic.  Ignoring all evidence of the need to treat Paul's mental condition, and rejecting Ms. Allen's request that Paul be hospitalized for mental health treatment, Defendants Derisio, Maggi, and Murrow placed Paul under arrest for a crime he did not commit.

49.     Defendant Murrow transported Paul to SDPD headquarters.  There he obtained a urine sample.  A laboratory test of Paul's urine later showed that there was no evidence Paul had consumed methamphetamine, cocaine, or any stimulant drug.  Murrow then transported Paul to Central Jail to be booked.

**B. Although SDPD Officers and Medical Staff at Central Jail Recognized Paul Suffered from Schizophrenia, Paul was Given No Treatment.**

50.     At approximately 11:21AM on February 20, 2018, registered nurse Anthony Adraneda conducted an intake interview of Paul at the Central Jail.

51.     Paul informed Adraneda that Paul suffered from diabetes and schizophrenia.  Adraneda noted that Paul was anxious and hyperverbal.  Paul told Adraneda that he had been hospitalized before in a psychiatric hospital.

52.     Adraneda knew that Paul had been prescribed psychiatric medication, and that Paul had not been taking it.  Adraneda reviewed Paul's prior medical records in the Jail's information management system (JIMS).  Adraneda observed that Paul's medical history in JIMS showed Paul suffered from schizophrenia.  JIMS records also reflected that Paul had previously self-reported prior psychiatric hospitalizations.  Adraneda told Paul that he would refer Paul to be seen by a psychiatric doctor, even though Paul was a "book and release" inmate who would only be staying at the jail for 8 hours.

- 14

53.     Despite his statement to Paul, Adraneda failed to refer Paul to see a psychiatrist or mental health specialist for a psychiatric evaluation.  He failed to place any order for Paul to be seen by a medical doctor for his diabetes.

54.     Paul was given no medication for schizophrenia.

55.     During the intake process, Adraneda asked Murrow four questions about Paul Silva:

> a)      Did you (Murrow) witness anything to believe the arrestee (Paul) may be at risk for a medical condition, intellectual disability, or suicide? *Murrow answered "no."*
>
> b)      By your observation, does the arrestee appear to be under the influence of drugs of alcohol? *Murrow answered "yes" that Paul was under the influence.*
>
> c)      Was the arrestee combative at the time of the arrest? *Murrow answered "no."*
>
> d)      Is there additional information that you can provide to us to better care for this arrestee and to insure his health and safety? *Murrow answered "no."*

56.      Because Paul Silva was considered a "book and release" inmate, he was not dressed in jail clothing, but remained in the clothes he wore at the time he was booked into custody.  Paul was to be released from detention when he was deemed sober and not under the influence of a controlled substance.

57.     Instead of being in jail for only 8 hours, Paul Silva was in Central Jail for the next 36 hours.

- 15

**C. Paul Begins to Severely Decompensate as He Is Ignored and Neglected For 36 Hours in Temporary Holding Cells.**

   i. <u>Paul Silva is housed in a cold temporary holding cell with no bed, no blanket, and no clean clothes.</u>

58. A person who is arrested for being under the influence of a controlled substance and is held for "book and release" should be housed in a "sobering cell" where they can properly be monitored for physical and mental problems.

59. During the 36 hours in which Paul was at Central Jail, deputies moved him from temporary holding cell to temporary holding cell. He was given no medical or psychiatric attention during that time. Paul was not placed in a sobering cell to be monitored. He was not placed in a medical observation unit or a psychiatric unit.

60. An intake cell is where inmates are initially held before speaking to a booking clerk. Dressout cell is where inmates wait to be strip searched and dressed out of street clothes for a jail outfit. Release holding cells are where inmates are temporarily placed before being released to the community.

61. For those 36 hours between February 20 and 21, the jail staff left Paul in temporary holding cells with no shower, no toilet paper, no soap, no toothbrush, no clean clothes, and no bed. Jail staff, many of whom were wearing winter jackets, gave Paul no blankets. Paul was wearing the same dirty t-shirt and pants the entire 36 hours.

62. Jail staff left Paul in a cold concrete cell in February weather with metal benches with nowhere to rest. Paul was given no pillow or anything else to lay his head on.

63. For the last 29 hours before his death, Paul remained in a release holding cell, designed only to temporarily hold inmates awaiting release from Jail, with constant bright light and noise.

- 16

64.     Paul was never taken to a day area.  He had no access to a television, a radio or a book.

65.     Paul was never given an opportunity to use the telephone to speak to anyone.

66.     Paul's cell was immediately across the hallway from what appears to an entrance to the building or the elevator.  There was constant movement of deputies, inmates and workers walking past Paul's cell, day and night, at times moving equipment down the hallway.

     ii.  <u>Deputies ignore Paul as he shows signs of psychiatric distress and schizophrenic decompensation.</u>

67.     Paul, who was diabetic, did not appear to eat in the last 24 hours of his life.  When Paul arrived at the hospital, he was hypoglycemic with his blood sugar level at 30.

68.     During these 36 hours, multiple deputies, sergeants and corporals saw Paul living in these filthy and unsafe conditions.  Paul was continuously pacing back and forth for 36 hours.

69.     These defendants were aware that Paul was a "book and release" inmate who would be released within 8 hours, which is sufficient time for someone to sober up.  Each of these defendants saw that after 8 hours, Paul did not sober up and was in fact becoming increasingly agitated and psychotic.

70.     Paul was putting items under the cell door and to the side of the door, acting erratically.  No jail staff placed Paul in a housing unit, the sobering unit, or called for medical or psychiatric help.

71.     Paul was booked into the Central Jail at approximately 11:21 a.m. At 11:55 a.m. on February 20, 2018, Paul was placed in Intake Holding Cell 1. He was then moved to livescan area for fingerprinting. At 1:06 p.m.  at 1:16 p.m., he was taken to Intake Holding Cell 6.  At 2:32 p.m. He was taken to the second floor to be placed in Dressout Holding Cell 1.

72.     While Paul is in Dressout Holding Cell 1, his cell mate is seen on camera continuously taking off his pants, standing in front of Paul and making aggressive movements toward Paul.  At one point, the cell mate took food or some other item and smeared it on the camera to block the video view.  During this entire time, no deputy came to investigate what was taking place in this cell.

73.     At 6:05 p.m., Deputy Selensky moved Paul out of Dressout Holding Cell 1 and placed him in Dressout Holding Cell 2.  Between approximately 6:44 p.m. to 7:46 p.m. on February 20, 2018, Paul was seen in the video pacing, throwing shoes all around the cell, talking to the wall, and talking to a non-existent person.  No deputy watching Paul on the video monitor in the TV/control room took any action.

74.     At 7:46 p.m. on February 20, 2018, approximately 9 hours after Paul was booked into the Jail, Defendant Corporal Harvey Seeley took Paul out of Dressout Holding Cell 2 and placed him in Release Holding 1.  By then, Paul was already showing symptoms of decompensation.

75.     Release Holding is a temporary cell where inmates wait to be called by clerks for an interview and verification of identity before being released from the Jail.  It is not a housing unit. There is no camera inside the Release Holding units. Only the hallway is visible via a camera. The hallway camera showed a small view of Paul's window, through which he can be seen constantly moving and pacing back and forth and appearing to speak to the wall for the duration of his stay.

76.     For the next 6 hours, Paul was inexplicably ignored.  He was not released.  He was not taken out of his cell for his interview.

77.     At approximately 1:35 a.m., the following day, Defendant Seeley conducted a cell check.  Paul had been in that particular cell for approximately six hours and he had been in the Jail for a total of approximately 15 hours.  Seeley

- 18

did not break his stride when walking past Paul's cell when he glanced into Paul's cell. Seely knew that he had moved Paul into that Release Cell 6 hours before.

78.     By February 21, at 2:28 a.m., Lt. Laura Coyne was on the floor and had an opportunity to review the logs. At this point Paul had been in temporary holding cells for 16 hours. Defendant Coyne took no action.

79.     At 8:07 a.m. on February 21, 2018, Sgt. Ceballos and Sgt. Navarro went to Paul's cell carrying a clip board and some paperwork. They looked into the cell for about a minute. This is around the time Paul was placing items under the door and moving them around. Paul had been in temporary holding cells at this point for approximately 22 hours without being able to sleep. Ceballos and Navarro did nothing.

80.     At approximately 10:57 a.m. on February 21, 2018, deputies Gonzalez and Costelow conducted a hard count. A hard count requires that every single inmate in the facility be counted and that deputies use a scanner to check the band on each inmate. These deputies never went inside Paul's cell to check on his welfare and to scan his wrist band.

81.     At approximately 2:16 p.m. on February 21, 2018, when Paul had been imprisoned for over 28 hours, Sgt. Ceballos was the supervisor on the floor. Ceballos had personally observed Paul 6 hours earlier. Ceballos knew that Paul had been denied access to toiletries and proper housing for over 28 hours.

82.     No medical providers were called to speak to Paul. No one gave him medication for his schizophrenia or diabetes.

83.     Paul Silva was pacing and moving in his cell the entire time.

- 19

**D. After 32 Hours of Confinement in Temporary Holding Cells Without Food, Sleep, or Psychiatric Care, Paul Stops Communicating and Acts Bizarre and Erratic.**

       i.  <u>Jail deputes escalate the use of force against Paul, who is uncommunicative and acting bizarre.</u>

84.    On February 21, 2018, at 7:41 p.m., Deputy Julio Rodriguez observed Paul "looking around the cell" and appearing "paranoid." At 7:51 p.m., Deputies Rodriguez, Seabron, and Suarez entered Paul's cell. Paul complied with Deputy Rodriguez's instructions, but talked at a rapid pace. Deputy Rodriguez noted that Paul looked around the walls as if he were still paranoid. Paul was agitated and spoke incoherently. When Paul saw Deputy Rodriguez reach for his handcuffs, Paul ran towards the back of cell. The deputies left Paul in his cell to "complete the detox process."

85.    By 10:55 p.m. that same night, deputies observed Paul continuing to behave erratically. Paul ran from wall to wall in his cell and placed his body against the walls and on the floor. Paul took off his shoes as he yelled incoherently. Sergeant Lawson instructed Paul to come to the door of the cell to be placed in handcuffs. Paul did not respond.

86.    At approximately 10:59 p.m., Sergeant Lawson instructed Deputy Seabron to use oleoresin capsicum (OC) spray on Paul to force him to comply. The OC spray had no effect on Paul. He continued to run back and force in his cell.

87.    Sergeants Lawson and Douthitt conferred with Lieutenant Coyne, the watch commander, who arrived to observe Paul. Lawson and Douthitt proposed assembling the Tactical Team to gain control of Paul and extract him from his jail cell because they concluded that Paul was suffering from excited delirium. Lawson and Douthitt did not request a medical or psychiatric evaluation of Paul Silva before determining he suffered from excited delirium and required extraction by a Tactical Team. Neither sergeant reviewed Paul's

medical history in JIMS, which documented Paul's schizophrenia and mental health history. Lieutenant Coyne agreed to this plan. Coyne did not review Paul's medical history and did not request a medical or psychiatric evaluation before agreeing to the plan.

88. Deputy Spencer Schafer began recording video of Paul Silva at 11:10 p.m. on February 21, 2018. The video shows Paul staring at the deputy holding the camera with his mouth wide open. Paul then ducks down. Paul walks around his cell in bewilderment with his mouth open wide in the shape of an "O." He sits on the floor of his cell and makes shapes in the air with his fingers. Paul spins on the floor while holding his fingers in the air. He stands up, backs away from the door where deputies stand, and throws himself on the ground. Paul's head darts back and forth as he looks at the deputies; his mouth remains open in a wide "O" formation; his eyes are bulging and wide open.

ii. <u>Nurse practitioner Keri Cavallo recognizes that Paul Silva may be suffering from psychosis but provides no medical aid to Paul Silva.</u>

89. As the Tactical Team assembled, nurse practitioner Keri Cavallo arrived. Paul was in the midst of schizophrenic decompensation. This was caused by the lack of any psychiatric assistance, the lack of medication, and the onset of hypoglycemia (excessively low blood sugar). The hypoglycemia was caused by the lack of sufficient food to maintain his glucose at a proper level. The effect of hypoglycemia, coupled with decompensation, caused Paul to sweat profusely, to become anxious and confused, to misperceive, and to behave in an irrational manner. The video shows that as Cavallo approaches the door, Paul backs away towards the back of the cell with his hands up as he spins and sways. Paul repeatedly throws himself on the ground as Cavallo asks him, "Mr. Silva, do you know where you are?" Paul does not respond to Cavallo's questions, but stares at the deputy recording him with his mouth and eyes wide open; he ducks to avoid the camera and crouches on the ground as if to hide. He then returns to

the window to stare at the camera with his mouth open in an "O" formation and his eyes staring vacantly at the deputy.  When a deputy approaches the door, Paul ducks to the ground.  A deputy is heard on the video telling Cavallo that in the last few hours, Paul has been acting bizarre and will make a "monkey face" but had not said a word.

90.    Cavallo later described Paul's behavior as "spooked" and "almost animalistic."  She stated that Paul would look "spooked" and quickly back away and would crouch down and jump up.  When Paul made eye contact, he looked scared and would quickly back away.

91.    Cavallo erroneously stated that Paul suffered from excited delirium from drug use.  She was concerned that Paul could be suffering from something else, such as psychosis.  But Cavallo did not request a psychiatrist to come evaluate Paul.  Cavallo did not ask a medical doctor to assess Paul.  Cavallo did not call any psychiatric expert for guidance.  Cavallo did not check Paul's medical history in JIMS.  Cavallo did not ask for a psychiatric evaluation so Paul could be admitted to the Psychiatric Security Unit (PSU), the Central Jail's internal hospital for involuntary medication.  Cavallo told Lt. Coyne that Paul needed to be sent to the hospital based on her claim that Paul was suffering from "excited delirium."

