EUGENE G. IREDALE, SBN 75292
JULIA YOO, SBN 231163
GRACE JUN, SBN 287973
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
TEL: (619) 233-1525
FAX: (619) 233-3221
Attorneys for Plaintiffs

James P. Frantz, Esq., SBN 87492
William P. Harris III, Esq., SBN 123575
George T. Stiefel, Esq., SBN 297611
FRANTZ LAW GROUP, APLC
402 West Broadway, Suite 860
San Diego, CA 92101
Tel: (619) 233-5945
FAX: (619) 525-7672

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

THE ESTATE OF PAUL SILVA by and through its successors-in-interest LESLIE ALLEN and MANUEL SILVA, MANUEL SILVA, and LESLIE ALLEN,

　　　　　　Plaintiffs,

v.

CITY OF SAN DIEGO *et al*.

　　　　　　Defendants.

CASE NO. 18-cv-02282-L-MSB

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT BY DEFENDANTS KERI CAVALLO, MARK O'BRIEN, COAST HOSPITALIST MEDICAL ASSOCIATES, INC., AND COAST CORRECTIONAL MEDICAL GROUP**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **Table of Contents**

I.    FACTUAL ALLEGATIONS OF THE COMPLAINT.................................1

A.   Paul Is Falsely Arrested by SDPD Officers. ...................................1

B.   Paul Is Confined to Central Jail, Denied Medical and Psychiatric Care, and Denied Humane Conditions of Confinement. ................................2

C.   County Jail Defendants Use Excessive and Unreasonable Force Against Paul Silva ...........................................................................5

II.   ARGUMENT....................................................................9

A.   Defendant Keri Cavallo Failed to Satisfy Her Constitutional Obligation to Provide Medical Care to Paul Silva Who was in Obvious and Severe Mental and Physical Distress ...................................................10

1.   Plaintiffs have alleged facts to satisfy all elements of the *Gordon* standard for deliberate indifference...................................................10

2.   Because Cavallo saw Paul Silva in severe mental distress, she had a responsibility to seek psychiatric assistance for him..........................13

3.   Because Cavallo denied Paul Silva adequate psychiatric care, Cavallo may not escape § 1983 liability by claiming that she made no decision regarding a condition of his confinement. ..........................................14

B.   As Cavallo Played an Integral Role in the Forcible Extraction of Paul Silva, Her Conduct was a Substantial Factor in Causing His Death ......................15

C.   Cavallo Had a Constitutional Obligation to Intervene to Prevent the Use of Excessive Force on a Mentally Ill Man........................................17

D.   Plaintiffs Have Alleged Sufficient Facts to Support Their Theory that Defendant Keri Cavallo Is Liable for Paul Silva's Death. ...........................19

E.   Because Plaintiffs Have Alleged that Defendant O'Brien Provided No Training, Supervision, or Discipline of His Subordinate, Keri Cavallo, the

Seventh and Eighth Causes of Action for Supervisory Liability Should Not Be Dismissed ...................................................................................20

F.  Because Plaintiffs' Claims in Their First Amended Complaint "Relate Back" to the Filing Date of the Initial Complaint, the Statute of Limitations Does Not Bar Any of Their Claims. ........................................................21

G.  California's Unruh Act Applies to Private Entities Operating Inside Correctional Facilities...................................................................23

III.  CONCLUSION...............................................................................24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Table of Authorities

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ..............................................................9

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)...............................9, 10

*Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007)...............16

*Butler v. Nat'l Cmty. Renaissance of Cal.*, 766 F.3d 1191, 1200 (9th Cir. 2014) ...22

*Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) ..........................10

*Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) ..................................17

*Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 207 (1st Cir. 1990) ...17

*Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018).......... passim

*Hernandez v. Cty. of Monterey*, 70 F. Supp. 3d 963, 977 – 78 (N.D. Cal. 2014) ...24

*Jensen v. Lane County*, 222 F.3d 570, 577 (9th Cir. 2000)....................................18

*Manzo v. County of Riverside*, No. EDCV1701165JGBSPX, 2017 WL 10544292,
 at *6 (C.D. Cal. Oct. 19, 2017)...................................................................... 17, 18

*Miranda v. County of Lake*, 900 F.3d 335, 349 (7th Cir. 2018)............................14

*Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019)............. 16, 17

*Norgart v. Upjohn Co*., 21 Cal. 4th 383, 397 (Cal. 1999) .....................................21

*O'Connor v. Village Green Owners Assn*., 33 Cal.3d 790, 795 (Cal. 1983) ..........23

*Richardson v. McKnight*, 521 U.S. 399, 412 (1997) ..............................................18

*Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 794 n.3 (7th Cir. 2014)...............18

*Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ..........................................9, 19

*United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994) ...........................17

*Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir. 1989).....................................13

*Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir.1998). .........................19

*Wilkins-Jones v. Cty. of Alameda*, 859 F. Supp. 2d 1039, 1050 (N.D. Cal. 2012)..23

*Wilson v. Seiter*, 501 U.S. 294, 303 (1991) ...........................................................14

**Statutes**

Code Civ. Proc. § 364 ...................................................................................22

Code Civ. Proc. § 583.210(a) ........................................................................21

Code of Civil Procedure § 474 ......................................................................21

**Rules**

Fed. R. Civ. P. 15(c)(1) .................................................................................22

Fed. R. Civ. P. 15(c)(1)(A) ...........................................................................22

Rule 12(b)(6) ..................................................................................................10

# I.   FACTUAL ALLEGATIONS OF THE COMPLAINT

## A. Paul Is Falsely Arrested by SDPD Officers.

On Tuesday, February 20, 2018, Plaintiff Leslie Allen contacted the San Diego Police Department ("SDPD") to request the assistance of "PERT" (Psychiatric Emergency Response Team) for her schizophrenic son, Paul Silva. (First Amended Complaint ("FAC") at ¶¶ 35, 39).  Because Paul had been acting irrationally, Ms. Allen was concerned that Paul was not taking his medication.  (*Id*. ¶ 34).  Ms. Allen had called PERT on previous occasions to assist Paul.  (*Id*. ¶ 38). On each of the previous occasions, a PERT officer would speak to Paul calmly, and Paul would comply with all of their requests.  (*Id*.).  Because PERT members are trained in dealing with mental illness, Ms. Allen specially requested PERT's assistance.  (*Id*. ¶ 39).