92.    Had Cavallo checked Paul's medical history in the Jail's JIMS system, she would have seen records from March 16, 2016, which documented that Paul suffered from schizophrenia and had attempted suicide before.  An encounter note by a nurse on that date stated that "I/P (inmate/patient) denies any medical problems, report that he was dx (diagnosed) with schizophrenia . . . he's responding to internal stimuli, has poor eye-contatc (sic), affect is blunted. . . . alt. in thought process, sched. for psych sc for f/u[.]"

93.    The Sheriff's Department has a contract with a medical group, Liberty Healthcare, which employs psychiatrists who work onsite at the Central

- 22

Jail until approximately 10:00 PM each night.  Liberty Healthcare also has psychiatrists on-call after 10:00 PM who are available in the case of a psychiatric emergency.

94.    At no point did Nurse Practitioner Cavallo or any other Sheriff's official seek an emergency psychiatric or medical assessment.  Nobody called Liberty Healthcare psychiatrists to request emergency assistance.

95.    As the Tactical Team got ready, Lt. Coyne, the Watch Commander, returned to her office to review Paul's history in the jail's JIMS system to discern the reason for Paul's bizarre behavior.  Despite having access to Paul's medical history, Coyne did not ascertain that Paul had a history of mental illness and suffered from schizophrenia.

iii.    The Sheriff Department's Tactical Team uses extreme force on Paul Silva as he pleads for help.

96.    Seven members of the Tactical Team assembled in front of Paul's jail cell.  The Tactical Team members wore all black, including black jumpsuits, elbow pads, knee pads, protective vests, and helmets.  The Tactical Team was under the command of Sergeant John Douthitt and consisted of Deputy Charles DelaCruz, Deputy Diego Lopez, Deputy Aaron Vrabel, Deputy Jorge Enciso, Deputy Tanner Sherman, Corporal Christopher Simms, and Deputy Ryan Seabron.

97.    Sergeant Douthitt told the Tactical Team that Paul was exhibiting signs of "excited delirium."  Corporal Simms reported that Paul had been pepper sprayed, but the OC spray had not worked.  Simms informed officers they would use "less lethal" on Silva to gain his compliance.

98.    Lt. Coyne went to Paul's jail cell door and ordered him to "come to the door and be cuffed up or force will be used."  Paul did not respond.

99.    Deputy Vrabel opened the food flap on the jail cell door and shot "water rounds" at Paul.

- 23

100.    Corporal Simms then removed his Taser and pointed it at Paul.  In the video, Paul is seen running to the back of the cell to hide behind a short barrier.  Paul then gets up to run to the other side of the jail cell.  Simms fires Taser at Paul, causing Paul to fall to the ground as he cries out in pain.  An analysis of the Taser records by Taser International (now "Axon Enterprise") showed that Simms activated the trigger switch 4 times and the arc switch 6 times during this incident.  Each of the 4 trigger activations lasted 5 seconds while 5 of the 6 arc switch activations lasted a fraction of a second.

101.    As Paul was being Tased, the Tactical Team entered his cell.  Deputy Enciso, using a Nova body shield that is capable of producing an electrical shock, pinned Paul against the wall.  The deputies then took Paul to the ground where he lay face up.  As Paul is on the ground, Sgt. Douthitt can be heard on the video calling out, "Enciso get in there.  Enciso get in there.  Downward pressure with that shield, put your body weight on it."  Deputy Enciso placed his shield on top of Paul's upper body and then climbed on top of the shield.

102.    On the video, Paul is heard saying, "I didn't do anything, sir, I didn't do anything."  Douthitt is heard commanding the Tactical Team members to get Paul's "feet under control."

103.    Deputy DelaCruz grabbed Paul's arms and legs and wrestled Paul's arms behind his back.  Deputy Seabron grabbed Paul's legs to pin them down.  DelaCruz delivered a "hammer strike" to Paul's face.  DelaCruz then employed the "hammer strike" to Paul's right shoulder.  Simms grabbed Paul's arm and placed a "wrist flex" on Paul's arm to gain compliance.

104.    Deputy Sherman flipped Paul onto his stomach and grabbed Paul's hand.  Deputy Enciso held the shield against Paul's back.  Deputy Sherman used his right hand to push down and forcefully pin Paul's head to the ground.  Deputy Vrabel forcefully pushed down on Paul's head to keep his head pinned to the ground.  Vrabel used the "mandibular angle" technique on Paul's head pressing

- 24

underneath the jaw to cause great pain.  Deputy Sherman placed his knee on Paul's elbow.

105.   Video shows all 7 members of the Tactical Team on top of Paul's midsection, arms, and legs.  Paul is heard pleading, "Stop!  Stop!  Stop sir, please stop.  Don't do it, don't do it, sir."  Paul begins to talk about his brother and his mother as officers remain piled on top of him, pressing down on him.  Paul pleads, "don't hurt me."  Douthitt is heard saying, "Enciso, you need to hit him with the shield, activate the shield."  Paul continues to yell out, "stop!  Please sir, stop!"  Paul is heard crying and saying repeatedly, "Can't breathe.  Can't breathe."

106.   Deputies used multiple handcuffs to cuff Paul's hands behind his back while the shield was on his back.  They secured leg chains on his legs.  Paul was face-down on the ground.  The video shows that it took approximately seven minutes, after the Tactical Team entered Paul's cell, to place handcuffs and leg chains on Paul.  During those seven minutes, defendants never stopped to check on Paul's ability to breathe despite Paul's repeated plea that he could not breathe.

107.   By the time Paul is handcuffed, he is not moving on the video.  A voice is heard saying "we got him under control right now."  Approximately one minute later, deputies finally seem to realize that Paul is nonresponsive as they attempt to roll him over to his side.  A large pool of bright red blood is seen on the ground after the deputies get off Paul and place him in the "recovery position."  A deputy arrives to cover the blood with towels.  Paul's head is bloodied.  Another minute passes.  Firefighters are on scene.  A firefighter is seen checking Paul's neck area for a pulse.  One of the firefighters states the cuffs need to be taken off of Paul.  It takes approximately two minutes for the deputies to remove the handcuffs and leg chains from Paul and place a waist chain on him.  A firefighter begins chest compressions.  Paramedics arrive and begin assisting with CPR efforts.

108.   At approximately 11:58 p.m. on February 21, 2018, paramedics were able to find a pulse.  They placed Paul into a gurney.  As paramedics transported Paul to the ambulance, Paul lost his pulse.  Paramedics began CPR again.  Paul remained pulseless and apneic as paramedics loaded him into the ambulance.

109.   Medical tests would later show Paul had a collapsed lung. According to the Medical Examiner, there were visible injuries of the head including blood on forehead, eyebrows and nose; laceration with abrasion on the right eyebrow; contusion to the right eye; upper lip edema; puncture wounds to the torso possibly from the Taser; abrasions to the wrist, knuckles and forearm; a puncture wound to the inner thigh, and contusions to the left knee and left thigh.

110.   Paul sustained serious and permanent brain damage, neurological injuries, kidney failure and other life-threatening injuries.

111.   Paul was hospitalized at UCSD Medical Center.  Hospital lab results were negative for any alcohol, amphetamines, opiates, methadone, barbiturates or cocaine.  Tests at UCSD showed Paul suffered from hypoglycemia as his blood sugar was 30, a dangerously low level.  Hospital records indicate that Paul had rhabdomyolysis.

112.   Paul was in a coma for several weeks before he ultimately succumbed to his injuries.

113.   The Medical Examiner found the cause of death to be lack of oxygen to the brain resulting from cardiopulmonary arrest during restraint.  The restraint was imposed due to bizarre behavior resulting from schizophrenia and diabetes mellitus with hypoglycemia.  The Medical Examiner determined that the manner of death was homicide.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# IV. *MONELL* ALLEGATIONS

**A. The San Diego County Sheriff Department's Pattern and Practice of Killing Inmates by Denying Medical Care to Those Inmates Who Are Known to Suffer from Serious Medical Needs.**

114.    Despite the fact that Paul was visibly symptomatic of schizophrenia, no medical staff tended to Paul.

115.    During the 36 hours Paul was in jail, he received no medication for his schizophrenia or any mental health treatment.

116.    Despite the fact that the deputies determined that Paul needed medical attention, no medical care provider was consulted or called for diagnosis or treatment.

117.    All medical staff worked under the direction and supervision of Defendants Lee and Joshua, who set the policies and procedures with respect to medical services.

118.    There had been an antecedent systemic failure to adhere to the written policies and procedures with respect to providing adequate health care to inmates in the San Diego County jails.

119.    Deaths of sixty (60) inmates in the San Diego County jails in a span of five (5) years prompted a series of articles by Citybeat, a local newspaper. Citybeat reported that San Diego County had the highest mortality rate among California's largest jail systems based on data from 2007 to 2012.

120.    Citybeat reported that between 2007 and 2012, San Diego County averaged ten (10) deaths a year, with a high of twelve (12) in 2009 and a low of eight (8) in both 2007 and 2012.

121.    Citybeat reported in a follow-up article that twelve (12) people died in 2013.  In 2014, sixteen (16) county-jail inmates died.

122.    There had been countless complaints made by inmates, family members, community members and the Jail's own staff regarding injuries caused

by medical neglect and staff misconduct.  San Diego County officials took no action to prevent further Constitutional violations.

123.    The County of San Diego, Gore, Joshua, and Lee were aware that a high number of inmate deaths were caused by failures to communicate critical medical information to coordinate care for inmate-patients with serious medical and psychiatric needs:

a. In 2008, after the death of an inmate named Adrian Correa, CLERB expressed concern about a breakdown in communication during shift changes: "A checklist that includes the status of at-risk inmates and the Department's response plan would enhance continuity of care, monitoring and housing."

b. On June 25, 2011, Daniel Sisson died from an acute asthma attack made worse by drug withdrawal. The San Diego County Medical Examiner estimated in an autopsy report that Sisson had been dead for several hours when a fellow inmate found him.  The jail staff had failed to monitor him despite his exhibiting signs of withdrawal and his vomiting in his cell.  There had been a failure to communicate Mr. Sisson's serious medical condition among staff.

c. In September 2012, Bernard Victorianne suffered for five days from drug overdose because the staff ignored his medical information that he had ingested a baggie of methamphetamine, and that he was to return to the hospital immediately if he became symptomatic of overdose.  Staff had failed to input critical medical information in the JIMS system.  Staff had failed to communicate with each other Mr. Victorianne's medical alerts which required that the staff report symptoms of overdose and take him immediately to the hospital. As a result of the failure to

- 28 -

communicate, Bernard Victorianne was placed in segregation instead of Medical, where he was found dead face-down, naked in his cell.

d.  In 2014, Ronnie Sandoval died in the Jail from drug overdose. Mr. Sandoval showed obvious symptoms of overdose, sweating profusely and disoriented. The corrections staff told the nursing staff that Mr. Sandoval needed medical treatment, two of them stating that Mr. Sandoval was withdrawing from drugs. The nursing staff did not summon help or treat him for overdose. The nurses failed to pass down information regarding Mr. Sandoval's condition during the shift change. Mr. Sandoval died from drug intoxication.

e.  In 2016, Heron Moriarty was arrested after having a psychotic break. Despite multiple warnings by family members, including 28 telephone calls by his wife, the Jail staff failed to provide him psychiatric care. On the sixth day, Mr. Moriarty was found dead in his cell, having hung himself.

f.  In 2014, Kristopher NeSmith committed suicide after the jail staff failed to treat Mr. NeSmith. Jail staff knew Mr. NeSmith suffered from mental illness and had a history of suicide attempts. When Mr. NeSmith was last seen alive about 10:00 p.m., a guard noticed a bedsheet fashioned into a rope as he was making a routine safety throughout the detention center. The deputy, without breaking stride, said something to the effect of, "Nesmith, what are you trying to do? Kill yourself? Take that thing down." This deputy failed to communication this information to other jail staff. Mr. NeSmith was found dead, having hung himself.

- 29

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

g. In 2014, Jerry Cochran, a known diabetic, was arrested after mumbling gibberish on the street.  At the time of his arrest, Mr. Cochran was wearing his medical ID bracelet with an alert for diabetes, but his condition was not communicated.  At the Jail, he fell face-forward off a bench.  Mr. Cochran died from diabetic ketoacidosis, a condition caused by an insulin shortage that is rarely fatal if treated properly.

h. In 2015, Ruben Nunez, a schizophrenic mental health patient transferred from Patton State Hospital, died when the medical staff failed to treat a potentially lethal condition for water intoxication and the jail staff left Mr. Nunez in the cell in his own vomit and urine.  Patton State Hospital records notified County jail staff that Ruben suffered from hyponatremia, a condition caused by overconsumption of water.  The psychiatrists treating Mr. Nunez failed to read his medical records and failed to input critical medical information in JIMS regarding Mr. Nunez's known psychiatric condition.  Despite his diagnosis of hyponatremia, a nurse noted in Mr. Nunez's chart: "Informed I/P that he will seen [sic] by psych for f/u. Exercise as tolerated and ***drink plenty of water***. I/P verbalizes understanding and agrees to plan." (Emphasis added).  This nurse failed to document Mr. Nunez's medical records, leaving nearly the entire seven pages of an intake form blank.

i. In Mr. Nunez's case, one of his treating psychiatrists at the Central Jail testified that she did not know how to use JIMS to add "alerts", meaning the most critical information regarding a patient's care. She testified that she was never trained.  The medical and nursing staff had failed to input critical information into the JIMS system,

- 30

meaning Mr. Nunez's serious psychiatric needs were not properly communicated to Jail staff.

j.   Mr. Nunez died as a result of the Jail staff failing to communicate Mr. Nunez's condition and coordinate care.  According to one of the nursing staff, the intake nurses do not have sufficient time to read medical records or to conduct a thorough intake because of the number of inmates being booked at once.  The intake nurses only have sufficient time to look to whether the Jail will book he person into jail.