During her phone call with SDPD dispatch, Ms. Allen told police dispatch that her son had no weapons, was not drunk, and was not under the influence of a controlled substance.  (*Id*. ¶ 40).  Ms. Allen stated that Paul was schizophrenic, had been taken to the hospital before, and was a danger to himself.  (*Id*.).  Ms. Allen told Police Dispatch that Paul was cooperative with police because he was scared of officers, and had been cooperative in the past when interacting with the police. (*Id*.).

The dispatch log for Ms. Allen's phone call shows that it was classified as a "5150 Mental Case" and that the "type" of call was "CW – CHECK THE WELFARE."  (*Id*. ¶ 39).  A "5150" hold allows County Mental Health to detain a person for up to 72 hours due to mental health concerns under California Welfare and Institutions Code § 5150.  (*Id*.).  The dispatch record stated "RP (reporting person) REQ PERT // SON PAUL SILVA . . . NO WPNS, NO 647F (drunk in public) OR 11550 (under the influence of a drug) // DIAGNOSED SCHIZOPHRENIC, SHOULD BE ON MEDS, BUT RP THINKS HE IS OFF THEM . . ."  (*Id*. ¶ 41).

1    Ms. Allen called SDPD dispatch a total of three times.  (*Id.* ¶¶ 42-43).  Each

2    time, she emphasized that Paul was schizophrenic and off his medication, but that

3    he did not have any weapons and was not violent.  (*Id.*).  She asked the dispatch

4    operator to tell police officers to refrain from hurting Paul.  (*Id.* ¶ 43).

5    Eventually SDPD officers responded to the street where Leslie Allen lives.

6    (*Id.* ¶ 44).  Ms. Allen spoke to Defendant officer Thomas Derisio.  (*Id.*).  She told

7    him that Paul suffered from schizophrenia, was not taking his medication, and

8    needed to be hospitalized.  (*Id.*).  She requested officers take Paul to the hospital

9    for treatment.  (*Id.*).  Ms. Allen informed Defendant Derisio that Paul was not

10   under the influence of drugs, but was suffering from a schizophrenic episode.

11   (*Id.*).  Despite Ms. Allen's repeated statements that Paul did not use illicit drugs

12   and required hospitalization to treat his schizophrenia, Defendant officers Derisio,

13   Maggi, and Murrow arrested Paul Silva for being under the influence of a

14   controlled substance.  (*Id.* ¶¶ 45-46).  Ms. Allen disagreed that Paul was under the

15   influence of drugs and reiterated that Paul needed to be hospitalized due to his

16   schizophrenia.  (*Id.* ¶ 47).  Defendant officer Murrow transported Paul to SDPD

17   headquarters where he obtained a urine sample from Paul Silva.  (*Id.* ¶ 49).  A

18   laboratory test of Paul's urine later showed that there was no evidence Paul had

19   consumed methamphetamine, cocaine, or any stimulant drug.  (*Id.*).

20   **B. Paul Is Confined to Central Jail, Denied Medical and Psychiatric Care,**

21   **and Denied Humane Conditions of Confinement.**

22   Murrow then transported Paul to Central Jail to be booked.  (*Id.* ¶ 49).

23   Murrow informed the intake nurse at the Central Jail, Defendant Anthony

24   Adraneda, that Paul was under the influence of drugs or alcohol.  (*Id.* ¶ 55).  In

25   response to the question, "Did you witness anything to believe the arrestee (Paul

26   Silva) may be at risk for a medical condition, intellectual disability, or suicide?"

27   Murrow responded, "no."  (*Id.*).  In response to the question, "Is there additional

28   information that you can provide to us to better care for this arrestee and to insure

his health and safety?" Murrow responded, "no." (*Id*.).

The Central Jail's information management system (JIMS) showed that Paul suffered from schizophrenia and that Paul had previously reported psychiatric hospitalizations. (*Id*. ¶ 52). The JIMS system contained a medical record from March 16, 2016, which documented that Paul suffered from schizophrenia and had attempted suicide before. (*Id*. ¶ 92). An encounter note by a nurse on that date stated that "I/P (inmate/patient) denies any medical problems, report that he was dx (diagnosed) with schizophrenia . . . he's responding to internal stimuli, has poor eye-contatc (sic), affect is blunted. . . . alt. in thought process, sched. for psych sc for f/u[.]" (*Id*.). Adraneda reviewed Paul's medical history in JIMS and noted that it showed Paul suffered from schizophrenia. (*Id*. ¶ 52).

Paul told Defendant Adraneda that he suffered from diabetes, schizophrenia, and that he had been hospitalized before in a psychiatric hospital. (*Id*. ¶ 51). Adraneda told Paul that he would refer Paul to be seen by a psychiatric doctor, even though Paul was a "book and release" inmate who would only be staying at the jail for 8 hours. (*Id*. ¶ 52). Paul was to be released from jail when he was deemed sober and not under the influence of a controlled substance. (*Id*. ¶ 56).

For the next 36 hours, the final 36 hours of his life, Paul Silva was not seen by a psychiatrist or medical doctor; he was not given medication to treat his diabetes or schizophrenia; and he was not provided a bed, toiletries, bedding, or clean clothes. (*Id*. ¶¶ 56 – 59). Deputies moved Paul from temporary holding cell to temporary holding cell. (*Id*. ¶ 59). Paul was not placed in a sobering cell to be monitored. (*Id*.). He was not placed in a medical observation unit or a psychiatric unit. (*Id*.). For those 36 hours between February 20 and 21, the jail staff left Paul in temporary holding cells with no shower, no toilet paper, no soap, no toothbrush, no clean clothes, and no bed. (*Id*. ¶ 61). Jail staff, many of whom were wearing winter jackets, gave Paul no blankets. (*Id*.). Paul was wearing the same dirty t-shirt and pants the entire time. (*Id*.). He was left in a cold concrete

cell with no bedding and no place to sleep. (*Id*. ¶ 62). For the last 29 hours of his life, Paul remained in a release holding cell, designed only to temporarily hold inmates awaiting release from Jail, with constant bright light and noise. (*Id*. ¶ 63).