124.   In 2018, Disability Rights California (DRC), the largest disability rights group in the United States, issued the findings from a study of San Diego County Jails, which reviewed mental health treatment from December 2014 to 2016.

125.   According to DRC, its experts identified several deficiencies in San Diego County's clinical referral and evaluation practices.  These experts also found that San Diego County Jail inmates do not receive an adequate individualized mental health treatment plan, a violation of state law.

126.   DRC experts found that San Diego County has lacked an effective system for custodial staff, mental health staff, and other health care staff to **communicate about an inmate's decompensating condition**, potential risk of suicide or self-harm, and mental health treatment needs.

127.   DRC reported:

> Our investigation found that there are a large number of San Diego County Jail inmates with significant mental health needs. With few exceptions, enhanced mental health treatment programming is provided only to those with critically acute needs. ***In many cases, inmates remain in harsh, non-therapeutic settings without adequate treatment until their condition deteriorates. Only when they reach the point of engaging in acts of***

*self-harm or having an acute breakdown do they receive an enhanced level of care.* Such a system is cruel and counterproductive, and does not meet constitutional and legal requirements.

128.    DRC experts found problematic the number of inmates in mental health crisis who are not referred for placement in the PSU (Psychiatric Security Unit), where the patient can be monitored.

129.    DRC reported that in its investigation, a major theme that emerged was that inmates do not have timely access to adequate mental health care, including counseling, psychiatric medications, and other treatment programming.

130.    DRC found that access to mental health treatment remains extremely limited outside the inpatient PSUs.

131.    The DRC experts found a significant number of failures on the part of San Diego County Jails from intake of inmates, housing placements, communication between custodial staff and mental health staff, monitoring of the mentally ill, to coordination of care.  The experts found that San Diego County has no functioning quality improvement program to improve health care by identifying problems, and by implementing and monitoring corrective actions.

**B. The Sheriff's Department's Pattern and Practice of Harming Inmates by Failing to Conduct Proper Cell Checks**

132.    The County of San Diego and Gore were made aware that deputies were not conduct proper cell checks in the following cases involving inmate deaths:

a.  In the case of Bernard Victorianne, none of the deputies conducted proper security checks, soft counts, or hard counts, which requires the deputies to scan the wrist band of each inmate. One deputy was told by an inmate that Mr. Victorianne was not breathing.  This deputy kicked Mr. Victorianne; stated that Mr. Victorianne "twitched"; and left him to die in his cell. These deputies failed to conduct proper checks then lied about it to investigators.

- 32 -

b. In Mr. Nunez's case, a deputy saw Mr. Nunez in his cell sitting in his own vomit and urine. A nurse told this deputy to take Mr. Nunez to Medical. Despite seeing Mr. Nunez twice in this condition, this deputy failed to summon help or take Mr. Nunez to Medical as directed. Mr. Nunez died from overconsumption of water.

c. In Mr. Sisson's case, jail deputies failed to check on Mr. Sisson for hours. Mr. Sisson later died during a drug withdrawal.

d. In Mr. NeSmith's case, a jail deputy saw Mr. NeSmith attempting suicide, but took no action to stop Mr. NeSmith or to call for psychiatric intervention.

e. In February of 2016, Richard Boulanger hung himself in his cell. His cellmate pressed the emergency call button but no deputy came to the cell for approximately 20 minutes. A subsequent investigation revealed that one of the deputies did not break stride or look into Mr. Boulanger's cell during a cell check. The investigation revealed that during cell checks, the deputy peered into each cell for approximately one second in violation of policy.

**C. The Sheriff's Department's Pattern and Practice of Harming Inmates by Failing to Investigate, Supervise, and Discipline Staff for Misconduct.**

133. There had been a systemic failure in San Diego County to investigate incidents of medical neglect, staff misconduct, excessive force, and deaths in the Jail.

134. At the time of Paul Silva's death, Defendants County of San Diego, Lee, and Joshua were aware of a long-standing custom and practice of improper and inadequate investigations of misconduct by medical staff at the County jails; cover-ups of such misconduct; and the failure to discipline and train medical staff.

- 33 -

135.     Defendant Joshua was well aware of these problems when he became the medical director.  Joshua told reporters that staff would be trained to be more attentive to signs that might indicate mental distress, like the condition of an inmate's cell or whether someone was refusing meals.

136.     Defendant Lee was well aware of these problems as evidenced by her emails to a private contractor complaining about repeated "adverse events" involving mental health patients at the Jails.

137.     The County and its officials were well aware of the problems of the Jail staff failing to use JIMS.  The Grand Jury took issue with the Jail Information Management System (JIMS), a database used for maintaining inmate records. According to jail staff who commented to jurors for the report, the staff have trouble sorting and retrieving information and the eleven-year old software was in need of an update.  See https://www.nbcsandiego.com/investigations/Grand-Jury-Report-Criticizes-San-Diego-County-Jail-Facilities-381590761.html

138.     Tommy Tucker, who suffered from a psychiatric condition, died in 2009 at the hands of jail deputies due to oxygen deprivation when guards attempted to restrain him by piling on top of his back.  Deputies who were involved in the use of force sat together in the supervisor's office at the Central Jail and discussed what happened before writing a report.   The deputy statements were inconsistent with the video of the event and the physical evidence.  Upon information and belief, none of the deputies were reprimanded.  The Citizens' Law Enforcement Review Board ("CLERB") did not investigate Tommy Tucker's death.

139.     In Mr. Victorianne's case, a supervisor prevented Homicide detectives from interviewing or obtaining statements from the deputies who last saw Mr. Victorianne alive and who had lied about their conduct.

140.     These are just a few examples of the customs and/or policies of the Sheriff's Department which sent the message to staff that negligence, dishonesty and improprieties will be tolerated by the Department, even when a death results.

141.    Despite well-known problems of deaths and serious injuries from improper monitoring of inmates and failure to render adequate medical care, Gore, Lee and Joshua continued to cover up their subordinates' misconduct.  After the deaths of Messrs. Nishimoto, Nunez, and Moriarty, Joshua and Lee agreed with the private contractor, CPMG, that they would make documents "non-discoverable" during litigation.  Joshua, Lee and the County withheld critical evidence from the families of these decedents in order to keep the misconduct of the CPMG psychiatrists a secret.

142.   In a March 2011 letter to the sheriff, the CLERB expressed concern that the department did not have formal policies regarding when it would alert CLERB of an inmate's death, despite the County Code's endowing the board with clear oversight responsibilities. Per state law, CLERB is allowed one year to initiate an investigation. There were cases in 2009 and 2010 that the Board didn't find out about in time in order to timely begin an investigation. CLERB identified five areas in which it wanted to be included in the notification process; the Sheriff declined to initiate all of them.

143.    "We strive to respond with professionalism and a spirit of cooperation to recommendations for improvement to the policies and procedures," Sheriff's Department Executive Manager John Madigan wrote in response. "CLERB has significantly contributed to the enhancement [of] these important documents and we appreciate the Board's insight."  But, he concluded: "After due consideration, Sheriff Gore respectfully declines to modify the policies and procedures as suggested by CLERB."

144.    In 2013, two years after Gore refused to implement changes to the policies regarding CLERB, the Department failed to notify CLERB regarding the suicide death of Dervin Bowman.  The Department only turned the case over when CityBeat inquired about Mr. Bowman's death.

- 35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**D. The Sheriff's Department's Pattern and Practice of Harming Individuals by Failing to Investigate, Supervise, and Discipline Sheriff's Deputies for Use of Excessive Force**

145.    There has been a systemic failure in San Diego County to investigate incidences of deaths caused by Sheriff's deputies' use of force; to discipline deputies who used unwarranted force; and to supervise and train deputies to ensure that excessive force is not used.

146.    At the time of Paul Silva's death, Defendants County of San Diego, Gore, and Doe Defendants were aware of the long-standing custom and practice of inadequate investigations and failures to discipline deputies for the use of excessive force.  These Defendants were aware of the following cases where deputies were alleged to have used excessive force, but took no action:

i.    In *Hayes v. County of San Diego*, 736 F.3d 1223 (9th Cir. 2013), where deputies were summoned for a welfare check and used excessive force on a man.

ii.    In *Kendrick v. County of San Diego*, 2018 WL 1316618, case no. 15-cv-2615-GPC (AGS), deputies shot and killed a suicidal man.

iii.    In *Maxwell v. County of San Diego*, 708 F.3d 1075 (2013), a Sheriff's deputy shot his wife in the jaw with his service pistol and responding deputies prevented the ambulance holding the wife from leaving, which delayed her medical care and led to her death.

iv.    In *S.B. v. County of San Diego*, 864 F.3d 1010, 1014 (2017), the Ninth Circuit held a jury could conclude that deputies' used unreasonable force when they shot and killed a mentally ill man.

v.    In *Mendoza v. County of San Diego*, No. 17CV1349 W (NLS), 2018 WL 1185230, at *1 (S.D. Cal. Mar. 7, 2018), a deputy drove his patrol car into plaintiff, throwing plaintiff in the air.

vi.    In *Estate of Tommy Tucker v. County of San Diego*, 11-CV-0356-JLS-WVG (S.D. Cal. 2011), decedent Tommy Tucker was a mentally ill inmate in the

- 36

San Diego Central Jail who was given conflicting commands by deputies during lockdown. After Tommy complied with one deputy's command, three deputies sprayed Tommy with OC spray; one applied a carotid hold on Tommy from behind; five deputies rushed at Tommy, "swarming" him; and then all deputies piled on top of him to apply mechanical restraints. One deputy applied a "spit sock" over Tommy's head, which was wet from the OC spray, as he lay face down in a prone position. Tommy Tucker suffered anoxic encephalopathy (brain death) due to prolonged hypoxia and cardiac arrest.

vii.   In *A.B. v. County of San Diego*, case no. 18-CV-01541-MMA-LL (S.D. Cal. 2018), on October 14, 2017, Sheriff's deputies approached Kristopher Birtcher, a mentally impaired man. Deputies repeatedly Tased Mr. Birtcher; struck and beat him; forced him to lay prone on the ground, face down, in restraints as multiples deputies pressed down on him; used a spit sock to cover his face; and ultimately killed Mr. Birtcher.

viii.  In *Washington v. County of San Diego*, 02-CV-0143-LAB-JMA (S.D. Cal. 2002), Marshawn Washington, an inmate by George Bailey, was killed by deputies. Mr. Washington had complained regarding a deputy's conduct. Deputies placed a spit sock over Mr. Washington's head; attempted to force him in a "Pro-straint Chair"; one deputy applied a carotid restraint hold to Mr. Washington's neck; and then deputies placed Mr. Washington face down on the ground and hog-tied him. Mr. Washington was forced on his belly with his wrists and ankles cuffed together behind his back. He said he could not breathe. Witnesses heard him choke and gag. Mr. Washington eventually suffocated to death.

ix.    In *Marcial Torres v. County of San Diego*, case no. 15-CV-01151-CAB-BLM (S.D. Cal. 2015), a Sheriff's deputy repeatedly tased Marcial Torres who was unarmed. After repeated Tases, Marcial Torres lay face down on

the ground in handcuffs.  He stopped breathing and turned blue in the face.
No deputy attempted to render any aid to Mr. Torres.  Based on the records
and testimony of Vista Fire Department paramedics, Mr. Torres had been
without a pulse anywhere from 12 to 20 minutes.  Because of the length of
time Mr. Torres had gone without a pulse, his body had shut down.  Oxygen
had stopped circulating to his brain, causing an anoxic brain injury.  While
comatose in the hospital, doctors amputated Mr. Torres' legs and fingers due
to sepsis.  While Mr. Torres regained consciousness, the anoxic brain injury
affected his cognitive function.  The County settled with plaintiff for
$3,000,000.

x.   *Jimenez v. County of San Diego*, case no. 15-cv-02299-L-JLB ($500,000
settlement for excessive force when a deputy beat a man while he was
handcuffed).

xi.   *Pitt v. County of San Diego*, Case No. 3:16-cv-00515, 2017 ($220,000
settlement for false arrest).

xii.   *Bush v. County of San Diego*, Case No. 15-cv-00686-L-JMA (S.D. Cal.
2016) ($225,000 settlement for police shooting of family dog after plaintiffs
established liability by winning a motion for summary judgment).

xiii.   *Johnson v. County of San Diego*, Case No. 14-cv-616-LAB (S.D. Cal. Feb.
1, 2016) (unanimous jury verdict of excessive force and false arrest,
awarding total damages of $600,000)

xiv.   *Antonio Martinez v. County of San Diego*, 37-2014-00013656-CU-CR-NC,
in 2012, a $1 million settlement in an excessive force case involving a San
Diego County Sheriff's deputy and man with Down Syndrome, who was
wrongfully beaten and detained.

147.   Despite their awareness of the deficiency of their policies, Defendants
County of San Diego, Gore, and Doe Defendants continued to maintain the
following unconstitutional customs, practices, and policies:

- 38 -

i.   Using excessive force, including deadly force on unarmed person who do not pose a risk of imminent death or serious bodily injury to others;

ii.   Providing inadequate training regarding the use of force, including deadly force

iii.   Providing inadequate training and supervision regarding the risks of asphyxiation in circumstances where deputies use force against individuals who are lying prone and face-down on their stomachs.

iv.   Providing inadequate training regarding the use of force against mentally ill individuals;

v.   Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining and controlling misconduct by County Sheriff's deputies, including the misconduct of the Defendant-deputies in this case, Defendants Deputy Charles DelaCruz, Deputy Diego Lopez, Deputy Aaron Vrabel, Deputy Jorge Enciso, Deputy Tanner Sherman, Corporal Christopher Simms, and Deputy Ryan Seabron;

vi.   Announcing that unjustified uses of force are "within policy," including in-custody deaths that were later determined in court to be unconstitutional;

vii.   Even where in-custody deaths are determined in court to be unconstitutional, refusing to discipline, terminate, or retrain the deputies involved;

viii.   Maintaining a policy of inaction and an attitude of indifference towards soaring numbers of in-custody deaths, including by failing to discipline, retrain, investigate, terminate, and recommend deputies for criminal prosecution who participate in the in-custody-death of unarmed, nonviolent, compliant, and/or potentially mentally impaired people.