Each of the Defendant deputies at the Central Jail knew that Paul was a "book and release" inmate who would be released within 8 hours, which is sufficient time for someone to "sober up." (*Id*. ¶ 69). Each of these defendants saw that after 8 hours, Paul did not sober up. (*Id*.). Paul, who suffered from diabetes, did not appear to eat in the last 24 hours of his life. (*Id*. ¶ 67). Hospital tests would later show that he was hypoglycemic with blood sugar levels at 30. (*Id*.). Paul began to demonstrate increasingly psychotic and agitated behavior. (¶ 69). He paced back and forth during his entire 36-hour detention. (*Id*.). He shoved items under the cell door and side of the door. (*Id*. ¶ 70). Defendant deputies knew that Paul had been in custody for well over 8 hours and did not appear to be sobering up. (*Id*. ¶¶ 70 – 81). Yet, no deputy sought medical attention for Paul Silva. (*Id*. ¶ 82).

By February 21, 2018, at 7:41 p.m. (after approximately 32 hours of confinement in temporary holding cells), Defendant Julio Rodriguez observed Paul "looking around the cell" and appearing "paranoid." (*Id*. ¶ 84). At 7:51 p.m., Deputies Rodriguez, Seabron, and Suarez entered Paul's cell. (*Id*.). Paul complied with Deputy Rodriguez's instructions, but talked at a rapid pace. (*Id*.). Deputy Rodriguez noted that Paul looked around the walls as if he were still paranoid. (*Id*.). Paul was agitated and spoke incoherently. (*Id*.). When Paul saw Deputy Rodriguez reach for his handcuffs, Paul ran towards the back of cell. (*Id*.). The deputies left Paul in his cell to "complete the detox process." (*Id*.).

Three hours later, at 10:55 p.m., deputies observed Paul continuing to behave erratically. (*Id*. ¶ 85). Paul ran from wall to wall in his cell and placed

his body against the walls and on the floor.  (*Id.*).  Paul took off his shoes as he yelled incoherently.  (*Id.*).  Paul did not respond to officer commands.  (*Id.*).

## C. County Jail Defendants Use Excessive and Unreasonable Force Against Paul Silva

At approximately 10:59 p.m., Sergeant Lawson instructed Deputy Seabron to use oleoresin capsicum (OC) spray on Paul to force him to comply.  (*Id.* ¶ 86). The OC spray had no effect on Paul as he continued to run back and force in his cell.  (*Id.*).  Sergeants Lawson and Douthitt conferred with Lieutenant Coyne, the watch commander, who arrived to observe Paul.  (*Id.* ¶ 87).  At no point did any of these Defendants seek a medical or psychiatric evaluation of Paul Silva.  (*Id.*). Instead, Lawson and Douthitt proposed assembling the Tactical Team to gain control of Paul and extract him from his jail cell.  (*Id.*).  None of these supervisory defendants (Lawson, Douthitt, or Coyne) reviewed Paul's medical history in JIMS, which documented his schizophrenia and mental health history. (Id.).

Video taken of Paul Silva before the Tactical Team arrives shows Paul staring at the deputy holding the camera with his mouth wide open.  (*Id.* ¶ 88). Paul then ducks down.  (*Id.*).  Paul walks around his cell in bewilderment with his mouth open wide in the shape of an "O."  (*Id.*).  He sits on the floor of his cell and makes shapes in the air with his fingers.  (*Id.*).  Paul spins on the floor while holding his fingers in the air.  (*Id.*).  He stands up, backs away from the door where deputies stand, and throws himself on the ground.  (*Id.*).  Paul's head darts back and forth as he looks at the deputies; his mouth remains open in a wide "O" formation; his eyes are bulging and wide open. (*Id.*).

The video shows Defendant Keri Cavallo, a nurse practitioner, approach Paul's cell door.  (*Id.* ¶ 89). Paul backs away towards the back of the cell with his hands up as he spins and sways.  (*Id*)  Paul repeatedly throws himself on the ground as Cavallo asks him, "Mr. Silva, do you know where you are?"  (*Id*)  Paul

does not respond to Cavallo's questions, but stares at the deputy recording him with his mouth and eyes wide open; he ducks to avoid the camera and crouches on the ground as if to hide.  (*Id*).  He then returns to the window to stare at the camera with his mouth open in an "O" formation and his eyes staring vacantly at the deputy.  (*Id*).  When a deputy approaches the door, Paul ducks to the ground. (*Id*).   A deputy is heard on the video telling Cavallo that in the last few hours, Paul has been acting bizarre and will make a "monkey face" but had not said a word.  (*Id*).  Cavallo would later describe Paul's behavior as "spooked" and "almost animalistic."  (*Id*. ¶ 90).

Cavallo erroneously stated that Paul suffered from excited delirium from drug use.  (*Id*. ¶ 91).  She was concerned that Paul could be suffering from something else, such as psychosis.  (*Id*.).  But Cavallo did not request a psychiatrist to come evaluate Paul.  (*Id*.).  Cavallo did not ask a medical doctor to assess Paul.  Cavallo did not call any psychiatric expert for guidance.  (*Id*.). Cavallo did not check Paul's medical history in JIMS.  (*Id*.).  Cavallo did not ask for a psychiatric evaluation so Paul could be admitted to the Psychiatric Security Unit (PSU), the Central Jail's internal hospital for involuntary medication.  (*Id*.).

The Sheriff's Department has a contract with a medical group, Liberty Healthcare, which employs psychiatrists who work onsite at the Central Jail until approximately 10:00 PM each night.  (*Id*. ¶ 93).  Liberty Healthcare also has psychiatrists on-call after 10:00 PM who are available in the case of a psychiatric emergency.  (*Id*.).  At no point did Nurse Practitioner Cavallo seek an emergency psychiatric or medical assessment.  (*Id*. ¶ 94).  She did not call Liberty Healthcare psychiatrists to request emergency assistance.  (*Id*.).  Instead, Cavallo told Lt. Coyne that Paul needed to be sent to the hospital based on her claim that Paul was suffering from "excited delirium."  (*Id*.).

Seven members of the Tactical Team assembled in front of Paul's jail cell. (*Id*. ¶ 96).  The team consisted of Deputy Charles DelaCruz, Deputy Diego

Lopez, Deputy Aaron Vrabel, Deputy Jorge Enciso, Deputy Tanner Sherman, Corporal Christopher Simms, and Deputy Ryan Seabron. (*Id*.). It was under the command of Sergeant John Douthitt. (*Id*.). Lt. Coyne went to Paul's jail cell door and ordered him to "come to the door and be cuffed up or force will be used." (Id. ¶ 98). Paul did not respond. (*Id*.).