- 39

**E. The County's Failure to Adequately Fund CLERB and Services That Monitor and Assist Mentally Ill Inmates.**

148.     The County's investigative body, CLERB, which has the responsibility to investigate all in-custody deaths, had just three paid employees: an executive officer, an investigator, and an administrative assistant.

149.     CLERB consists of eleven volunteers, who are not required to have previous special training or experience in investigations or any other relevant topics related to jail operations, Constitutional requirements, or law.  CLERB does not control its budget.  It cannot hire investigative staff itself, even when required to complete its work.

150.     CLERB members are appointed by the County Board of Supervisors.

151.     While CLERB has the authority to annually inspect county adult detention facilities and annually file a report of such visitations together with pertinent recommendations on issues including detention, care, custody, training and treatment of inmates, CLERB has never inspected a single jail facility in the 25 years of its existence.

152.     By October of 2017, CLERB had 59 open in-custody death investigations, including a death going back six years.

153.     On November 11, 2017, CLERB announced that it was summarily dismissing 22 death cases without review.  CLERB dismissed these cases based on a one-year time limitation for imposing officer discipline for misconduct.  This is despite the fact that CLERB has publicly stated that "death cases and other complex investigations often take more than one year to complete."

154.     The County failed to invest available state funding for mental health services, including over $100 million of Mental Health Services Act (MHSA) funding in 2017, with an additional $42 million in reserves.

155.     In June of 2016, a Grand Jury documented the County's under-utilization of MHSA monies. The Grand Jury recommended that the County

"appropriate a larger percentage of MHSA funds each year in order to improve services to a larger number of seriously mentally ill and at-risk county residents."

156.     At the time of Paul Silva's death in 2018, the County had failed the implement the recommended changes from the Grand Jury.

## V.   FIRST CAUSE OF ACTION
### (Arrest without Probable Cause (42 U.S.C. §1983))
### [By the Estate of Paul Silva Against Defendants Murrow, Derisio, Maggi  and Does 24-100]

157.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

158.   42 U.S.C. § 1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory subjects, or causes to be subjected, any person of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit at equity or other proper proceeding for redress.

159.     Paul Silva had a firmly established right under the Fourth Amendment to be free from arrest without probable cause. Defendants Murrow, Derisio, and Maggi arrested Paul without probable cause despite the fact that he had committed no crime.  All three Defendants were performing their duties as an officer for Defendant City of San Diego.

160.     There was no basis to believe that Paul had committed a crime.

161.     Leslie Allen's phone call requesting the assistance of PERT was specifically identified as a "5150 – MENTAL CASE."  The computer dispatch record stated that Paul was a diagnosed schizophrenic who was not taking his medication, who was not drunk, and who was not on any controlled substance.

All indications were that Paul was acting out as a result of his failure to take his medication. The dispatch record stated this incident was a "CW – CHECK THE WELFARE." It reflected that Ms. Allen had specifically requested the services of PERT. Rather than attempting to ascertain whether Paul needed to be hospitalized under a 5150 hold because of a mental illness, Defendants Murrow, Derisio, and Maggi unreasonably arrested Paul for being under the influence of methamphetamine.

162.     No member of PERT responded to the scene. Defendants did not request or wait for PERT members, despite the specific request for PERT.

163.     Derisio was specifically informed by Leslie Allen that Paul did not take street drugs; that Paul was schizophrenic; that Paul's conduct and demeanor were the result of schizophrenia, not drug consumption; and that Paul needed to be hospitalized for mental health treatment. Leslie Allen disagreed that Paul was under the influence and asked that Paul be hospitalized.

164.     Murrow, Maggi, and Derisio had no reason and no legal basis to arrest Paul Silva. Based on the dispatch records and the statements of Leslie Allen, Defendants knew that Paul's behavior was symptomatic of Paul's mental health condition and his failure to take his psychotropic medication. They knew that Paul's behavior was not symptomatic of illicit drug use.

165.     Defendant Maggi, as the sergeant and commanding officer on the scene, made the decision to place Paul under arrest. Defendants Murrow and Derisio were well aware that Paul's behavior was symptomatic of Paul being off of his psychotropic medication. Despite having the opportunity to intercede, Murrow and Derisio failed to do so and allowed a schizophrenic patient to be unnecessarily and unlawfully incarcerated.

166.     As a direct and proximate cause, Paul Silva was unlawfully and needlessly incarcerated for over 36 hours. As a result of defendants' actions, Paul was not taken to a hospital where he could be medicated and monitored. As a

result of Defendants' failure to communicate Leslie's Allen's reporting that Paul was schizophrenic and that he had not used illicit drugs, the County was not made aware of the need to monitor Paul for decompensation.  As a direct result of Defendants' actions, the Jail booked Paul for being under the influence of illicit substances, and not as a patient who required medication and monitoring.  Denial of medical care to Paul at the Jail and the subsequent use of force was a foreseeable consequence of these Defendants' failure to take Paul to a hospital where he could be medicated.

## VI.  SECOND CAUSE OF ACTION
### (Violation of Due Process (42 U.S.C. §1983))
**[By the Estate of Paul Silva Against Defendants Julio Rodriguez, Harvey Seeley, Cesar Ceballos, Sgt. Navarro, Laura Coyne and DOES 24-100]**

167.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

168.     Incarcerated persons are entitled to confinement under humane conditions which provide for their basic human needs. A jail has a duty to provide adequate sanitation and hygienic materials. Incarcerated people are entitled to their basic human dignity.

169.     Defendants saw Paul in a holding cell with no clean clothes, toiletries, bed, blanket, pillow or access to a shower.  Each defendant who saw Paul knew that Paul was in a concrete cell with metal benches in February weather.  Some of the defendants were wearing their winter jackets and knew that Paul was never given a blanket.  They saw that Paul was wearing a filthy t-shirt and pants during the entire 36 hours.  They saw Paul with no place to sit or lie down during those 36 hours with constant bright light and noise.

170.     Paul was not let out of his tiny cell for 29 hours.   During the 36 hours of his imprisonment, Paul was only taken out of the holding cells to be moved from one cell to another.  Paul was never taken to the day room.  Paul was never

- 43

allowed to eat in the dining hall.  Paul was never given any books or access to a radio or a television.  Paul was never given an opportunity to use the telephone.  Paul was never allowed to brush his teeth.  Paul had no toilet paper for 36 hours.  Paul needed help with his basic medical and sanitary needs.

171.     Each Jail staff who saw that Paul was a "book and release" inmate did not summon help. Each supervisor made aware of Paul's confinement did nothing to release Paul or provide for Paul's basic needs.

172.     Defendants ignored Paul's needs by failing to take him to a clean and safe environment; failing to take him to medical or psychiatric observation unit; and failing to observe Paul.

173.     Denying Paul basic sanitation, a bed and the ability to sleep and rest was punishment without legal justification.  There was no legitimate governmental purpose to keeping Paul in a cold cell with no warmth and constant light and sound.  There is no legitimate governmental purpose to denying a man an opportunity to sit or sleep for 36 hours.

174.     Defendants knew that there was limited view into Paul's cell.  No one moved him into a housing unit or a unit where Paul could be watched.

175.     Defendants left Paul in serious adverse conditions, gravely ill and in filthy conditions.

176.     Defendants deprived the Paul of a minimal civilized measure of life's necessities.

177.     Defendants were deliberately indifferent when they consciously disregarded the condition they observed.

### VII. THIRD CAUSE OF ACTION
**(Deliberate Indifference to Serious Medical Needs (42 U.S.C. §1983))**
**[By the Estate of Paul Silva Against Defendants Murrow, Derisio, Maggi, Adraneda, Cavallo, Seeley, Ceballos, Sgt. Navarro, Rodriguez, Coyne, Lawson, Douthitt, DelaCruz, Lopez, Vrabel, Enciso, Sherman, Simms, Seabron, Lee, Joshua, and Does 24-100]**

- 44

178.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

179.     Defendants violated Paul Silva's Fourteenth Amendment right to medical care.

180.     Defendants knew that Paul Silva faced a serious medical and mental health need.

181.     Defendants Murrow, Derisio, and Maggi were made aware that Paul suffered from schizophrenia and that he needed to be hospitalized to receive psychiatric care.  They knew they were responding to a "5150" mental health call that required a welfare check.  They knew that Paul's behavior was symptomatic of mental illness and consistent with Ms. Allen's repeated statement that Paul was off of his medication.

182.     Instead of instituting a 5150 hold to hospitalize Paul and treat his psychiatric condition, Murrow, Derisio, and Maggi arrested him and decided to book him into Central Jail for a crime Paul did not commit.

183.     Murrow failed to adequately communicate to the Jail Staff that Paul suffered from schizophrenia and required mental health care.  Murrow failed to tell Jail staff that he made contact with Paul Silva as a result of a "5150" mental health call that requested officers check the welfare of Paul Silva.

184.     Once at the Central Jail, Paul reported to the intake nurse, Adraneda, that he suffered from schizophrenia and diabetes and was not taking his medication.  Adraneda reviewed Paul's medical history in the JIMS system and verified that Paul had a history of schizophrenia.  JIMS records also reflected that Paul had previously self-reported suicide attempts and Paul had reported prior psychiatric hospitalizations.  Adraneda told Paul that he would schedule a psychiatric evaluation for Paul, although Paul was only a "book and release" inmate.  Because Paul had self-reported as diabetic, Adraneda was required to

- 45

arrange a medical evaluation of Paul.  Adraneda failed to order any psychiatric or medical evaluation of Paul Silva.  Adraneda failed to document any "alerts" in the JIMS system that highlighted that Paul suffered from schizophrenia; that Paul had previously self-reported suicide attempts; that Paul had previously been hospitalized for psychiatric conditions; and that Paul suffered from diabetes.

185.     Given Paul's psychiatric condition and mental health history, if Jail staff believed Paul would be released once he became "sober," Paul should have been placed in a sobering cell to be closely monitored.

186.     The Sheriff's Department's policy on sobering cells requires patients who are "intoxicated and are in need of special observation in a controlled environment" to be placed in sobering cells.  Once in a sobering cell, medical staff must check on the patient every 4 hours or sooner if clinically indicated.  All inmates in a sobering cell will receive a medical evaluation after 12 hours from time of placement.  A placement of more than 24 hours requires a medical physician to determine if a patient should remain in the sobering cell.  A psychiatric consultation is provided if needed.  If a nurse believes that medical and/or mental function is declining during observation, a medical and psychiatric consultation are provided.

187.     Instead, Jail staff failed to house Paul in an area where he could be observed and monitored.  For 36-hours, Paul was moved from one temporary holding cell to another with no medical monitoring.  Instead of closely monitoring Paul, defendants moved Paul from the dressout cell to the release cell, which has no video camera inside the cell.  Paul remained in the temporary release cell for the last 29 hours of his life.  County Defendants were deliberately indifferent to a known and serious medical need.

188.     Defendants failed to properly communicate to other medical and security staff the necessary medical information so that Paul would receive medical attention.

- 46

189.     Defendants Julio Rodriguez, Harvey Seeley, Sgt. Ceballos, Sgt. Navarro, Laura Coyne knew of Paul's deteriorating condition and/or personally observed Paul Silva for hours in a temporary housing cell decompensating.  They knew that Paul had been living in conditions well below the minimum standard set forth by law under Title 24.  They could see that as a result, Paul was increasingly agitated, disoriented, and acting irrationally.  Paul was pacing for 36 hours, unable to sleep, talking to himself, his shoes, the wall and nonexistent people. He was placing items under the cell door and moving them around.  No one called for medical help.  No one made arrangements for Paul to be housed in a cell where he could be monitored and given medical help.

190.   These defendants above caused Paul physical and mental pain and Suffering for the 36 hours before Paul's cell extraction.  The Estate of Paul Silva is entitled to his pre-death pain and suffering pursuant to *Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014).

191.     These defendants created the need for the extraction team to use force to remove Paul from his cell by delaying and denying Paul medical care.  Causing Paul to decompensate fully by arresting him, denying him medical care and food, rest and sleep led to the extraction team being called.  Had these defendants taken Paul to a hospital, rendered any care or given him his medication, Paul would have been released to his mother's care.  These defendants are responsible for the foreseeable consequences of their actions, including Paul's death.

192.     It was foreseeable that withholding medical care to a schizophrenic patient would lead to decompensation, hallucinations and agitation.  It was foreseeable that withholding antipsychotic medication; denying sleep and rest for 36 hours; and failing to monitor Paul Silva for his decompensation would lead to the use of increased level of force by the extraction team.

- 47

193.     Coyne, Lawson, and Douthitt, supervisory officials at the Central
Jail, all saw that Paul Silva was acting in a bizarre manner and visibly distressed.
Coyne had access to Paul's medical history in the Jail's JIMS system, which
documented his history of schizophrenia, psychiatric problems, and diabetes.
Coyne, Lawson, and Douthitt all failed to research Paul's medical history in
JIMS, which documented his schizophrenia and psychiatric history.  Defendant
supervisors knew that Paul was a "book and release" who had been in custody for
over 32 hours, who was not becoming sober, and whose condition was rapidly
deteriorating.  Rather than request a psychiatric evaluation, or a physician to
assess Paul Silva, Defendants Coyne, Lawson, and Douthitt, who had no medical
training or background, determined that Paul Silva was suffering from excited
delirium and decided on a course of action involving application of unreasonable
amounts of force.