Deputy Vrabel began by opening the food flap on the jail cell door. (Id. ¶ 99). He shot "water rounds" at Paul. (*Id*.). Corporal Simms then removed his Taser and pointed it at Paul. (*Id*. ¶ 100). Paul ran to the back of the cell to hide behind a short barrier. (*Id*.). He then ran to the other side of the jail cell. (*Id*.). Simms fired the Taser at Paul, causing Paul to fall to the ground as he cried out in pain. (*Id*.). An analysis of the Taser records by Taser International (now "Axon Enterprise") showed that Simms activated the trigger switch 4 times and the arc switch 6 times during this incident. (*Id*.). Each of the 4 trigger activations lasted 5 seconds while 5 of the 6 arc switch activations lasted a fraction of a second. (*Id*.).

As Paul was being Tased, the Tactical Team entered his cell. (Id. ¶ 101). Deputy Enciso, using a Nova body shield that is capable of producing an electrical shock, pinned Paul against the wall. (*Id*.). The deputies then took Paul to the ground where he lay face up. (*Id*.). Deputy Enciso placed his shield on top of Paul's upper body and then climbed on top of the shield. (*Id*.).

On the video, Paul is heard saying, "I didn't do anything, sir, I didn't do anything." (*Id*. ¶ 102). Deputy DelaCruz grabbed Paul's arms and legs and wrestled Paul's arms behind his back. (*Id*. ¶ 103). Deputy Seabron grabbed Paul's legs to pin them down. (*Id*.). DelaCruz delivered a "hammer strike" to Paul's face. (*Id*.). DelaCruz then employed the "hammer strike" to Paul's right shoulder. (*Id*.). Simms grabbed Paul's arm and placed a "wrist flex" on Paul's arm to gain compliance. (*Id*.).

Deputy Sherman flipped Paul onto his stomach and grabbed Paul's hand. Deputy Enciso held the shield against Paul's back.  (*Id*. ¶ 104).  Deputy Sherman used his right hand to push down and forcefully pin Paul's head to the ground. (*Id*.).  Deputy Vrabel forcefully pushed down on Paul's head to keep his head pinned to the ground.  (*Id*.).  Vrabel used the "mandibular angle" technique on Paul's head pressing underneath the jaw to cause great pain.  (*Id*.).  Deputy Sherman placed his knee on Paul's elbow.  (*Id*.).

Video shows all 7 members of the Tactical Team on top of Paul's midsection, arms, and legs.  (*Id*. ¶ 105).  Paul is heard pleading, "Stop!  Stop! Stop sir, please stop.  Don't do it, don't do it, sir."  (*Id*.).  Paul begins to talk about his brother and his mother as officers remain piled on top of him, pressing down on him.  (Id.).  Paul pleads, "don't hurt me."  (*Id*.).  Douthitt is heard saying, "Enciso, you need to hit him with the shield, activate the shield."  (Id.).  Paul continues to yell out, "stop!  Please sir, stop!"  (*Id*.).  Paul is heard crying and saying repeatedly, "Can't breathe.  Can't breathe."  (*Id*.).

Deputies used multiple handcuffs to cuff Paul's hands behind his back while the shield was on his back. (*Id*. ¶ 106).  They secured leg chains on his legs. Paul was face-down on the ground. (*Id*.).  The video shows that it took approximately seven minutes, after the Tactical Team entered Paul's cell, to place handcuffs and leg chains on Paul. (*Id*.).  During those seven minutes, defendants never stopped to check on Paul's ability to breathe despite Paul's repeated plea that he could not breathe. (*Id*.).

By the time Paul is handcuffed, he is not moving on the video. (*Id*. ¶ 107). A voice is heard saying "we got him under control right now." (*Id*.). Approximately one minute later, deputies seem to realize that Paul is nonresponsive. (*Id*.).  A large pool of bright red blood is seen on the ground after the deputies get off Paul. (*Id*.).  A deputy arrives to cover the blood with towels. (*Id*.).  After another minute, Firefighters are on scene checking Paul's neck area

for a pulse. (*Id*.).  One of the firefighters states the cuffs need to be taken off of Paul. (*Id*.).  It takes approximately two minutes for the deputies to remove the handcuffs and leg chains from Paul and place a waist chain on him. (*Id*.).  A firefighter begins chest compressions with the assistance of paramedics. (*Id*.).

Medical tests would later show Paul had a collapsed lung. (*Id*. ¶ 109).  There were visible injuries of the head including blood on forehead, eyebrows and nose; laceration with abrasion on the right eyebrow; contusion to the right eye; upper lip edema; puncture wounds to the torso possibly from the Taser; abrasions to the wrist, knuckles and forearm; a puncture wound to the inner thigh, and contusions to the left knee and left thigh. (*Id*.).  Paul sustained serious and permanent brain damage, neurological injuries, kidney failure and other life-threatening injuries. (*Id*. ¶ 110).

UCSD Medical Center hospital lab results were negative for any alcohol, amphetamines, opiates, methadone, barbiturates or cocaine. (*Id*. ¶ 111).  Tests at UCSD showed Paul suffered from hypoglycemia and rhabdomyolysis. (*Id*.).

Paul was in a coma for several weeks before he ultimately succumbed to his injuries. (*Id*. ¶ 112).  The Medical Examiner found the cause of death to be lack of oxygen to the brain resulting from cardiopulmonary arrest during restraint.  The manner of death was homicide. (*Id*. ¶ 113).

## II. ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), *citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  To be "entitled to the presumption of truth" the complaint "must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  Additionally, the factual allegations, taken as true, "must plausibly suggest entitlement to relief."  *Id*.  A plaintiff satisfies the

plausibility requirement even where defendant proposes an alternative explanation. *Id*. "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Id*. Plaintiff's allegations or explanations in a complaint at this stage need not be true or even probable. *Id*. at 1217. "Rule 8(a) '*does not impose a probability requirement at the pleading stage*; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' to support the allegations." *Id*., *citing Twombly*, 550 U.S. at 556 (emphasis in the original). "The theory of the federal rules is that once notice-giving pleadings have been served, the parties are to conduct discovery in order to learn more about the underlying facts." *Id*. at 1212.

## A. Defendant Keri Cavallo Failed to Satisfy Her Constitutional Obligation to Provide Medical Care to Paul Silva Who was in Obvious and Severe Mental and Physical Distress

### 1. Plaintiffs have alleged facts to satisfy all elements of the *Gordon* standard for deliberate indifference

Cavallo's moves to dismiss Plaintiffs' claim of deliberate indifference (the third cause of action) by arguing two points: (1) that Cavallo did not make any decision regarding Paul Silva's conditions of confinement; and (2) that Cavallo made the appropriate medical decision by recommending Paul be extracted from the jail cell. (Cavallo Mem. Ps. & As., doc. 85-1, at 6-7).