194.     Section 1217 of Title 15 of the California Code of Regulations
permits a physician to involuntarily administer psychotropic medication to an
inmate when the physician determines that the inmate is a danger to himself or
others by reason of mental disorder.  Rather than asking a physician if
psychotropic medication could be administered to Paul Silva in his jail cell,
Defendants Coyne, Lawson, and Douthitt decided to extract Paul Silva, who sat
alone in a locked jail cell.  Their plan involved 7 armed men who deployed
pepper spray water projectiles, Tasers, a body shield capable of administering
electrical shock, and brute strength.

195.     After Coyne, Lawson, and Douthitt erroneously decided that Paul
suffered from excited delirium and arranged for the Tactical Team to extract him,
nurse practitioner Keri Cavallo arrived to confirm that Paul needed to be removed
from his cell.  Defendant Cavallo believed Paul might be suffering from a form of
psychosis with which she was unfamiliar.  Cavallo observed that Paul appeared
frightened, unable to understand events, and was acting in an irrational manner.

- 48

Cavallo made no attempt to request a psychiatric evaluation to determine if Paul should be immediately admitted to the Central Jail's internal hospital, the Psychiatric Security Unit (PSU).  Cavallo failed to review Paul's JIMS medical history, which stated that he suffered from schizophrenia and diabetes.  Had Cavallo reviewed Paul's medical records, she would have known that Paul had not received any psychiatric or diabetic treatment.  UCSD hospital records state that Paul had a blood sugar of 30 – a dangerously low level that can cause delusion and render a person unable to comprehend or respond to commands.  Instead of consulting with a medical doctor or psychiatrist, and instead of reviewing Paul's medical history to discern the medical basis for his behavior, Cavallo agreed that Paul needed to be forcibly extracted from his jail cell and taken to the hospital.

196.    Deputies DelaCruz, Lopez, Vrabel, Enciso, Sherman, Simms, and Seabron, members of the Tactical Team, saw that Paul was acting in a bizarre and incomprehensible fashion, that he was uncommunicative, and appeared to not understand commands.  Rather than insisting that medical and/or psychiatric aid to be provided to Paul by doctors, these Defendants prepared to unleash egregious amounts of force on a severely mentally ill man.

197.    Defendants were deliberately indifferent to Paul Silva's serious medical need, which caused harm to the decedent, ultimately killing him.

198.    Defendants Lee and Joshua were deliberately indifferent to Paul Silva's serious medical need by failing to properly set forth policies and procedures for proper care of inmates in medical distress.

199.    Lee and Joshua knew that a significant number of inmates booked in Central Jail suffered from serious mental health conditions.  Defendants Lee and Joshua knew that the jail staff were failing to read the patients' medical charts or that they were ignoring the information contained in the medical records.  They knew that the jail staff were failing to communicate critical medical information.

200.     They knew that the policies they had implemented with respect to Jail staff's failure to communicate mental health conditions were grossly inadequate.  They knew that their failure to implement proper policies regarding communication, including the use of JIMS, had led to disproportionately high number of deaths in San Diego County Jails, including that of Adrian Correa, Daniel Sisson, Bernard Victorianne, Ronnie Sandoval, Ruben Nunez and Heron Moriarty.  They were made aware of the deficiencies in the coordination of care and communication of medical conditions by Disability Rights of California, which found that San Diego County lacked an effective system for staff to **communicate about an inmate's decompensating condition**.  They were made aware of the deficiencies by CLERB which questioned the lack of communication by staff of patient's serious medical condition.

201.     As a direct consequence of Lee's and Joshua's failures, Paul's serious medical condition was ignored and the staff failed to communicate critical medical information.  As a result of Lee's and Joshua's failures, Adraneda and Cavallo never communicated Paul's critical condition to the corrections staff; never referred Paul for diagnosis or treatment; never provided medication; never monitored Paul for his obvious symptoms of mental illness; and never reviewed Paul's medical history in JIMS.  It was foreseeable that failing to implement policies regarding the failures to communicate medical conditions would lead to denial of medical care and decompensation of schizophrenic patients.

202.     Defendants Adraneda and Cavallo acted under the direction of Defendants Lee and Joshua, who set forth the standards, policies and procedures on treatment of inmates, including Paul Silva.  Pursuant to the policies and procedures set by Defendants Lee and Joshua, Paul Silva received no medical care despite obvious signs that he was suffering from schizophrenia.

203.     By failing to set forth procedures on proper care of inmates, including mandates that inmates who suffer from schizophrenia be observed in

Medical; that they be monitored regularly by a medical doctor; that the inmate be transported to a hospital when exhibiting obvious signs of schizophrenia, Defendants Lee and Joshua were deliberately indifferent to Paul Silva's serious medical need.

204.     As a direct and proximate result of all Defendants' deliberate indifference to Paul's serious medical need, Paul Silva experienced physical pain, severe emotional distress, and mental anguish for days, as well as loss of his life and other damages alleged herein.

205.     The conduct alleged herein caused Paul Silva to be deprived of his civil rights that are protected under the United States Constitution which has also legally, proximately, foreseeably and actually caused Paul Silva to suffer emotional distress, pain and suffering and further damages according to proof at the time of trial.

206.     The conduct alleged herein was done in deliberate or reckless disregard of decedent's constitutionally protected rights; justifying the award of exemplary damages against defendants in an amount according to proof at the time of trial in order to deter the defendants from engaging in similar conduct and to make an example by way of monetary punishment.  Plaintiff is also entitled to attorney fees and costs of suit herein.

## VIII.  FOURTH CAUSE OF ACTION
### (Excessive Force and Failure to Intercede (42 U.S.C. §1983))
**[By the Estate of Paul Silva against Defendants Coyne, Lawson, Douthitt, DelaCruz, Lopez, Vrabel, Enciso, Sherman, Simms, Seabron and Cavallo]**

207.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

208.     Defendants committed wrongful acts which proximately caused the death of Paul Silva.

- 51

209.     During his intake at the Central Jail, Paul was described as anxious and hyper-verbal.  The Jail staff were aware that Paul suffered from schizophrenia.

210.     The following day, on February 21, 2018, deputies saw Paul acting erratically and paranoid, running in his cell, throwing himself to the ground and yelling incoherently.  He was seen staring out the window with mouth wide open, holding his arms out pointing toward the window and walls, crawling and rolling on the floor.

211.     Defendants knew that Paul needed medical attention.  Paul had not harmed anyone or threatened to harm anyone.

212.     Instead of requesting medical attention for Paul, Lawson ordered Seabron to use OC spray against Paul.  Seabron pepper sprayed Paul even though Paul was visibly suffering and in distress.

213.     Instead of calling for a medical evaluation or psychiatric assistance, or determining whether Paul could be treated within his jail cell, Supervisory Defendants Coyne, Lawson, and Douthitt concluded that Paul was suffering from excited delirium.  They decided to extract Paul from his jail cell using the 7-member Tactical Team and unreasonable force.

214.     Coyne, Lawson, and Douthitt called for Tactical Team (TT) to remove Paul from his cell.  Paul remained non-verbal, exhibiting bizarre behavior for approximately 22 minutes while Defendants observed Paul as they waited for the Tactical Team to arrive.

215.     When the Tactical Team arrived, Vrabel shot Paul with water balls though he posed no threat to any person.  Simms repeatedly Tasered Paul.  The seven members of the Tactical Team then piled onto Paul Silva and placed downward force and pressure on his head, midsection, arms, and legs.  Enciso and the other Tactical Team members pushed down on Paul's body with the shield.

216.     Douthitt instructed the other members to use "downward pressure with the shield, get your body weight on it."

- 52 -

217.     The Tactical Team members heard Paul yell "no, don't do it, sir." Despite hearing his pleas, these Defendants continued to use force on Paul Silva, who was prone and helpless on the ground.

218.     Paul's voice became faint and unintelligible.

219.     Paul became unresponsive.

220.     Cavallo observed Paul exhibiting symptoms of decompensation and schizophrenia.  Cavallo failed to consult with a doctor.  Cavallo stood by while the extraction team used force on Paul, killing him.  Cavallo was a direct participant in the use of force because she failed to intercede, having the opportunity to do so.

221.     Paul was taken to UCSD Hospital unconscious, where he died from the injuries inflicted by Defendant Sheriff Deputies.

222.     The acts of these Defendants as described above amounted to deliberate indifference to decedent's Constitutional Rights.

223.     Each of these Defendants failed to intercede to prevent the use of unreasonable and excessive force on Paul Silva.  The failure of each Defendant to intercede to prevent the use of unreasonable force by each other caused Paul Silva to be deprived of his rights under the United States Constitution, which legally, proximately, foreseeably, and actually caused Alex Martin to suffer emotion distress, pain and suffering, and, ultimately, death.

224.     As a direct and proximate result of the unlawful acts, excessive force, unlawful seizure and recklessness described above, decedent Paul Silva suffered severe injuries and loss of his life. His estate is entitled to general, compensatory, and punitive damages in an amount to be proven at trial.

## IX.  FIFTH CAUSE OF ACTION
### (Wrongful Death (42 U.S.C. §1983))
**[By the Estate of Paul Silva against Defendants Murrow, Derisio, Maggi, Adraneda, Cavallo, Rodriguez, Coyne, Lawson, Douthitt, DelaCruz, Lopez, Vrabel, Enciso, Sherman, Simms, Seabron, and Does 24-100]**

225.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

226.     Defendants committed wrongful acts which proximately caused the death of Paul Silva.  Defendants were deliberatively indifferent to Paul Silva's serious medical needs, health and safety; they violated Paul Silva's civil rights; and they falsely arrested him and used excessive and unnecessary force, all causing the untimely and wrongful death of Paul Silva.

227.     Defendants saw Paul Silva in medical and psychiatric distress but failed to render aid, call for a doctor, or transport him to the hospital.

228.     Defendants deprived Paul Silva of his rights under the Fourteenth Amendment to the United States Constitution in denying critical medical care and in using excessive force.

229.     Defendants deprived Paul Silva of his rights under the Fourteenth Amendment to the United States Constitution by failing to implement policies and by failing to train and supervise the Jail staff on coordination of care; providing critical medical care; and communicating critical medical conditions and needs.

230.     These wrongful acts were done with a deliberate indifference to the safety and welfare of Paul Silva.

231.     The failure to render critical medical care proximately caused not only Paul Silva's pre-death pain and suffering, but the use of force, which caused Paul's death.  But for the failure to render medical care, Paul Silva would not have fully decompensated.   Without medical care, it was foreseeable that Paul would experience a psychotic break, unable to communicate and follow orders by the extraction team.

232.     The conduct alleged herein violated Paul Silva's rights alleged above thereby resulting in a deprivation of Plaintiffs' rights alleged above which has legally, proximately, foreseeably and actually caused Plaintiff to suffer emotional

distress, pain and suffering, and further general and special damages according to proof at the time of trial.

## X.   SIXTH CAUSE OF ACTION
### (Right of Association (42 U.S.C. §1983))
**[By Plaintiffs Manuel Silva and Leslie Allen against Murrow, Derisio, Maggi, Adraneda, Cavallo, Rodriguez, Coyne, Lawson, Douthitt, DelaCruz, Lopez, Vrabel, Enciso, Sherman, Simms, Seabron, and Does 24-100]**

233.    Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

234.    Defendants deprived Paul Silva of his rights under the United States Constitution to be free denial of medical care and denial of due process.

235.    The aforementioned acts and/or omissions of Defendants in being deliberatively indifferent to serious medical needs, health and safety; violating Paul Silva's civil rights; falsely arresting him and using excessive and unnecessary force caused the untimely and wrongful death of Paul Silva, and deprived Plaintiffs Manuel Silva and Leslie Allen of their liberty interest in the parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

236.    There was no legitimate penological interest in failing to communicate critical medical information and denying access to medical care to an inmate in obvious medical distress.  Defendants' actions shock the conscience.

237.    The deprivation of the rights alleged above has destroyed the Constitutional rights of Paul Silva's parents, Manuel Silva and Leslie Allen, to the society and companionship of their son which is protected by the substantive due process clause of the Fourteenth Amendment.

238.    The conduct alleged herein violated Paul Silva's rights alleged above thereby resulting in a deprivation of Plaintiffs' rights alleged above which has legally, proximately, foreseeably and actually caused Plaintiffs to suffer emotional

distress, pain and suffering, and further damages according to proof at the time of trial.

## XI.  SEVENTH CAUSE OF ACTION
### (Failure to Properly Train (42 U.S.C. § 1983))
**[By the Estate of Paul Silva against Zimmerman, Maggi, Gore, Lee, Joshua, O'Brien, Coyne, Lawson, Douthitt, and Supervisory Doe Defendants 24-100]**

239.     Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

240.     Zimmerman and Maggi failed to properly train defendants Murrow and Derisio in the performance of their duties.  They failed to properly train officers on how to deal with a call made to PERT for assistance with the mentally ill.  They failed to properly train Murrow and Derisio on how to properly deal with citizens in mental health crisis. They failed to properly train officers on how to distinguish mental illness from signs of substance abuse.  They failed to train officers on the necessity of providing hospitalization and treatment for citizens in crisis instead of incarceration.  They failed to properly train officers on arresting and charging the mentally ill citizens with crimes based on no evidence of a crime.  They failed to properly train their officers on arrests without probable cause.

241.     Zimmerman and Maggi failed to properly train their employees with regard to the need to communicate critical medical information to jails that would house their patients.  They were aware of the need to train their employees given that dealing with the mentally ill is a recurring situation for the San Diego Police Department.  The Department received over 30,000 calls for "5150" alone over a three-year period.  The need for this training was obvious.

242.     As a direct consequence of the failure of Defendants to properly train their officers, Paul Silva was falsely arrested and incarcerated.  As a consequence of the failure to train, Murrow failed to communicate critical medical information. As a result of that unlawful arrest and failure to render medical care, Paul Silva

- 56 -

suffered physical and emotional pain and suffering during the 36 hours of incarceration.