The Ninth Circuit in *Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018), *cert. denied sub nom. Cty. of Orange, Cal. v. Gordon*, 139 S. Ct. 794, 202 L. Ed. 2d 571 (2019), held that claims of denial of medical care made by pretrial detainees under the Fourteenth Amendment "must be evaluated under the objective deliberate indifference standard." Gordon then adopted the four-factor test of the Ninth Circuit's *en banc* decision in *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016), a failure to protect case:

Based thereon, the elements of a pretrial detainee's

medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon*, 888 F.3d at 1125 (9th Cir. 2018). The third prong of this test requires a showing that defendant's conduct was "objectively unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each particular case." *Id*. (internal citations omitted). Plaintiffs must show "'more than negligence but less than subjective intent – something akin to reckless disregard.'" *Id*. (internal citation omitted).

The First Amended Complaint alleges all elements of the *Gordon* test to Cavallo's conduct. Cavallo made an intentional decision when she diagnosed Paul with "excited delirium" and recommended that Paul be forcibly extracted from his jail cell and then hospitalized. (FAC ¶ 195). Her decision put Paul at a substantial risk of suffering serious harm because Cavallo knew that in order to be hospitalized, deputies would violently extract Paul using force because she stood by as the Tactical Team assembled with their combat gear and weapons and entered Paul's cell. (FAC ¶ 220). Cavallo had observed Paul to be frightened and nonresponsive to verbal commands or questions. (*Id*. ¶ 89). Cavallo believed that Paul might be suffering from psychosis. (*Id*. ¶ 91). She knew that Paul did not appear to understand what has happening to him. (*Id*. ¶ 195). Cavallo knew or should have known of the heightened risk of excessive force being used by officers in tactical gear who would perceive Paul's psychiatric distress as noncompliance.

But Cavallo "did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious[.]" *Gordon*, 888 F.3d at 1125. Plaintiffs allege that Cavallo failed to take any reasonably objective steps to assess Paul and to seek a medically appropriate course of treatment. (FAC ¶ 195). Cavallo personally observed Paul acting in a bizarre and irrational manner. (*Id*. ¶ 90). Yet, she did not review any of Paul's medical records in JIMS, which reflected that he suffered from schizophrenia and diabetes. (*Id*. ¶ 195). Had she reviewed his medical records, Cavallo would have seen that no one had treated Paul for schizophrenia and diabetes. Cavallo believed Paul might be suffering from psychosis, but she made no attempt to contact a medical doctor, seek the opinion of a psychiatrist, or even call Liberty Healthcare to request assistance with a psychiatric emergency. (*Id*. ¶¶ 93-94). Instead, unsupported by any actual medical assessment or review of medical history, Cavallo concluded Paul suffered from excited delirium and required hospitalization. (*Id*. ¶ 91). Cavallo acted recklessly by failing to actually assess and understand the etiology of Paul's acute distress. She acted recklessly by failing to seek a more qualified opinion from a psychiatrist about the appropriate course of action when she knew that Paul was suffering from some sort of psychosis.

The First Amended Complaint alleges other reasonable measures Cavallo could have taken to abate the risk of force being used against Paul: she could have consulted with a psychiatrist who could have admitted Paul into the Jail's internal hospital, the Psychiatric Security Unit (*Id*. ¶ 195); or Cavallo could have sought an evaluation by a psychiatrist who was on-call to handle such emergencies. (*Id*. ¶¶ 93-94). A psychiatrist could have made the determination to forcibly medicate Paul Silva inside his jail cell. (*Id*. ¶ 194). Cavallo did none of these things. Thus, the First Amended Complaint adequately alleges facts to satisfy the fourth *Gordon*

element: that by failing to take these measures, Cavallo caused the Paul Silva's injuries.

2. Because Cavallo saw Paul Silva in severe mental distress, she had a responsibility to seek psychiatric assistance for him.

Although Cavallo characterizes Plaintiffs' deliberate indifference claim as one involving the "wrong diagnosis" (Cavallo Mot. at 6), the First Amended Complaint alleges that Cavallo failed to act in an objectively reasonable manner by concluding that Paul needed to be removed from his cell without any medical assessment or review of his medical history.  (FAC ¶ 195).  Moreover, though Cavallo saw that Paul could not respond to questions or verbal commands, Paul did not appear to understand what was happening, and Cavallo suspected some sort of psychosis, she took no steps to summons the assistance of a psychiatrist.  (*Id*.).

"Courts have held that failure to notify competent officials of an inmate's dangerous psychiatric state can constitute deliberate indifference." *Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir. 1989) (internal citations omitted).  In *Waldrop*, a seriously mentally ill inmate named Waldrop slashed his own arm.  871 F.2d at 1032.  A medical doctor, who knew Waldrop suffered from a severe psychiatric problem, treated the arm wound, but did not notify a psychiatrist or take any other action regarding the self-inflicted injury.  *Id*. at 1036.  Three days later, Waldrop gouged out his left eye.  *Id*.  Plaintiffs alleged the doctor should have taken some action to treat Waldrop's psychiatric problem after he slashed his own arm.  *Id*.  The Eleventh Circuit denied qualified immunity to the medical doctor who failed to notify a psychiatrist regarding Waldrop's act of self-harm: "The law was clear in 1984 that prison officials have an obligation to take action or to inform competent authorities once the officials have knowledge of a prisoner's need for medical or psychiatric care."  *Id*. (internal citations omitted).

Like the doctor in *Waldrop*, Cavallo had an obligation to notify a psychiatrist regarding Paul's severe decompensation.  Cavallo personally observed

Paul in terrible distress: he could not communicate, he could not respond, and he did not understand what was happening to him.  Cavallo, as a nurse practitioner, had an obligation to protect Paul from further harm.  "We have recognized a jail or prison official's failure to protect an inmate from self-harm as one way of establishing deliberate indifference to a serious medical need.  The obligation to intervene covers self-destructive behaviors up to and including suicide." *Miranda v. County of Lake*, 900 F.3d 335, 349 (7th Cir. 2018) (internal citations omitted).  Had she even reviewed Paul's JIMS medical records, Cavallo would have seen that he suffered from schizophrenia.  Rather than alert a psychiatrist, Cavallo recommended forcible extraction as she stood by and watched the Tactical Team assemble.