243.     As a result of the Defendant Zimmerman's and Maggi's failures to train their officers, Paul's medical condition was not properly communicated to the Jail staff, which resulted in Paul Silva's decompensation and the extraction team being called.  Paul Silva's death was a foreseeable consequence of Defendants' failures.

244.     Officials of the San Diego Sheriff's Department, acting under color of law, have subjected decedent Paul Silva and other persons similarly situated to a pattern of conduct consisting of continuing, widespread and persistent pattern of unconstitutional misconduct.

245.     Defendants Gore, Lee, and Joshua have failed to maintain adequate and proper training necessary to educate deputies and medical staff as to the Constitutional rights of inmates; to prevent the consistent and systematic failure to provide medical care; to prevent placement of inmates with serious medical and psychiatric needs in cells where the inmate would be denied medical monitoring and basic necessities, such as food, bed, and blankets.

246.     There has been an official policy of acquiescence in the wrongful conduct.  Despite repeated Constitutional violations, Gore, Lee, and Joshua failed to train nurses and medical staff on the necessary coordination of care of inmates suffering from serious medical conditions; failed to train nurses and medical staff about the necessity of documenting medical and psychiatric alerts to ensure seriously ill inmates are placed in appropriate cells, or housed in appropriate locations, where they are properly monitored by trained staff;  and they failed to implement policies and procedures with respect to proper training on these matters.

247.     Gore, Lee, and Joshua failed to train medical staff and nurses on reading critical information on medical charts, documenting alerts or bringing

- 57 -

attention to serious medical and/or psychiatric conditions, and communicating such sensitive and critical information to ensure continuity of care.

248.     Defendant Gore failed to properly train his deputies regarding the performance of proper cell checks, despite his specific knowledge that his subordinates had failed to conduct proper cell checks in multiple instances of inmate deaths or injuries.

249.     Despite their knowledge of previous instances of wrongful deaths in the jails as a result of the failure to communicate critical medical conditions, Defendants failed to properly train or retrain their deputies and medical staff to prevent deaths of inmates.  It was foreseeable that the failure to train would lead to the denial of critical medical care resulting in Paul Silva's decompensation and psychosis.  It was foreseeable that a delusional and agitated patient would be taken out of the cell by the extraction team using force.  These Defendants' failure to train led to Paul's pain and suffering during the 36 hours of his incarceration without medical care and to his death.

250.     Under CHMA's/CCMG's contract with the San Diego Sheriff's Department, Mark O'Brien, as president and CEO, was responsible for training and supervising nurse practitioner Keri Cavallo.  O'Brien had a responsibility to ensure Cavallo had sufficient training to evaluate and treat inmate-patients in a correctional setting.  O'Brien had a duty to ensure Cavallo was properly trained about her responsibilities at the Central Jail, including her responsibility in evaluating and treating mentally ill inmate-patients and the policies and protocols at the Central Jail regarding treatment of mentally-ill patients.  O'Brien had a duty to train Cavallo about the ability to contact a Liberty Healthcare psychiatrist after-hours in the event of an emergency.  O'Brien had the obligation to train Cavallo about admission into the Psychiatric Security Unit (PSU) where inmate-patients could be involuntarily medicated.

251.     As a direct result of O'Brien's failure to train, Cavallo failed to recognize obvious symptoms of schizophrenia and failed to consult with a psychiatrist.  As a direct result, Cavallo advised the corrections staff that Paul was suffering from excited delirium from drug use without ever looking at Paul's medical history.  As a direct result, Cavallo stood by while the extraction team used force on Paul, killing him.

252.     Gore, Coyne, Lawson, and Douthitt had a responsibility to properly train deputies about the appropriate use of force on mentally ill inmates. Defendants failed to train deputies about the need to seek professional medical assessments of mentally ill inmates in a correctional setting; about the need to provide medical aid to an inmate in distress; failed to train deputies regarding the inability of mentally ill inmates to understand or respond to officer commands; and failed to train deputies regarding the obligation to treat mentally ill inmates fairly and humanely.  This was despite the fact that booking or housing mentally ill inmates was a recurring situation at the Jails.

253.     The failure of all supervisory defendants to promulgate or maintain constitutionally adequate training was done with deliberate indifference to the rights of Paul Silva and others in his position.

254.     As a direct consequence of the failure of Defendants to properly train their officers and medical staff, Paul Silva suffered unconstitutional treatment and inhumane conditions during his 36-hour detention.

255.     As a result, decedent Paul Silva suffered physical and psychological injuries and death.

## XII. EIGHTH CAUSE OF ACTION
### (Failure to Properly Supervise and Discipline (42 U.S.C. §1983))
**[By the Estate of Paul Silva against Zimmerman, Maggi, Gore, Lee, Joshua, Coyne, Lawson, Douthitt, O'Brien, and Supervisory Doe Defendants 24-100]**

256.     Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

257.     Defendants Zimmerman and Maggi failed to properly supervise and discipline defendant Murrow and Derisio in the performance of their duties in responding to 5150 mental health calls that request welfare checks of individuals who suffer from psychiatric conditions; in evaluating mentally ill citizens who require hospitalization and treatment; and in making false arrests.

258.     These Defendants failed to properly supervise their employees with regard to the need to communicate critical medical information to jails that would house their patient/arrestee.

259.     As a result of the Defendants' historical failure to properly supervise and discipline their employees, Defendants Murrow and Derisio were deliberately indifferent to the serious medical needs of Plaintiff.

260.     All defendants failed to supervise their subordinates so that persons living with mental illness will have access to and be referred to programs at the appropriate level of service and no person will be hospitalized or incarcerated unnecessarily.  All defendants failed to supervise their subordinates so that they contribute to the well-being of individuals with mental illness by actively and compassionately assisting individuals in crisis who come to the attention of law enforcement to access appropriate services and to optimize outcomes through on-scene assessments and referrals.

261.     All Defendants failed to properly supervise their subordinates regarding the need to communicate critical medical information and the need to provide adequate care to individuals suffering from serious psychiatric and medical conditions.  As a result, police officers, deputies and medical care providers denied care to Paul Silva.

262.    Defendants Gore, Lee, and Joshua failed to provide adequate supervision and discipline to the medical staff who are required to render medical care that meet the standards of the Constitution.

263.    Defendants Gore, Lee, and Joshua failed to properly supervise, monitor, and discipline medical and correctional staff at the Central Jail regarding housing placements for inmates with known, documented, and/or obvious medical and psychiatric needs. Defendants failed to supervise jail staff regarding placement of inmates with serious medical needs in appropriate housing to ensure regular monitoring of such medically fragile individuals.

264.    Defendants Gore, Lee, and Joshua failed to promulgate and enforce adequate policies and procedures related to misconduct and the violation of citizens' civil rights by deputies and medical staff.

265.    Defendants Gore, Lee, and Joshua have a widespread history of ratifying employee misconduct by failing to conduct appropriate investigations.

266.    Defendants Coyne, Lawson, and Douthitt failed to supervise their deputies in the use of force against Paul Silva, a mentally ill person in obvious medical distress.

267.    Defendant O'Brien was aware of the history of deaths of inmates at the Central Jail related to the failure to provide adequate medical care. O'Brien was aware of previous inmate deaths caused by the failure of contractors and contract medical staff to provide medical and psychiatric care to inmates with serious medical and psychiatric needs. O'Brien was aware of the need to closely monitor and supervise Defendant Cavallo, a new nurse practitioner, and to ensure that Cavallo understood her responsibilities and job function in a correctional setting.

268.    Defendants were aware of previous instances of untimely and wrongful deaths in the San Diego County Jails related to the use of force and

- 61

inadequate provision of medical care.  They failed to properly supervise and discipline their employees or agents.

269.     Defendants Gore, Lee, Joshua, Coyne, Lawson, and Douthitt refused to investigate misconduct and/or took no remedial steps or action against deputies and medical staff.

270.     Upon information and belief, supervising officers were made aware of the misconduct or witnessed the Constitutional violations committed by the deputies and medical staff but failed to supervise or discipline them.

271.     Defendants condoned and acquiesced in the abusive behavior of their subordinates by refusing to retrain them, discipline them, or correct their abusive behavior.

272.     Defendants were, or should have been, aware that the policy regarding supervision and discipline of staff who violated the civil rights of inmates or citizens was so inadequate that it was obvious that a failure to correct it would result in further incidents of dangerous and lawless conduct perpetrated by their subordinates.

273.     As a result of all Defendants' historical failure to properly supervise and discipline deputies, Defendants were deliberately indifferent to the needs of Plaintiff.  The failure to supervise and discipline was the moving force behind the misconduct of the deputies, the denial of medical care on the Plaintiff, and the resulting pain and suffering and death.

## XIII.  NINTH CAUSE OF ACTION
### (Failure to Properly Investigate (42 U.S.C. §1983))
### [By the Estate of Paul Silva against Zimmerman, Gore, Lee, Joshua, Coyne, Lawson, and Douthitt]

274.     Plaintiff realleges all prior paragraphs of this complaint and incorporates the same herein by this reference.

275.     Defendants maintained a longstanding pattern of failing to properly investigate misconduct.

276.     Upon information and belief, Defendant Zimmerman maintained a *de facto* policy of failing to adequately investigate instances of Constitutional violations, including wrongful arrests.

277.     Upon information and belief, all Defendant Zimmerman maintained a *de facto* policy of not obtaining accurate and timely reports from witnesses and staff alleged to have been involved in misconduct or witnessed misconduct.

278.     Upon information and belief, Defendant Gore maintained a *de facto* policy of allowing homicide investigators to intimidate witnesses; to ask leading questions, suggesting the answers; and to summarize the interviews of inmates in their investigation files in a manner that distort the actual recorded statements of witnesses.

279.     Upon information and belief, Defendants Gore, Lee, and Joshua gave families of inmates limited information regarding the deaths of their loved ones. On one occasion, they waited 1½ years to provide information on how an inmate died.  In another case, the family found out the facts of their son's death from reading reports of CLERB made publicly available.

280.     Defendants Gore, Lee, Joshua, Coyne, Lawson, and Douthitt historically and systematically engaged in a pattern of failure to properly investigate misconduct and dishonesty of deputies and medical staff.

281.     The longstanding pattern of failing to properly investigate staff misconduct led to the actions or inactions of the deputies and medical staff who denied medical care to Paul Silva.  Defendants' pattern of failing to investigate created a culture of unconstitutional acts and acts that violate the Jail's own policies and procedures.

282.     Defendant Gore was personally aware of these failures but took no action to prevent harm to inmates, including Paul Silva.

283.     Defendants Lee and Joshua failed to properly investigate the misconduct of the medical staff despite a history of medical neglect and preventable deaths in the San Diego jails.  These defendants covered up for the actions of their subordinates instead of investigating their misconduct.

284.     Defendants Coyne, Lawson, and Douthitt failed to properly investigate the misconduct of correctional staff despite a history of excessive use of force against inmates.

285.     The individual defendants in this case knew that their actions would not be investigated and that they would not be disciplined for their actions.

286.     The systemic failures by all defendants to properly investigate led to the misconduct of the police officers, deputies and medical staff in this case.

287.     As a result of all Defendants' historical failure to properly investigate, Defendants were deliberately indifferent to the needs of Plaintiff Paul Silva.  The failure to investigate was the moving force behind the denial of medical care; and cruel and unusual punishment on the decedent Paul Silva; the denial of access to warmth, sleep, rest, shower and basic hygiene; and the resulting pain and suffering and death.

## XIV.  TENTH CAUSE OF ACTION
### (*Monell* Municipal Liability – Failure to Train (42 U.S.C. §1983))
### [By all Plaintiffs Against Defendants the City of San Diego and the County of San Diego]

288.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

### A. City of San Diego's Failure to Train

289.     The training policies of Defendant City of San Diego ("CITY") were not adequate to train its officers to handle the usual and recurring situations with which the officers must deal.

- 64

290.     Defendant CITY knew contact with the mentally ill was a frequent and recurring situation for the San Diego Police Department.  SDPD received over 30,000 calls classified as "5150" during a three-year period.  The need for training officers on how to respond to "5150" calls related to mentally ill individuals was obvious.

291.   The training policies of Defendant CITY were not adequate to train its officers to handle the usual and recurring situations with which they must deal, including responding to calls involving mentally ill people; responding to calls requesting hospitalization of mentally ill persons; responding to calls and interacting with people who display symptoms of mental illness; recognizing the indicators of mental illness; appropriately assessing the needs of mentally ill persons; and protecting the rights of mentally ill persons to be free from unreasonable seizures of their persons.  Defendant CITY did not train its officers to refrain from using field sobriety tests on mentally ill patients who were incapable of passing such tests.  The CITY failed to train its officers that use of field sobriety tests on mentally ill patients would consistently result in such persons failing these tests.  Additionally, the CITY's training policies do not conform to nationally accepted standards in police practices.

292.     Upon information and belief, Defendants Maggi, Murrow, and Derisio received no training, or minimal training, regarding assessment of the needs of mentally ill persons who require hospitalization and medication, not incarceration. Defendants received no training on how to properly assess mentally ill persons to divert them towards treatment; instead, Defendants assumed such persons were under the influence of controlled substances and placed mentally ill individuals in jail.

293.     The CITY was deliberately indifferent to the known or obvious consequences of its failure to train its police officers adequately.  The CITY knew its failure to train adequately its officers made it highly predictable that its police

officers would engage in conduct that would deprive persons such as Paul Silva of his rights.

294.     Paul Silva had a right to be free from unlawful arrests and illegal seizures of his person.  He had a right to psychiatric care for his serious medical need.  Plaintiffs Leslie Allen and Manuel Silva had a right to the society and companionship of their son, Paul Silva.

295.     The failure of the CITY to provide adequate training caused the deprivation of these aforementioned rights of Plaintiffs by Maggi, Murrow, and Derisio; that is, the CITY's failure to train is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused the ultimate injury.