Because the First Amended Complaint has alleged detailed and specific facts in support of Plaintiffs' claim of deliberate indifference against Cavallo, Plaintiffs respectfully request the Court deny her motion to dismiss.

3.  <u>Because Cavallo denied Paul Silva adequate psychiatric care, Cavallo may not escape § 1983 liability by claiming that she made no decision regarding a condition of his confinement.</u>

Cavallo appears to read the first element of the *Gordon* test to literally require her to make an intentional decision regarding where and how a pretrial detainee is housed within a jail.  "Cavallo did not have any role in determining the conditions of Decedent's confinement."  (Cavallo Mot. at 6:13-14).  Cavallo provides no citation to authority to support such a radical limitation of § 1983 liability for medical practitioners within jails.

*Gordon* makes clear that the adequacy of medical care a pretrial detainee receives is a condition of his confinement.  888 F.3d at 1124.  "The Supreme Court has treated medical care claims substantially the same as other conditions of confinement violations including failure-to-protect claims.  *Id.*  "Indeed, the medical care a prison receives is just as much a 'condition' of his confinement as .

14
18-cv-2282-L-MSB

. . the protection is afforded against other inmates." *Id*., *quoting Wilson v. Seiter*, 501 U.S. 294, 303 (1991). Thus, the first prong of *Gordon* can be fairly read to say that a medical practitioner's intentional decision regarding a pretrial detainee's medical care relates to a condition of that detainee's confinement.

Moreover, Cavallo's interpretation of the first prong of the *Gordon* test is at odds with the facts of *Gordon* itself. In *Gordon*, plaintiff, the successor-in-interest to decedent Matthew Gordon, brought suit against various individual defendants, including two nurses, related to the death of Matthew Gordon. 888 F.3d at 1121. Plaintiff alleged the two defendant nurses failed to properly treat Gordon for opiate withdrawal. *Id*. The doctor, Dr. Le, who made the determination as to where Gordon would be housed within the jail was not named as a defendant. *Id*. The Ninth Circuit vacated the district court's grant of summary judgment on plaintiff's inadequate medical care claim because the district court had failed to apply *Castro's* objective deliberate indifference standard. *Id*. at 1125. *Gordon* provides no support for Cavallo's assertion that Plaintiffs' deliberate indifference claim must fail because Cavallo made no decision regarding where Paul Silva was housed or the conditions of his jail cell.

Given Plaintiffs' allegations that Cavallo failed to provide adequate psychiatric care when she saw Paul Silva in the midst of a mental health crisis, there is no legal support for her claim that she did not make an intentional decision regarding a condition of Paul Silva's confinement.

### B. As Cavallo Played an Integral Role in the Forcible Extraction of Paul Silva, Her Conduct was a Substantial Factor in Causing His Death

Cavallo contends that she cannot be responsible for Paul Silva's death because she did not cause the cell extraction that necessitated the use of excessive force that culminated in Paul's death. (Cavallo Mot. at 7 – 8). "It was the excessive force, and not any failure of Cavallo to provide medical care , that caused Decedent's demise." (*Id*. at 8).

Contrary to Cavallo's claim, the First Amended Complaint alleges that Cavallo was an integral participant in the decision to forcibly extract Paul Silva from his jail cell. Cavallo told Lieutenant Coyne, the most senior official on scene, that Paul should be taken to the hospital for "excited delirium" (*Id*. ¶ 91). Cavallo concurred with the plan to forcibly extract Paul to go to the hospital. (*Id*. ¶ 195). Cavallo knew the Tactical Team would conduct the extraction because she arrived on scene after the Tactical Team was assembling and she stood by as they entered Paul's cell with their weapons. (*Id*. ¶ 220).

A state actor may be liable under § 1983 if she has "some fundamental involvement in the conduct that allegedly caused the violation." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019). "An officer's liability under section 1983 is predicated on his 'integral participation' in the alleged violation. [I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation. But it does require some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007) (internal citations omitted). "Thus, under our case law, an officer could be held liable where is just one participant in a sequence of events that give rise to a constitutional violation." *Nicholson*, 935 F.3d at 691.

The First Amended Complaint alleges that Cavallo participated in the sequence of events culminating in the use of excessive force by sanctioning the plan to forcibly extract Paul Silva. She concurred with the plan and made the recommendation to remove Paul for hospitalization knowing the Tactical Team would be used. (FAC ¶¶ 195, 220). Given the plan to use the Tactical Team, a plan that Cavallo agreed to, and given the nature of Paul's distress which rendered him unable to understand commands or comply with instructions, the use of excessive force was reasonably foreseeable.

Moreover, the use of force was reasonably avoidable had Cavallo consulted

with a psychiatrist.  Under Section 1217 of Title 15 of the California Code of Regulations, a psychiatrist could have ordered that Paul be involuntarily administered psychotropic medication in his jail cell, avoiding the need for an extraction.  (FAC ¶ 194).  But Cavallo did not consult a psychiatrist even though psychiatrists were on call for emergencies.  (*Id.* ¶¶ 94 – 95).  Because Plaintiffs had alleged facts to show that Cavallo played an integral role in the decision to forcibly extract Paul Silva from his jail cell, "these issues present questions for the jury because their resolution depends on disputed material facts," *Nicholson*, 935 F.3d at 692, and Cavallo's motion to dismiss should be denied.

## C. Cavallo Had a Constitutional Obligation to Intervene to Prevent the Use of Excessive Force on a Mentally Ill Man

Individuals acting under color of state law have a duty to intercede when other state actors violate the constitutional rights of suspects or other citizens. *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).  The "constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows.  Thus an officer who failed to intercede when his colleagues were depriving a victim of his Fourth Amendment right to be free from unreasonable force in the course of an arrest would, like his colleagues, be responsible for subjecting the victim to a deprivation of his Fourth Amendment rights."  *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996).  Accord *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203, 207 n.3 (1st Cir. 1990) ("An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance.").