296.     By reason of the aforementioned acts and omissions, Plaintiffs have suffered loss of the love, companionship, comfort, care, society, training, guidance, and past and future support of Paul Silva. The aforementioned acts and omissions also caused Paul Silva's pain and suffering, loss of life, loss of enjoyment of life, and death.

**B. County of San Diego's Failures to Train**

297.     The training policies of Defendant County of San Diego (COUNTY) were not adequate to train its deputies and medical staff to handle the usual and recurring situations with which they must deal.

298.     Defendant COUNTY knew contact with the mentally ill was a frequent and recurring situation for the Central Jail.

299.     San Diego Central Jail (SDCJ) is the largest mental health facility in the County. The sixth floor houses a PSU, with 180 beds dedicated to inmates with serious mental health needs. About 30% of the County's approximately 6,000 inmates are on prescribed psychotropic medication.  Providing housing, bedding, and basic toiletries to inmates is a recurring situation that occurs daily at the County's jails.

300.   The training policies of Defendant COUNTY were not adequate to train

- 66

its medical staff to handle the usual and recurring situations with which they must deal, including: (1) adequately communicating inmates' serious mental health needs to ensure coordination of care and continuity of care; and (2) documenting and inputting "alerts" in the Jail's JIMS system to ensure inmates' serious mental health needs were adequately flagged and highlighted so care could be timely provided.

301.    The training policies of Defendant COUNTY were not adequate to train its correctional staff to handle the usual and reccuring situations with which they must deal, including: (1) conducting proper cell checks to observe and monitor medically fragile or vulnerable inmates; and (2) seeking immediate medical and psychiatric care for inmates in obvious distress.

302.    Upon information and belief, Defendants Adraneda and Cavallo received no training on how to adequately communicate an inmate's serious mental health needs to ensure provision and coordination of care; these Defendants received no training on how to review JIMS' alert system to communicate an inmate's serious mental health needs, or understand the needs of vulnerable inmate-patients.

303.    Upon information and belief, Defendants Coyne, Lawson, Douthitt, Rodriguez, Delacruz, Lopez, Vrabel, Enciso, Sherman, Simms, Seaborn, Seeley, Ceballos, and Navarro received no training on how to identify obvious symptoms of psychiatric distress; to approach such persons in distress; to communicate with such persons; and to seek assistance for persons in psychiatric distress to avoid the use of unreasonable force.

304.    The COUNTY was deliberately indifferent to the known or obvious consequences of its failure to train its medical and correctional staff regarding treatment of mentally ill persons.  The COUNTY knew its failure to train adequately its medical and correctional staff made it highly predictable that its jail

staff would engage in conduct that would deprive persons such as Paul Silva of his rights.

305.     Plaintiff Paul Silva had a right to receive consistent and coordinated medical care for his schizophrenia.  Because jail medical staff knew, or should have known, he suffered from schizophrenia, he had a right to continuity of care for his serious psychiatric need, and a right to be observed and monitored through proper cell checks.  Paul Silva, a medically fragile inmate, had a right to be free from the use of excessive and unreasonable force.  Plaintiffs Leslie Allen and Manuel Silva had a right to the society and companionship of their son, Paul Silva.

306.     The failure of the COUNTY to provide adequate training on medical care and use of force caused the deprivation of the aforementioned rights of Plaintiffs by Defendants Adraneda, Cavallo, Coyne, Lawson, Douthitt, Rodriguez, Delacruz, Lopez, Vrabel, Enciso, Sherman, Simms, Seaborn, Seeley, Ceballos, and Navarro; that is, the COUNTY's failure to train is so closely related to the deprivation of the Plaintiffs' rights as to be the moving force that caused the ultimate injury.

307.     By reason of the aforementioned acts and omissions, Plaintiffs have suffered loss of the love, companionship, comfort, care, society, training, guidance, and past and future support of Paul Silva. The aforementioned acts and omissions also caused Paul Silva's pain and suffering, loss of life, loss of enjoyment of life, and death.

## XV. ELEVENTH CAUSE OF ACTION
### *Monell* Municipal Liability – Unconstitutional Custom, Practice, or Policy (42 U.S.C. §1983)
### [By all Plaintiffs Against Defendants the City of San Diego and the County of San Diego]

308.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference.

309.     Defendants Maggi, Murrow, and Derisio acted pursuant to an expressly adopted policy, or a longstanding practice or custom of Defendant CITY.

310.     Defendants Adraneda, Cavallo, Coyne, Lawson, Douthitt, Rodriguez, Delacruz, Lopez, Vrabel, Enciso, Sherman, Simms, Seaborn, Seeley, Ceballos, and Navarro acted pursuant to an expressly adopted policy, or a longstanding practice or custom of Defendant COUNTY.

311.     On information and belief, Defendants Maggi, Murrow, and Derisio were not disciplined, reprimanded, retrained, suspended, or otherwise penalized in connection with Paul Silva's death.

312.     On information and belief, Defendants Adraneda, Cavallo, Coyne, Lawson, Douthitt, Rodriguez, Delacruz, Lopez, Vrabel, Enciso, Sherman, Simms, Seaborn, Seeley, Ceballos, and Navarro were not disciplined, reprimanded, retrained, suspended, or otherwise penalized in connection with Paul Silva's death.

313.     Defendant CITY, together with other CITY policymakers and supervisors, maintained the following unconstitutional customs, practices, and policies:

     a.   Falsely arresting citizens, including those who need medical or psychiatric help;

     b.   Denying medical care to the mentally ill;

     c.   Inadequately supervising, training, controlling, assigning, and disciplining CITY officers, including Maggi, Murrow, and Derisio; and

     d.   Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining, and controlling misconduct by CITY officers, including Maggi, Murrow, and Derisio.

314.     The collective inaction and callous indifference of San Diego Police Department officers caused Paul Silva to be denied hospitalization for treatment of

his psychiatric condition, despite repeated requests for hospitalization by Leslie Allen, and caused Paul to be incarcerated for a crime he did not commit.

315.    Defendant COUNTY, together with other COUNTY policymakers and supervisors, maintained the following unconstitutional customs, practices, and policies:

      a.  Using excessive force on mentally ill individuals who do not pose a risk of imminent death or serious bodily injury to themselves or others;

      b.  Providing inadequate training regarding the use of force, including deadly force;

      c.  Inadequately supervising, training, controlling, assigning, and disciplining COUNTY jail personnel and deputies, including Defendants Adraneda, Cavallo, Coyne, Lawson, Douthitt, Rodriguez, Delacruz, Lopez, Vrabel, Enciso, Sherman, Simms, Seaborn, Seeley, Ceballos, and Navarro;

      d.  Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining, and controlling misconduct by COUNTY jail personnel and deputies, including Defendants Adraneda, Cavallo, Coyne, Lawson, Douthitt, Rodriguez, Delacruz, Lopez, Vrabel, Enciso, Sherman, Simms, Seaborn, Seeley, Ceballos, and Navarro; and

      e.  Maintaining a policy of inaction and an attitude of indifference towards soaring numbers of in-custody deaths, including by failing to discipline, retrain, investigate, and terminate deputies and medical staff who cause the in-custody-death of unarmed, nonviolent, compliant, and/or potentially mentally ill people.  This creates a culture of

- 70

lawlessness where medical and correctional staff are free to act with impunity and thus continue to violate inmates' Constitutional rights.

f.  There were longstanding and systemic deficiencies in San Diego jails' treatment to inmates. Deficiencies included improper cell checks, inadequate medical staffing, lack of required training on screening, diagnosis and treatment of medical and psychiatric conditions, lack of communication of necessary and critical medical information among staff, and non-compliant medical policies and procedures.

g.  These deficiencies included allowing the use of unlawful and unnecessary force and failing to investigate and discipline deputies for the use of such force. There was a custom and practice of resorting to use of force on mentally ill patient/inmates who needed psychiatric help, not use of force.

h.  There was a custom and practice of not properly documenting medical and psychiatric alerts to ensure inmates with serious medical and psychiatric needs are housed in appropriate locations or cells where they are monitored.

i.  There was a custom and practice of failing to communicate the medical needs of inmates between the medical staff and deputies.

j.   There was a custom and practice of not properly checking on the welfare of inmates, even those inmates known to have serious physical or psychiatric needs.

- 71

k.  There was a custom and practice of failing to conduct proper cell checks as required by County's own written policies.

316.     The collective inaction and indifference of Sheriff's Department jail medical staff and deputies caused Paul Silva to be denied appropriate placement in a sobering cell; denied Paul Silva placement in a cell where he could receive medical attention, food, rest, and bedding; denied provision of medical and psychiatric care to Paul Silva when he exhibited obvious signs of psychiatric distress; and caused Paul to be moved from temporary holding cell to temporary holding cell without being released or medically assessed to determine the source of his deteriorating condition.

317.     There was a custom and practice of not properly funding, utilizing, and requesting the specialized services of PERT.

318.     Defendants, the City of San Diego and the County of San Diego, failed to set forth any policies or conduct any self-evaluation of procedures and training under the Americans with Disability Act and the Rehabilitation Act for its personnel about how to handle encounters with persons who have mental illness or another disability.

319.     County of San Diego Defendants maintained a *de facto* policy of failing to notify CLERB of in-custody deaths.

320.     County of San Diego Defendants maintained a *de facto* policy of failing to adequately fund CLERB; properly staff CLERB; to properly train CLERB on how to conduct proper investigations; and to allow summary dismissal of in-custody deaths without any investigation.

321.     County of San Diego Defendants maintained a *de facto* policy of failing to investigate in-custody deaths by CLERB.

322.     The unlawful and illegal conduct of Defendant deprived Paul Silva of the rights, privileges and immunities secured to him by the Constitutions of the United States.

- 72

323.     By reason of the aforementioned acts and omissions, Plaintiffs have suffered loss of the love, companionship, comfort, care, society, training, guidance, and past and future support of Paul Silva. The aforementioned acts and omissions also caused Paul Silva's pain and suffering, loss of life, loss of enjoyment of life, and death.  As a direct, proximate and foreseeable result, Plaintiff suffered damages in an amount according to proof at the time of trial.

## XVI.  TWELFTH CAUSE OF ACTION
### (Wrongful Death– CCP §377.60 *et seq*.)
### [By Plaintiffs Leslie Allen and Manuel Silva against All Defendants]

324.     Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein.

325.     Plaintiffs allege all California state law claims as basis for state law wrongful death cause of action and incorporate later torts by reference.

326.     Defendants committed wrongful acts which proximately caused the death of Paul Silva.  Specifically, Defendants deprived Paul Silva of his rights under the United States Constitution to be free from the punishment without due process and cruel and unusual punishment.

327.     Defendants failed to provide Paul medical and psychiatric assistance when he was in obvious distress.  They arrested Paul for a crime he did not commit and punished him with inhumane conditions of confinement and the excessive use of force.

328.     These acts resulted in the death of Paul Silva.

329.     The City of San Diego, County of San Diego, Tri-City/CHMA/CCMG are responsible for the acts of employees and agents under the theory of *respondeat superior*.

330.     The wrongful acts alleged above has destroyed the relationship between Plaintiffs and Paul Silva and has legally, proximately, foreseeably and actually caused severe emotional damages, including the loss of society,

companionship, emotional distress, and further economic and non-economic damages according to proof at the time of trial.

## XVII. THIRTEENTH CAUSE OF ACTION
### (Negligence)
### [By Estate of Paul Silva against All Defendants]

331.     Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

332.     Defendants had a duty to Paul Silva to act with ordinary care and prudence so as not to cause harm or injury to another.

333.     In evaluating, assessing and handling Paul Silva's medical condition, Defendants failed to comply with professional and legal standards.

334.     Defendants improperly, negligently, wrongfully, and recklessly subjected Paul Silva to arrest for a criminal charge instead of taking him to a mental health care facility.

335.     Defendants failed to provide PERT clinicians qualified to assess, treat, and/or care for a mentally ill patient.

336.     Defendants improperly, negligently, wrongfully, and recklessly failed to provide necessary medical documentation and information to San Diego Central Jail regarding Paul's serious medical need.

337.     Defendants improperly, negligently, wrongfully, and recklessly failed properly document's serious medical and psychiatric condition; failed to communicate to the other jail staff regarding the need to monitor; failed to house Paul in an area where he would be medically monitored; failed to provide basic humane jail housing; and failed to provide any medical care for a life-threatening condition.

338.     Defendants improperly, negligently, wrongfully, and recklessly failed to take any action to monitor Paul Silva despite his obvious symptoms of a serious illness.  They failed to conduct proper cell checks to monitor his well-being.  They

placed him in a cell for 29 hours in a cell with no video camera after they were made aware that Paul's condition was deteriorating.

339.    Defendants improperly, negligently, wrongfully, and recklessly failed to render medical care to Paul Silva who was in obvious physical distress and in acute need of psychiatric care.

340.    Defendants improperly, negligently, wrongfully, and recklessly failed to transport Paul Silva to a psychiatric care facility and instead booked him in jail for a crime Paul did not commit.

341.    Defendants improperly, negligently, wrongfully, and recklessly failed to take any action to summon help or transport Paul Silva to the hospital despite their knowledge that he needed medical assistance.

342.    Defendants improperly, negligently, wrongfully, and recklessly used excessive and unreasonable force against Paul Silva while he was in medical and psychiatric distress and unable to understand his circumstance and situation.

343.    Defendants Zimmerman, Gore, Lee, Joshua and CHMA/CCMG improperly, negligently, wrongfully, and recklessly failed to set forth policies regarding medical treatment of inmates suffering from serious mental health conditions, including schizophrenia.

344.    Defendants Zimmerman, Gore, Lee, and Joshua improperly, negligently, wrongfully, and recklessly failed to set forth policies regarding proper screening, evaluation, housing, monitoring, treatment, and transportation of inmates suffering from a serious medical condition.