Cavallo argues that "[t]here is no authority in the 9th Circuit to support Plaintiffs' Fourth Cause of Action[.]"  (Cavallo Mot. 8:18-19).  She cites *Manzo v. County of Riverside*, No. EDCV1701165JGBSPX, 2017 WL 10544292, at *6

(C.D. Cal. Oct. 19, 2017), to support her claim that "there is no law 'establishing a duty to intervene to provide sufficient medical care.'"  The analysis of the district court in *Manzo* inapplicable to this case because the *Manzo* court determine that any duty to intervene to provide medical care was not "clearly established" for purposes of qualified immunity.  *Id*. at *6-7.  Thus, the court granted defendants' motion to dismiss by finding they were entitled to qualified immunity.  *Id*. at *6.

But here, as a private contractor working in the Central Jail, Cavallo is not entitled to the defense of qualified immunity.  *Richardson v. McKnight*, 521 U.S. 399, 412 (1997) ("we must conclude that private prison guards, unlike those who work directly for the government, do not enjoy immunity from suit in a § 1983 case"); *Jensen v. Lane County*, 222 F.3d 570, 577 (9th Cir. 2000) (holding qualified immunity was not available to private medical providers in correctional settings); and *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 794 n.3 (7th Cir. 2014) ("Although *Richardson* involved a private prison, some circuits (including our own) have applied *Richardson* to private medical providers, holding that they are similarly barred from asserting immunity under § 1983.") (citing cases therein).

In any event, Plaintiffs' Fourth Cause of Action alleges Cavallo failed to intercede to prevent the use of excessive force by officers against Paul Silva when she had the opportunity to do so.  (FAC ¶ 220).  This responsibility is clearly established in the Ninth Circuit.  Plaintiffs do not allege that Cavallo had a responsibility to "intervene" to provide Paul medical care – she had the direct obligation to provide him with adequate medical and psychiatric care, which she failed to do, giving rise to Plaintiffs' claim against her for deliberate indifference (the third cause of action).  Cavallo's motion to dismiss on this basis should be denied.

**D. Plaintiffs Have Alleged Sufficient Facts to Support Their Theory that Defendant Keri Cavallo Is Liable for Paul Silva's Death.**

Cavallo moves to dismiss Plaintiffs' fifth cause of action for wrongful death and sixth cause of action for deprivation of familial relations because these claims are derivative of Plaintiffs' third cause of action for deliberate indifference. Plaintiffs' sixth cause of action for the loss of familial relations is not duplicative of the deliberate indifference claim because it relates to rights and injuries suffered by different parties - Plaintiffs Leslie Allen and Manuel Silva, Paul Silva's parents. Although Cavallo claims that paragraph 231 of the First Amended Complaint alleges that the death of Paul Silva was solely the fault of the County, there is nothing in paragraph 231 that is so definitive. Rather, paragraph 231 states that the failure to render medical care proximately caused Paul's death because Paul's schizophrenic decompensation was caused by the denial of medical care – an allegation that is alleged against each Defendant who denied Paul psychiatric/medical care.

In any event, the Federal Rules of Civil Procedure expressly permit Plaintiffs to plead separate and alternate claims and theories of liability. "A party may set out 2 or more statement of a claim or defense alternatively, or hypothetically, either in a single count . . . or in separate ones." Fed. R. Civ. P. 8(d)(2)). Plaintiffs' complaint is sufficient if any one of the alternative statements is sufficient. *Id*. Plaintiffs may even statement as many separate claims as it has, even if they are inconsistent. Fed. R. Civ. P. 8(d)(3). Rule 8(e) states "[p]leadings must be construed so as to do justice." Based on the foregoing, Cavallo's motion to dismiss these claims should be denied.

**E. Because Plaintiffs Have Alleged that Defendant O'Brien Provided No Training, Supervision, or Discipline of His Subordinate, Keri Cavallo, the Seventh and Eighth Causes of Action for Supervisory Liability Should Not Be Dismissed**

"'A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others.'" *Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011), *citing Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir.1998). Defendant O'Brien's primary argument is that Cavallo's actions were appropriate and, as such, he cannot be held liable for any failure to train. But these are contrary to the allegations of the complaint.

The FAC alleges that under the contract with the San Diego Sheriff's Department, Defendant Mark O'Brien had a duty to train Cavallo about her responsibilities at the Central Jail, including her responsibility to contact a Liberty Healthcare psychiatrist after-hours in the event of an emergency and ability to involuntarily medicate inmate-patients at the Central Jail. (FAC ¶ 250). O'Brien failed to train her about the ability to involuntarily medicate inmate-patients at the Jail's Psychiatric Security Unit (PSU). (*Id*. ¶¶ 250-51). O'Brien knew of the history of deaths of inmates at the Central Jail caused by the failure of contract medical staff to provide medical and psychiatric care to inmates with serious medical and psychiatric needs. (*Id*. ¶ 267). O'Brien was aware of the need to closely monitor and supervise Defendant Cavallo, a new nurse practitioner, and to ensure that Cavallo understood her responsibilities and job function in a correctional setting. (*Id*.). As a result of O'Brien's failure to train, Cavallo failed to consult with a psychiatrist. (*Id*. ¶ 251). Instead, she concurred with the plan to forcibly extract Paul Silva from his cell to treat him for "excited delirium." (*Id*. ¶¶ 91, 195). Had Cavallo been properly trained about the ability to contact a psychiatrist in the event of an emergency, a psychiatrist could have involuntarily

1  medicated Paul Silva in his jail cell rather than violently extract him.  (*See id*. ¶
2  194).  She did not consult with a psychiatrist to determine whether Paul Silva could
3  be admitted into the Jail's PSU hospital for treatment.

4      Because Plaintiffs have alleged a plausible theory of liability for O'Brien's
5  failures to train and supervise Cavallo suggesting entitlement to relief, *Starr*, 652
6  F.3d at 1217, Plaintiffs respectfully request the Court deny O'Brien's motion to
7  dismiss their supervisory claims.

8  **F.  Because Plaintiffs' Claims in Their First Amended Complaint "Relate**
9  **Back" to the Filing Date of the Initial Complaint, the Statute of**
10  **Limitations Does Not Bar Any of Their Claims.**

11      An exception to the general rule for defining the accrual of a cause of action
12  — indeed, the "most important" one — is the discovery rule. . . . It postpones
13  accrual of a cause of action until the plaintiff discovers, or has reason to discover,
14  the cause of action."  *Norgart v. Upjohn Co*., 21 Cal. 4th 383, 397 (Cal. 1999).  A
15  plaintiff discovers a cause of action when he suspects "that someone has done
16  something wrong to him" or  "when he has reason at least to suspect a factual basis
17  for its elements."  *Id*. at 397-98.