345.    Defendants County of San Diego and City of San Diego improperly, negligently, wrongfully, and recklessly failed to conduct any self-evaluation of procedures and training under the Americans with Disability Act and the Rehabilitation Act for its personnel about how to handle encounters with persons who have mental illness or another disability.

346.     Defendants improperly, negligently, wrongfully, and recklessly failed to conduct any self-evaluation of procedures and training under the Americans with Disability Act and the Rehabilitation Act for its personnel about how to handle protocols for patients who suffer from schizophrenia.

347.     Defendants Tri-City/CHMA/CCMG failed to properly train, supervise, and monitor its employee, Keri Cavallo, in the performance of her duties at the Central Jail.

348.     By engaging in the acts alleged herein, Defendants failed to act with ordinary care and breached their duty of care owed to Paul Silva.

349.     The City of San Diego, County of San Diego, and Tri-City/CHMA/CCMG are responsible for the acts of their employees and agents under the theory of *respondeat superior*.

350.     Plaintiffs are informed and believe that Defendants, the City of San Diego, the County of San Diego, Gore, Lee, Joshua, Tri-City/CHMA/CCMG, Coyne, Lawson, and Douthitt maintained policies, practices and procedures that allowed for and encouraged the denial of care which ultimately caused the death of Paul Silva.   These policies, practices and procedures include without limitation Defendants' training procedures and practices with respect to supervision of the officers and policies and procedures with regard to providing necessary medical attention.

351.     By engaging in the acts alleged herein, all Defendants failed to act with ordinary care and breached their duty of care owed to plaintiffs.

352.     As a direct and proximate result of the Defendants' negligent conduct as herein described, Paul Silva suffered physically and mentally in the amount to be determined at the time of trial.

353.     As a further proximate result of the Defendants' negligent conduct, Paul Silva died.

354.     As a further proximate result of the Defendants' negligent conduct, Plaintiffs Manuel Silva and Leslie Allen have lost their son and suffered great emotional and mental harm in the amount to be determined at the time of trial.

355.     The conduct of the Defendants also amounts to oppression, fraud or malice within the meaning of Civil Code Section 3294 et seq. and punitive damages should be assessed against each defendant for the purpose of punishment and for the sake of example.

## XVIII.  FOURTEENTH CAUSE OF ACTION
### (Violation of Cal. Civ. Code § 51)
**[By the Estate of Paul Silva against Cavallo, O'Brien, CHMA, and CCMG]**

356.     Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

357.     Pursuant to the Unruh Civil Rights Act, all persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

358.     Defendants violated the Unruh Act by denying Paul Silva the full and equal accommodations, advantages, facilities, privileges or services as other citizens who do not suffer from his disability.

359.     Paul Silva was experiencing a medical emergency and required assistance by medical care professionals.  Paul Silva was denied these services on the basis of his disability.

360.     Paul Silva required the accommodations and services provided to all inmates, which was a proper and accurate assessment of his medical and psychiatric conditions.  Paul Silva required the accommodations and services of a proper

- 77

medical assessment in a correctional setting to ensure that force would not be unreasonably used against him.  Defendants denied Paul Silva these services on the basis of his disability.

361.    As a direct and proximate result of Defendants' actions, as alleged herein, Plaintiff was injured as set forth above and is entitled to damages, including compensatory and punitive damages, in an amount to be proven at trial and in excess of the jurisdictional amount required by this Court.

362.    In conducting herself as alleged herein, Cavallo acted within the course and scope of her employment with CHMA/CCMG.  Thus, CHMA/CCMG is responsible for her conduct.

363.    In doing the foregoing wrongful acts, Defendants acted in reckless and callous disregard for Plaintiffs' constitutional rights. The wrongful acts, and each of them, were willful, oppressive, fraudulent and malicious, thus warranting the imposition of punitive damages against each individual Defendant in an amount adequate to punish the wrongdoers and deter future misconduct.

### XIX.  FIFTEENTH CAUSE OF ACTION
### (Violation of Cal. Civ. Code § 52.1)
**[By the Estate of Paul Silva against County of San Diego, City of San Diego, Murrow, Derisio, Maggi, Coyne, Lawson, Douthitt, DelaCruz, Lopez, Vrabel, Enciso, Sherman, Simms, Seabron, and DOES]**

364.    Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

365.    Defendants interfered by threats, intimidation, or coercion, with the exercise or enjoyment by Paul Silva of rights secured by the Constitution or laws of the United States.

366.    The Fourth and Fourteenth Amendments to the U.S. Constitution, and Article I, section 13 of the California Constitution, guarantee (a) an individual's

right to be free from excessive force and (b) parents' rights to the companionship of their child.

367.     Paul Silva had a Constitutional right not to be arrested without probable cause.  Murrow, Derisio, and Maggi arrested Paul through the use of intimidation and coercion by accusing him of being under the influence of a controlled substance when he was not.

368.     California Civil Code section 43 confers a right to be secure in one's bodily integrity from assault and excessive force.  By engaging in the acts alleged above, Defendants denied those rights to Plaintiff, thus giving rise to claims for damages pursuant to California Civil Code section 52.1.

369.     As a direct and proximate result of Defendants' actions, as alleged herein, Plaintiff was injured as set forth above and is entitled to damages, including compensatory and punitive damages, in an amount to be proven at trial and in excess of the jurisdictional amount required by this Court.

370.     In conducting himself as alleged herein, Defendants were acting within the course and scope of their employment with Defendants City of San Diego and County of San Diego. Thus, the City and the County are responsible for Defendants' actions.

371.     In doing the foregoing wrongful acts, Defendants acted in reckless and callous disregard for Plaintiffs' constitutional rights. The wrongful acts, and each of them, were willful, oppressive, fraudulent and malicious, thus warranting the imposition of punitive damages against each individual Defendant in an amount adequate to punish the wrongdoers and deter future misconduct.

## XX. SIXTEENTH CAUSE OF ACTION
### (Violation of the Americans With Disability Act of 1990
### 42 U.S.C. 12101, *et seq.*)
### [By the Estate of Paul Silva against the City of San Diego and County of San Diego]

372.     Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

373.     Pursuant to 42 U.S.C. § 12132, "Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

374.     Under Title II of the Americans with Disability Act, public entities are required to make reasonable modifications to avoid discrimination on the basis of disability.  The ADA sets an affirmative requirement to act appropriately with respect to prisoners with mental disabilities.

375.     ADA creates an affirmative duty in some circumstances to provide special, preferred treatment, or "reasonable accommodation."

376.     Facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced.

377.     Discrimination includes a defendant's failure to make reasonable accommodations to the needs of a disabled person based on his mental health. These accommodations include training on how to deal with the mentally ill, specialized training of jail staff, heightened level of medical care, and diligent surveillance.

378.     Paul Silva was a disabled individual suffering from a mental impairment that substantially limited one or more major life activities.  Paul Silva was a "qualified individual with a disability" for purposes of the Americans with Disabilities Act and the Rehabilitation Act.

379.     The City of San Diego and the County of San Diego are "public entities" for purposes of the Americans with Disabilities Act and the Rehabilitation Act.

380.     A person has a disability if he/she has a physical or mental impairment that substantially limits one or more major life activities, a record of such

impairment, or is regarded as having impairment. It was well documented that Paul Silva was diagnosed with schizophrenia and he was unable to care for himself.

381.     Defendants denied Paul Silva benefits of the services, programs or activities of the City of San Diego and the San Diego County Jail because of his disability and subjected him to discrimination.

382.     Defendants failed to make reasonable accommodations to Paul Silva's medical needs based on his mental health. The failure to provide critical medical information was a denial of the services program or activity based on his disability

383.     Defendants denied Paul Silva benefits of the services, programs or activities including a transfer to a mental health facility, which is the services, programs or activities they provide.

384.     Defendant CITY denied Paul medical treatment by failing to take Paul to the hospital. CITY employees assumed Paul's symptoms of schizophrenia were symptoms of drug use. SDPD officers administered a field sobriety test that a schizophrenic patient cannot pass. Officers administered a test where Paul had to determine when 30 seconds had passed and administered a test in which Paul was required to move his eyes to follow an object without moving his face. Mentally ill patients such as Paul cannot pass these tests. Knowing that the call was for a "5150," SDPD officers administered a test that Paul was certain to fail. These officers then failed to take Paul to a hospital, thereby failing to accommodate Paul's disability, and denying him a service, benefit, or program.

385.     Defendant COUNTY failed to make reasonable accommodations to meet Paul Silva's basic needs. COUNTY denied Paul any housing in the jail by keeping him in temporary holding cells in violation of State law. COUNTY denied Paul access to showers, bedding, and hygienic items (*e.g.* toothbrush, toilet paper, and soap).

386.     COUNTY failed to make reasonable accommodations to meet Paul Silva's mental health needs. COUNTY failed to provide Paul anti-psychotic

- 81

medication, or any other treatment for schizophrenia.  COUNTY ignored Paul Silva's signs of obvious medical distress.

387.     There was an outright denial of services when Paul was exhibiting obvious symptoms of medical distress.  This demonstrates that Defendants were discriminating against Paul Silva because of his disability.

388.     Defendants were deliberately indifferent to Paul Silva's serious medical condition.  Defendants had actual knowledge of the substantial risk of harm to Paul Silva from his serious diagnosed condition and they responded with deliberate indifference by failing to communicate or document his condition; failing to place him in Medical where he could be watched; and failing to provide him medical care when Paul was in medical distress.

389.     The regulations promulgated by the Department of Justice to implement Part A of Title II of the ADA require each government entity to conduct a self-evaluation of its programs and services (or the lack thereof) related to persons with disabilities:

> (a)     A public entity shall, within one year of the effective date of this part [that is, by January 26, 1993], evaluate its current services, policies, and practices, and the effects thereof, that do not or may not meet the requirements of this part and, to the extent modification of any such services, policies, and practices is required, the public entity shall proceed to make the necessary modifications.

> (b)     A public entity shall provide an opportunity to interested persons, including individuals with disabilities or organizations representing individuals with disabilities, to participate in the self-evaluation process by submitting comments.

390.     Defendants failed to conduct any self-evaluation of procedures and training for its personnel about how to handle encounters with persons who have mental illness or another disability.

391.     Defendants failed to conduct any self-evaluation of procedures and training for its personnel about how to handle communication with jails regarding schizophrenia.

392.     Defendants violated Paul Silva's clearly established rights under the ADA with deliberate indifference.

393.     The violation of Paul Silva's rights resulted from a municipal policy or custom adopted or maintained with deliberate indifference.

394.     As a direct and proximate result of the Defendants' conduct as herein described, Paul Silva suffered damages in the amount to be determined at the time of trial.

## XXI.  SEVENTEENTH CAUSE OF ACTION
### (Violation of the Rehabilitation Act 29 U.S.C. § 794(a))
### [By the Estate of Paul Silva against the City of San Diego and the County of San Diego]

395.     Plaintiffs reallege all prior paragraphs of this complaint and incorporates the same herein by this reference.

396.     The Rehabilitation Act of 1973 ("Section 504") states in pertinent part, provides that "No otherwise qualified individual with a disability in the United States  . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a).

397.     Defendants the City of San Diego and the County of San Diego are programs that receive federal financial assistance as defined in 29 U.S.C. § 794(b).

398.     Paul Silva was a "qualified individual with a disability" under the Rehabilitation Act.

399.     Defendants violated the Rehabilitation Act by failing to make reasonable accommodations to the needs of Paul Silva, a disabled person.  It was a reasonable accommodation to transfer a schizophrenic patient to a mental health facility where he could receive necessary services.

400.     Employees of Defendant City of San Diego were deliberately indifferent to Paul Silva's serious medical condition.  They failed to consider obvious symptoms of Paul Silva's mental health condition when they transferred Paul to a jail instead of a hospital.

401.     Defendant City of San Diego failed to communicate critical medical information to the San Diego Central Jail.

402.     Instead of providing Paul Silva with adequate medical services and fair treatment, Defendants the City of San Diego and the County of San Diego refused to provide him with medical and psychiatric care as his condition deteriorated.

403.     Defendant the County of San Diego failed to accommodate Paul Silva with the services and programs available to mental health patients.  There were services readily available to Paul Silva, which was a placement in a mental health hospital or a unit within the Central Jail where mental health care was available. Defendant the County of San Diego failed to house Paul Silva in the PSU, where Paul could be monitored and medicated.

404.     Defendants knew of the substantial risk of harm to Paul Silva from his serious, diagnosed condition and they responded with deliberate indifference by failing to communicate or document his condition; failing to place him in Medical where he could be watched; and failing to provide him medical care when Paul was in medical distress.

405.    Defendants violated the Rehabilitation Act by failing to conduct any self-evaluation of procedures and training for its personnel about how to handle communications with jails regarding patients who have mental illness or another disability.

406.    Defendants violated the Rehabilitation Act by failing to conduct any self-evaluation of procedures and training for its personnel about how to handle encounters with persons who have mental illness or another disability.

407.    As a direct and proximate result of the Defendants' conduct as herein described, Paul Silva suffered damages in the amount to be determined at the time of trial.

**WHEREFORE**, Plaintiffs pray as follows:

1.    For general and special damages according to proof at the time of trial;

2.    For attorneys' fees and costs of suit and interest incurred herein;

3.    For punitive damages; and

4.    Any other relief this court deems just and proper.

**DEMAND FOR A JURY TRIAL**

Pursuant to Rule 38 of the Federal Rues of Civil Procedure and the Seventh Amendment to the Constitution, Plaintiffs hereby demand a jury trial of this action.

Respectfully Submitted,

**IREDALE AND YOO, APC**

Dated:  August 9, 2019

s/ *Grace Jun*
s/ *Julia Yoo*
EUGENE IREDALE
JULIA YOO
GRACE JUN
Attorney for Plaintiffs
THE ESTATE OF PAUL SILVA by and through its successor-in-interest, MANUEL SILVA, and LESLIE ALLEN

- 85 -