18      In California, Code of Civil Procedure § 474 permits a plaintiff who is
19  ignorant of the identity of a defendant to name that defendant as "Doe" and when
20  the defendant's true identity is discovered, a plaintiff may amend his complaint.
21  *Id*. at 398.  Because under Code Civ. Proc. § 583.210(a), a plaintiff in California
22  has three years to "identify []the defendant, amend the complaint, and serve [him]"
23  the limitations period is effectively enlarged for three years "through the doctrine
24  that the amended complaint 'relates back' to the original one."  *Norgart*, 21 Cal.
25  4th at 398 (internal citations omitted).  Thus, a plaintiff in California essentially
26  extends an applicable limitations period "by the filing and amendment of a Doe
27  complaint and invocation of the relation-back doctrine."  *Id*. at 399 (internal
28  citations omitted).

The Complaint in this case was filed on October 2, 2018, less than 8 months after Paul Silva's contact with Cavallo on February 21, 2018.  Plaintiffs' Complaint listed DOE Defendants 1-100 and stated "Plaintiffs are truly ignorant of the true names and capacities of Does 1 through 100, inclusive, and/or is truly ignorant of the facts giving rise to their liability and will amend this complaint once their identities have been ascertained as well as the facts giving rise to their liability."  (Compl., doc. 1, at ¶ 22).

Plaintiffs learned of the identities of Keri Cavallo, Mark O'Brien, Coast Hospital Medical Associates, Inc., (CHMA) and Coast Correctional Medical Group (CCMG) in April 2019.  (Decl. Grace Jun, doc. 69-1, at ¶¶ 9-10).  In early May 2019, Plaintiffs submitted MICRA notices to Keri Cavallo, CHMA, and CCMG pursuant to Code Civ. Proc. § 364.  (*Id*. ¶ 12).  Yet, Code Civ. Proc. § 364(e) provides that MICRA notice provisions do not apply to newly identified defendants who were previously designated using fictious names under Code Civ. Proc. § 474.  In counsel's declaration filed June 24, 2019, she stated "Because Plaintiffs had utilized fictitious names for Doe Defendants under Fed. R. Civ. P. 15(c)(1)(A) and Code Civ. Proc. § 474, I realized that Code Civ. Proc. § 364's requirement that a plaintiff wait 90-days before filing suit against medical providers did not apply." (*Id*.).  Thus, on June 24, 2019, Plaintiffs sought leave to file an amended complaint that identified the Doe Defendants and plead the facts giving rise to their causes of actions against these new Defendants.

In their motion for leave to file the First Amended Complaint, Plaintiffs specifically argued that amendment to their complaint would not be futile under the statute of limitations because Plaintiffs' amended complaint related back to the filing of the original complaint.  (Doc. 69 at pp. 7 – 9).  In determining whether an amendment to a complaint relates back to the filing date of the original complaint, Fed. R. Civ. P. 15(c)(1), "incorporates the relation back rules of the law of a state when that state's law provides the applicable statute of limitations and is more

lenient." *Butler v. Nat'l Cmty. Renaissance of Cal.*, 766 F.3d 1191, 1200 (9th Cir. 2014). Thus, if an amendment to a complaint "relates back under the state law that provides the applicable statute of limitations, that amendment relates back under Rule 15(c)(1) even if the amendment would not otherwise relate back under the federal rules." *Id*. Plaintiffs made clear in their motion that their First Amended Complaint "related back" to the filing date of the original complaint under California's more permissive relation back standard set forth in Code Civ. Proc. § 474. (Doc. 69 at p. 8).

Defendants Keri Cavallo, Mark O'Brien, CHMA and CCMG do not even address Code Civ. Proc. § 474 and the relation back doctrine. They do not make any argument that Plaintiffs' First Amended Complaint does not relate back to the filing date of the initial Complaint, which was less than one year after Paul's death. As such, they have waived any further argument and their motion to dismiss Plaintiffs' state law claims should be denied.

### G. California's Unruh Act Applies to Private Entities Operating Inside Correctional Facilities

Although Defendants correctly note that the Unruh Civil Rights Act does not apply to county jails and municipal facilities, these Defendants are private, for-profit businesses operating within the jail. A private company operating for profit within a correctional facility constitutes a "'business establishment' under the broad terms of the Unruh Act." *Wilkins-Jones v. Cty. of Alameda*, 859 F. Supp. 2d 1039, 1050 (N.D. Cal. 2012). In *Wilkins-Jones*, the district court distinguished a municipal county's operation of a jail from that of a private contractor that operates a business for profit within a correctional facility. *Id*. at 1049. The district court analyzed the California Supreme Court's opinion in *O'Connor v. Village Green Owners Assn.*, 33 Cal.3d 790, 795 (Cal. 1983) construing the term "business establishment" in the Unruh Act. The California Supreme Court held that "any business or organization, whether for-profit, or non-profit, may be deemed a

'business establishment' if it performs 'customary business functions' and fulfills a 'businesslike purpose.'" *Wilkins-Jones*, 859 F. Supp. 2d at 1050, *citing O'Connor*, 33 Cal.3d at 796.  "By providing services for a fee, PHS/Corizon performs a 'customary business function,' through which it serves inmates like Plaintiff. That customary business function renders it a "business establishment" under the broad terms of the Unruh Act." *Wilkins-Jones*, 859 F. Supp. 2d at 1050.  The fact that a jail contractor receives its profits from San Diego County, and not inmates like Paul Silva, "does not defeat the Act's application." *Id.  See also Hernandez v. Cty. of Monterey*, 70 F. Supp. 3d 963, 977 – 78 (N.D. Cal. 2014) (finding that a private jail contractor operated a place of public accommodation, subjecting the private contractor to Title III of the American with Disabilities Act.).

Defendants make no other argument or objection to Plaintiffs' Unruh Act claim.  Because the Unruh Act can apply to private contractors like these Defendants operating a for-profit business within the Central Jail, Defendants' motion to dismiss Plaintiffs' fourteenth cause of action should be denied.

### III.   CONCLUSION

For the foregoing reasons, the motion to dismiss by Defendants Cavallo, O'Brien, Coast Hospitalist Medical Associates, Inc., and Coast Correctional Medical Group should be denied.

Respectfully submitted,

Dated: October 21, 2019        IREDALE & YOO, APC
                               /s Grace Jun
                               _____
                               EUGENE IREDALE
                               JULIA YOO
                               GRACE JUN