1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                  SOUTHERN DISTRICT OF CALIFORNIA
10

11  THE ESTATE OF PAUL SILVA, et al.,      Case No.:  3:18-cv-2282-L-MSB
12  Plaintiffs,
                                           **ORDER:**
13  v.                                     **(1) DENYING COAST MEDICAL**
                                           **DEFENDANTS' MOTION TO**
14  CITY OF SAN DIEGO, et al.,             **DISMISS [Doc no. 85]**
15  Defendants.
                                           **(2) DENYING CITY DEFENDANTS'**
16                                         **MOTION TO DISMISS [Doc no. 86]**
17
18                                         **(3) GRANTING IN PART AND**
                                           **DENYING IN PART COUNTY**
19                                         **DEFENDANTS' MOTION TO**
20                                         **DISMISS [Doc no. 87]**

21        Pending before the Court are Defendants' motions to dismiss Plaintiffs' first
22  amended complaint. Plaintiffs opposed the motions and Defendants replied. The Court
23  decides the matter on the papers submitted and without oral argument.  *See* Civ. L. R.
24  7.1(d.1).   For the reasons stated below, the Coast Medical Defendants' and the City
25  Defendants' motions (doc. no. 85, 86) are DENIED.  The County Defendants' motion (doc.
26  no. 87) is DENIED IN PART AND GRANTED IN PART without leave to amend.
27  Plaintiffs have voluntarily dismissed their eighth and ninth causes of action against Shelley
28  Zimmerman.

I.      **BACKGROUND**

   A.      **Factual Allegations**

   This action arises out of the contact, arrest, booking, and subsequent death of Plaintiffs' son, Paul Silva ("Paul" or "Decedent").  Silva suffered from schizophrenia and diabetes. (First Am. Compl. (doc. no. 79, "FAC")) ¶¶ 32, 50). Although he was 39 years old, he lived with his father, Manuel Silva, and visited his mother, Leslie Allen, each morning. (*Id.* ¶ 33).

   On February 19, 2018, while visiting Allen, Silva acted out and refused to go home. (*Id.* ¶ 34). Allen called the San Diego Police Department's Psychiatric Emergency Response Team ("PERT")[1] and requested assistance for a mental health emergency, also known as a California Welfare and Institution's Code § 5150 psychiatric hold ("5150 hold").[2] (*Id.* ¶¶ 35, 39). Allen had called PERT to assist Paul in the past.  On each prior occasion, "a PERT officer would speak to Paul calmly, and Paul would comply with all of their requests." (*Id.* ¶ 38). However, due to the President's Day holiday on February 19, 2018, PERT was unavailable. (*Id.* ¶ 35). To ensure PERT personnel responded to her call, Allen decided to wait until PERT became available the following day. (*Id.* ¶ 39).

   On February 20, 2018, San Diego police officers Derisio, Murrow, and Maggi responded to Allen's 5150 call without PERT personnel. (*Id.* ¶ 44). Allen informed Derisio that Paul (1) did not use illicit drugs, (2) required hospitalization to treat his schizophrenia,

---

[1] "PERT provides emergency assessment and referral for individuals with mental illness." (FAC ¶ 36.) It pairs licensed mental health clinicians with uniformed law enforcement officers/deputies and "evaluates the situation, assesses the individual's mental health condition and needs, and, if appropriate, transports individuals to a hospital or other treatment center, or refers him/her to a community-based resource or treatment facility." (*Id.*)

[2] "California Welfare and Institutions Code § 5150 authorizes qualified officers or clinicians to involuntarily take into custody a person who, 'as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled.'" *Horton v. City of Santa Maria*, 915 F.3d 592, 597 n.3 (9th Cir. 2019).

and (3) was not taking his psychiatric medication. (*Id.* ¶¶ 43-44). Murrow administered a field sobriety test requiring Paul to follow an object with his eyes without moving his head while counting to 30. (*Id.* ¶ 45). Paul failed the test. (*Id.*). As the supervising sergeant on the scene, Maggi made the decision to arrest Paul for being under the influence of methamphetamine. (*Id.*).

After obtaining a urine sample from Paul at police headquarters, Murrow transported him to the Central Jail, a County-owned facility, to be booked. (FAC ¶ 49). A subsequent laboratory test of Paul's urine showed no evidence of controlled substance use. (*Id.* ¶ 45). Murrow did not inform County personnel of Paul's psychiatric condition. (*Id.* ¶ 55).

Registered nurse Anthony Adraneda conducted Paul's intake interview at the Central Jail at approximately 11:21 AM on February 20, 2018. Paul informed Adraneda that he suffered from diabetes and schizophrenia and had been previously hospitalized in a psychiatric hospital. Adraneda reviewed Paul's medical records in the Central Jail's information management system and saw that his records showed a history of schizophrenia and self-reported psychiatric hospitalizations. Adraneda was aware that Paul had been prescribed psychiatric medication and had not been taking it. Although Paul was a "book and release" inmate, Adraneda informed him he would refer him to a psychiatric doctor.

"Book and release" inmates are arrested and booked for being under the influence of a controlled substance and are placed in "sobering cells" to be monitored for a maximum of 8 hours. (*See id.* ¶¶ 58, 69). Paul remained in County custody for the next 36 hours. During his 36 hours in the Central Jail, Sheriff's deputies saw Paul running around his cell, throwing himself to the ground, yelling incoherently, staring out the window with his mouth wide open, holding his arms out pointing toward the window and walls, and crawling and rolling on the floor. (*Id.* ¶ 210). Paul was not placed in a sobering cell, as required for book-and-release inmates, but was instead moved from temporary holding cell to temporary holding cell with "no shower, no toilet paper, no soap, no toothbrush, no clean clothes, and no bed [or blankets]." (*Id.* ¶ 61). He was not given a medical referral or

treatment for diabetes or his schizophrenia. (*See, e.g., id.* ¶¶ 67-68 ("When Paul arrived at the hospital, he was hypoglycemic with his blood sugar level at 30.").

At 7:46 p.m., approximately 9 hours after Paul had been booked, Corporal Harvey Seeley transferred Paul from the "Dressout Holding Cell 2" to  "Release Holding 1.[3] (*Id.* ¶ 74). Paul was exhibiting symptoms of decompensation but was not offered any medical assistance. (*Id.* ¶¶ 74-75). As recorded by the hallway camera, Paul was constantly pacing and appeared to speak to the wall for the duration of his stay in the holding cell.  (*Id.* ¶ 75.) At 1:35 AM on February 21, 2018, Seeley conducted a "cell check" by looking in from the outside. Paul was still not offered any medical assistance. (*Id.* ¶ 77).

At 2:28 AM on February 21, 2018, Lieutenant Laura Coyne reviewed the Central Jail log after Paul had been in temporary holding cells for 16 hours. Coyne did not take action to release him or request medical care. (*Id.* ¶ 78).

At 8:07 AM, Sergeants Ceballos and Navarro went into Paul's cell when he was placing items under the door and moving them around. Paul had been held for approximately 22 hours without sleep. Ceballos and Navarro did not assist him. (*Id.* ¶ 79). At 2:16 PM, Ceballos was the supervisor on the floor and knew that Paul had been denied access to adequate resources for over 28 hours. He still did not act. (*Id.* ¶ 81).

Between 7:41 PM and 7:51 PM, 33 hours after Paul was booked, Corporal Julio Rodriguez, Deputy Ryan Seabron, and Deputy Suarez visited him to complete the required book-and-release paperwork. (*See id.* at 9; *id.* ¶ 84). Paul was exhibiting symptoms of a psychotic break. Rodriguez, Seabron, and Suarez did not release him, provide medical care, or move him to a cell more suitable for long-term stays. (*Id.* ¶¶ 84-85).

At 10:59 PM, Sergeant Michael Lawson instructed Seabron to use pepper spray to force Paul to comply. (*Id.* ¶ 86). Because the pepper spray did not affect him, he continued

---

[3] "Dressout cell is where inmates wait to be strip searched and dressed out of street clothes for a jail outfit. Release holding cells are where inmates are temporarily placed before being released to the community." (FAC ¶ 60).

to pace in his cell. (*Id.*) Lawson and Sergeant John Douthitt concluded Paul was suffering from excited delirium, a potentially life-threatening condition caused by methamphetamine consumption, and proposed a tactical team extraction. Coyne, the watch commander on duty, agreed. (FAC ¶ 87). None of them reviewed Paul's medical history or requested a medical or psychiatric evaluation before deciding to use a tactical team to extract Paul from his cell. (*Id.*)

Nurse practitioner Keri Cavallo evaluated Paul immediately before the extraction. (*Id.* ¶¶ 89-92). Without looking at his medical history or requesting that a physician or psychiatrist evaluate him, Cavallo told Coyne that Paul was experiencing excited delirium and should be taken to the hospital. (*Id.*). Although Cavallo was concerned that Paul could be suffering from psychosis, she did not request that he be admitted into the jail's internal hospital for a psychiatric or medical evaluation. (*Id.*).

The tactical team tasked with extracting Paul was led by Douthitt and included Rodriguez and Deputies Seabron, Charles DelaCruz, Diego Lopez, Aaron Vrabel, Jorge Enciso, Tanner Sherman, Christopher Simms, and Seabron. (FAC ¶ 96). The team used various tactics. For example, (1) Vrabel shot water-filled pepper balls and forcibly pressed underneath Paul's jaw; (2) Simms tasered Paul multiple times; (3) DelaCruz wrapped Paul's arms behind his back and struck his face and shoulder; (4) Seabron restrained Paul's arm and pinned his legs down; (5) Sherman pushed Paul's head to the ground; and (6) Enciso pinned Paul against the wall using a body shield capable of producing an electrical shock. (*Id.* ¶¶ 99-101). In short, the tactical team piled on top of Paul and placed downward force and pressure on his head, midsection, arms, and legs. (*Id.* ¶ 105). By the end of the extraction, Paul was handcuffed but immobile.

At approximately 11:58 PM, paramedics found a pulse and transported Paul to UCSD Medical Center. (*Id.* ¶¶ 108). Although he sustained significant neurological injuries and kidney failure, the ultimate cause of death was lack of oxygen to the brain resulting from cardiopulmonary arrest during restraint. (*Id.* ¶¶ 113). The manner of death was determined to be homicide. (*Id.*).

**B.    Legal Claims and Parties**

Paul's parents, Allen and Manuel Silva, and the Estate of Paul Silva filed a complaint alleging federal constitutional claims under 42 U.S.C. § 1983, as well as violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., the Rehabilitation Act, 29 U.S.C. § 794(a), and related state laws.  The Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343(3) and (4), *et. seq.* as well as supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

They seek relief against three groups of defendants:

(1) City of San Diego ("City"), chief of the San Diego Police Department ("Police Department") Shelley Zimmerman, and officers Murrow, Derisio, and Maggi (collectively "City Defendants");

(2) County of San Diego ("County") as the public entity which operates and manages the Central Jail, Sheriff William Gore, Barbara Lee as the Medical Administrator in charge of the Medical Services Division of the Sheriff's Department, Alfred Joshua, M.D., as the Medical Director for the Sheriff's Department, as well as Adraneda, Lawson, Douthitt, Seeley, Ceballos, Navarro, Coyne, Rodriguez, DelaCruz, Lopez, Vrabel, Enciso, Sherman, Simms, and Seabron (collectively "County Defendants"); and

(3) Coast Hospitalist Medical Associates, Inc., Coast Correctional Medical Group, Mark O'Brien, and Cavallo (collectively "Coast Medical Defendants").  Coast Hospitalist Medical Associates, Inc. ("Coast Hospitalist") is a subcontractor of Tri-City Medical Center. The Sheriff's Department had a contract with Tri-City Medical Center and Coast Hospitalist to provide nurse practitioners to work at San Diego County jails. Coast Correctional Medical Group ("Coast Correctional") is a subsidiary of Coast Hospitalist. Cavallo is a nurse practitioner employed by Coast Correctional who worked at the Central Jail. O'Brien is the President and CEO of Coast Hospitalist and Coast Correctional.

Pending before the Court are Defendants' motions pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the following causes of action:

/ / / / /

- violation of due process under 42 U.S.C. § 1983 against Rodriguez, Seeley, Ceballos, Navarro, and Coyne;

- deliberate indifference to serious medical needs under 42 U.S.C. § 1983 against Murrow, Derisio, Maggi, Lee, Joshua, Coyne, Lawson, Douthitt, Adraneda, Seeley, Ceballos, Navarro, Rodriguez, DelaCruz, Lopez, Vrabel, Enciso, Sherman, Simms, Seabron, and Cavallo;

- wrongful death under 42 U.S.C. § 1983 against Coyne, Lawson, Douthitt, Adraneda, Rodriguez, DelaCruz, Lopez, Vrabel, Enciso, Sherman, Simms, Seabron, and Cavallo;

- violation of constitutional right of association under 42 U.S.C. § 1983 against Murrow, Derisio, Maggi, Coyne, Lawson, Douthitt, Adraneda, Rodriguez, DelaCruz, Lopez, Vrabel, Enciso, Sherman, Simms, Seabron, and Cavallo;

- failure to properly train under 42 U.S.C. § 1983 against Zimmerman, Maggi, Gore, Lee, Joshua, Coyne, Lawson, Douthitt, and O'Brien;

- failure to properly supervise and discipline under 42 U.S.C. § 1983 against Zimmerman, Maggi, Gore, Lee, Joshua, Coyne, Lawson, Douthitt, and O'Brien;

- failure to properly investigate under 42 U.S.C. § 1983 against Zimmerman, Gore, Lee, Joshua, Coyne, Lawson, and Douthitt;

- municipal liability under *Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978), for failure to train against the City and the County;

- municipal liability for unconstitutional custom, practice, or policy under *Monell* against the City and the County;

- violation of California Civil Procedure Code §§ 377.60 et seq. against County Defendants and Coast Medical Defendants;

- negligence against all Defendants;

- violation of the Unruh Civil Rights Act, Cal. Civ. Code §§ 51 et seq. ("Unruh Act") against Coast Medical Defendants;

1
2
3
4
5
6

- violation of the Tom Bane Civil Rights Act, Cal. Civ. Code § 52.1 ("Bane Act") against the City, Murrow, Derisio, and Maggi;

- violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("ADA") against the City and the County; and

- violation of the Rehabilitation Act, 29 U.S.C. §§ 701 et seq. ("Rehabilitation Act") against the City and the County.

7

## II.   **LEGAL STANDARD**

8
9
10
11
12
13
14
15
16
17

A motion under Rule 12(b)(6) tests the sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).[4] Dismissal is warranted where the complaint lacks a cognizable legal theory. *Shroyer v. New Cingular Wireless Serv., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). Alternatively, a complaint may be dismissed if it presents a cognizable legal theory yet fails to plead essential facts under that theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiffs' allegations must provide "fair notice" of the claim being asserted and the "grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

18
19
20

"If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2). A party may state "as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3).

21
22
23
24
25

In reviewing a Rule 12(b)(6) motion, the Court must assume the truth of all factual allegations and construe them most favorably to the nonmoving party. *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997, 999 n.3 (9th Cir. 2006). However, legal conclusions need not be taken as true merely because they are couched as factual allegations. *Twombly*,

26
27
28

---

[4] Unless otherwise noted internal quotation marks, ellipses, brackets, citations and footnotes are omitted from all quotations.

3:18-cv-2282-L-MSB

550 U.S. at 555. Similarly, "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. Fed. Deposit Ins. Corp.*, 139 F.3d 696, 699 (9th Cir. 1998).

## III. FEDERAL CONSTITUTIONAL CLAIMS

To state a claim under 42 U.S.C. § 1983 for violation of federal constitutional rights, a plaintiff must allege: (1) that the conduct complained of was committed by a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a federal constitutional or statutory right. *Jensen v. Lane Cnty.*, 222 F.3d 570, 574 (9th Cir.2000). A public employee acts under color of state law within meaning of § 1983 while acting in his or her official capacity or while exercising responsibilities pursuant to state law. *McDade v. West*, 223 F.3d 1135, 1139 (9th Cir. 2000). Plaintiffs must plead that the challenged conduct is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose. *Bell v. Wolfish*, 441 U.S. 520, 538–39 (1979).

State officials may be sued under § 1983 in their individual capacities for damages. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). In order to be individually liable under § 1983, an individual must personally participate in an alleged rights deprivation. *Avalos v. Baca*, 596 F.3d 583, 587 (9th Cir.2010). Plaintiffs must establish causation to "demonstrate that the defendant's conduct was the actionable cause of the claimed injury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir.2008).

A supervisor can be held liable in his or her individual capacity under § 1983 only if (1) he or she personally participated in the constitutional violation, or (2) there is a "sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989). For liability to attach, supervisors must have actual supervisory authority over the government actor who committed the alleged violations. *Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018).

A local governing body is not liable under § 1983 unless action pursuant to official municipal policy of some nature caused a constitutional violation. *Monell v. Dep't of Social*

*Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). Plaintiffs must establish that the conditions were part of a policy, custom or practice officially adopted by defendants and that the policy or custom "evince[s] a deliberate indifference to the constitutional right and [is] the moving force behind the constitutional violation." *Rivera v. County of Los Angeles*, 745 F.3d 384, 389 (9th Cir. 2014).

Where, as here, a plaintiff seeks damages against state officials, a strong presumption is created in favor of an individual capacity suit because an official capacity suit for damages would be barred. *See Mitchell v. Washington*, 818 F.3d 436, 442 (9th Cir. 2016). Accordingly, the Court applies an individual capacity analysis in its evaluation of claims relating to non-municipal parties.

## A.   Second Cause of Action (Violation of Due Process - 42 U.S.C. § 1983)

County Defendants Rodriguez, Seeley, Ceballos, Navarro, and Coyne seek to dismiss the Estate's § 1983 cause of action for violation of due process for lack of a plausible factual basis.

The Due Process Clause of the Fourteenth Amendment proscribes any conduct that amounts to punishment, cruel or otherwise, of a person detained before trial. *Chappell v. Mandeville,* 706 F.3d 1052, 1059 (9th Cir. 2013). Conditions of confinement that deprive pretrial detainees from basic human needs or "the minimal civilized measure of life's necessities" have been held to violate the Constitution. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989).

The Estate contends that Rodriguez, Seeley, Ceballos, Navarro, and Coyne failed to provide Decedent, a pretrial detainee, with adequate food, shelter, clothing, and medical

1  care during his 36-hour confinement. (*See* FAC ¶¶ 167-177). Defendants argue Decedent's
2  temporary exposure to unsanitary conditions does not give rise to a constitutional violation
3  because "extreme deprivations" are required to plead a conditions-of-confinement claim.
4  (Doc. no. 87-1 at 11). Defendants' argument relies on the Eighth Amendment's prohibition
5  on cruel and unusual punishment for convicted inmates.

6        Defendants reason that the Court should apply the standards of the Eighth
7  Amendment standard because pretrial detainees' rights under the Fourteenth Amendment
8  are comparable to prisoners' rights under the Eighth Amendment. (Doc. no. 87-1 at 11).
9  However, pretrial detainees have greater constitutional protections than prisoners. *See*
10 *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1246 n.5 (9th Cir. 2016) ("Eighth
11 Amendment protections apply only once a prisoner has been convicted of a crime, while
12 pretrial detainees are entitled to the potentially more expansive protections of the Due
13 Process Clause of the Fourteenth Amendment."). The Eighth Amendment establishes a
14 standard in the sense that a jail condition considered cruel and unusual would necessarily
15 amount to an impermissible punishment of a pretrial detainee, but Decedent is afforded
16 protections beyond prisoners' rights. Because Decedent was not confined in the Central
17 Jail after a trial and conviction, the determination must be made pursuant to the Fourteenth
18 Amendment. *See Trueblood v. Washington State Dep't of Soc. & Health Servs.*, 822 F.3d
19 1037, 1043 (9th Cir. 2016) ("Pretrial detainees, whether or not they have been declared
20 unfit to proceed, have not been convicted of any crime. Therefore, constitutional questions
21 regarding the circumstances of their confinement are properly addressed under the due
22 process clause of the Fourteenth Amendment.").

23       Decedent was confined in the Central Jail with "no shower, no toilet paper, no soap,
24 no toothbrush, no clean clothes, and no bed [or blankets]." (*Id.* ¶ 61). He was not provided
25 any food for at least 24 hours and suffered from hypoglycemia when the tactical team
26 extracted him from his cell. (*Id.* ¶¶ 67, 84, 89, 111.) Decedent was not given a medical
27 referral or treatment for his diabetes or schizophrenia. (*Id.* ¶¶ 67-68). When Rodriguez,
28 Seeley, Ceballos, Navarro, and Coyne checked on Decedent in his temporary holding cell,

they were aware of his status as a book-and-release inmate and that he had not been provided with basic human essentials. (*See id.* ¶¶ 74-78, 81, 84-85).

Although Decedent had been confined for over 8 hours, Defendants did nothing to release him or provide for his basic medical and sanitary needs. (*See id.*). When the County took Decedent into custody as a pretrial detainee, the Constitution imposed a duty to provide for his basic human needs. *DeShaney*, 489 U.S. at 199–200. Accordingly, the Estate has sufficiently alleged that Rodriguez, Seeley, Ceballos, Navarro, and Coyne violated Decedent's due process rights by depriving him of a minimal civilized measure of life's necessities.

## B.   Third Cause of Action (Deliberate Indifference to Serious Medical Needs - 42 U.S.C. § 1983)

The Estate asserts a § 1983 cause of action for deliberate indifference to serious medical needs against City Defendants Murrow, Derisio, and Maggi; County Defendants Adraneda, Lee, Joshua, Coyne, Lawson, Douthitt, Rodriguez, DelaCruz, Lopez, Vrabel, Enciso, Sherman, Simms, and Seabron; and Coast Medical Defendant Cavallo. Each named defendant moves to dismiss.

The Due Process Clause of the Fourteenth Amendment guarantees that pretrial detainees receive constitutionally adequate medical and mental health care. *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1122 (9th Cir. 2018). To plead a pretrial detainee's medical care claim against an individual defendant, the Estate must allege: (1) Defendants made an intentional decision with respect to the conditions of confinement; (2) those conditions put Decedent at substantial risk of serious harm; (3) Defendants did not take objectively reasonable and available measures to mitigate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of Defendants' conduct obvious; and (4) by not taking such measures, Defendants caused Decedent's injuries. *See id.* at 1125.

These claims are evaluated under an objective deliberate indifference standard. *Id.* at 1124-25. "Deliberate indifference is a stringent standard of fault, requiring proof that a

municipal actor disregarded a known or obvious consequence of his action." *Bryan County v. Brown*, 520 U.S. 397, 410 (1997). "The mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment. Thus, the plaintiff must prove more than negligence but less than subjective intent—something akin to reckless disregard." *Gordon*, 888 F.3d at 1125.

### 1. City Defendants Murrow, Derisio, and Maggi

Murrow, Derisio, and Maggi argue the Estate's deliberate indifference claim is insufficient because they made no decisions regarding the conditions of Decedent's confinement and did not cause his death. (Doc. no. 86-1 at 13-14).

The Estate alleges that Defendants knew Decedent's mother had called the Police Department to request that he be taken to a medical facility for psychiatric treatment. (FAC ¶¶ 35, 39). The dispatch log for her phone call shows the call was classified as a "5150 Mental Case" which qualifies as a welfare check request. (*Id.* ¶ 39). The computer dispatch records showed Decedent was schizophrenic and had no prior instances of being drunk in public or being under the influence of a drug. (*Id.* ¶ 41). Decedent's mother also directly informed Derisio that Decedent suffered from schizophrenia, was not taking his medication, and needed to be hospitalized. (*Id.* ¶ 44).

Instead of transporting Decedent to a medical facility for treatment, Maggi made the decision to arrest him for being under the influence of a controlled substance. (*Id.* ¶¶ 45, 182). Further, when Murrow booked Decedent into the Central Jail, he failed to inform County personnel that Decedent was picked up from a 5150 call and needed psychiatric treatment for schizophrenia. (*Id.* ¶ 183). At the Central Jail, Decedent was deprived of basic human needs, which caused him to experience schizophrenic decompensation and hypoglycemia. (*See id.* ¶¶ 59, 61, 67, 74).

While it is true Murrow, Derisio, and Maggi had no involvement in deciding the conditions of confinement, Decedent would not have been in the Central Jail but for the initial arrest. A reasonable officer would have responded to a 5150 call by seeking psychiatric treatment for Decedent. (*See id.* ¶ 38).

The Estate has sufficiently alleged that (1) Murrow, Derisio, and Maggi were aware of Decedent's medical needs and intentionally decided to confine him in the Central Jail when they arrested him; (2) confinement in the Central Jail placed Decedent at a substantial risk of harm due to the initial denial of psychiatric care; (3) Defendants failed to reasonably abate risk by not taking into account that they were dispatched on a 5150 call and denying him the treatment he needed; and (4) Defendants' failure to transport Decedent to a medical facility caused his decompensation which resulted in the tactical team's use of force, resulting in his death. (*See* doc. no. 96 at 7-8; *see also* FAC ¶¶ 39-49, 180-182).

## 2. County Defendant Adraneda

The Estate alleges that Adraneda, a registered nurse, acted with reckless disregard because he knew of Decedent's medical needs and failed to arrange for adequate medical or psychiatric care. (Doc. no. 97 at 8). County Defendants' motion offers no argument for dismissal as to Adraneda specifically. (*See* doc. no. 87-1 at 13-14).

During his intake interview, Decedent informed Adraneda that he suffered from schizophrenia, diabetes, and previous psychiatric hospitalizations. (FAC ¶ 184). Adraneda had access to the jail's information management system which showed that Decedent had a history of schizophrenia. (*Id.*). Adraneda told Decedent he would schedule a psychiatric evaluation and was required to arrange a medical evaluation because Decedent was diabetic. (*Id.*).

Adraneda failed to order a psychiatric or medical evaluation of Decedent and did not highlight Decedent's psychiatric or medical conditions in the jail information management system. (*Id.*). He also failed to place Decedent in a sobering cell for monitoring, although he knew Decedent had been brought in as a book-and-release inmate. (*Id.*). Based on the Estate's allegations, a reasonable registered nurse would have placed Decedent into a monitoring cell and arranged for evaluation and treatment to prevent the reasonably foreseeable consequence of Decedent decompensating.

Accordingly, the Estate has sufficiently alleged that (1) Adraneda knew of Decedent's medical needs but decided not to arrange a medical or psychiatric evaluation

and not to place Decedent into a sobering cell; (2) the lack of treatment and Decedent's confinement in successive temporary holding cells put him at substantial risk of harm given his medical conditions; (3) Adraneda did not take reasonable measures to mitigate this risk by requesting medical evaluation or care or moving Decedent into a sobering cell; and (4) by failing to do so, Adraneda caused Decedent's decompensation and hypoglycemia, prompting the tactical team's use of force which resulted in his death.

### 3.    County Defendants Lee and Joshua

The Estate avers that Lee and Joshua were deliberately indifferent to Decedent's medical needs by failing to implement policies and procedures for adequate care of detainees in need of medical care. Defendants contend the FAC contains no allegations showing Lee and Joshua personally acted with reckless disregard towards Decedent's medical needs.

Lee was the Medical Administrator and in charge of the Medical Services Division at the San Diego County Sheriff's Department. She supervised all departments within the Medical Services Division, and all medical staff at the San Diego County Sheriff's Department were under her direction, including Joshua, Adraneda, and Cavallo.  She was responsible for developing, implementing, and monitoring the policies and procedures applicable to the Medical Services Division. (FAC ¶ 14.) Joshua was the Medical Director for the Sheriff's Department. He supervised the medical staff and directed and oversaw the development and implementation of quality assurance and utilization review policies and procedures. All medical and psychiatric doctors worked under his direction. (*Id.* ¶ 15.)

The Estate alleges that Lee and Joshua supervise the policies, practices, and operations of the Sheriff's Department medical staff.  (*Id.* ¶¶ 14-15.) They were aware it was common for jail staff to ignore patients' medical charts or disregard the information contained in their medical records. (*Id.* ¶ 199). The Citizens' Law Enforcement Review Board and Disability Rights of California identified the County's deficiencies in the coordination of care and communication of medical conditions, including a detainee's decompensating condition. (*Id.* ¶ 200). Lee and Joshua knew their prior failure to

implement proper policies led to a substantial number of deaths in San Diego County jails. (*Id.* ¶¶ 199, 200). As a result of their failure to change the policies, Adraneda and Cavallo failed to communicate critical medical information to correctional staff and provide necessary evaluation and treatment for Decedent. (*Id.*).

As alleged, Lee and Joshua are liable in their individual supervisory capacities because there is a causal connection between their failure to implement adequate policies and County medical staff's failure to communicate and coordinate treatment for Decedent's medical needs. *See Hansen*, 885 F.2d at 645-46. Because they knew their policies were inadequate, it was foreseeable that continued implementation of the same policies could lead to denial of medical care and decompensation of schizophrenic patients. (*See* FAC ¶ 201).

The Estate has sufficiently alleged that (1) Lee and Joshua deliberately continued to implement policies they knew to be inadequate with respect to detainee medical care; (2) the implementation of these policies put Decedent at substantial risk of harm because they did not require proper communication of medical information or coordination of treatment; (3) Lee and Joshua were aware of the deficiencies of their policies but did not change them to mitigate risk of detainee harm; and (4) by failing to implement proper policies, they caused Decedent's medical needs to be ignored by County medical staff, leading to his forceful extraction, and ultimately resulting in his death. *See Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1446–47 (9th Cir. 1991) (en banc) (concluding that knowledge of a policy and practice of overcrowding that allegedly resulted in inmate's rape could be sufficient to establish liability).

> ### 4.  County Defendants Coyne, Lawson, Douthitt, Rodriguez, Seeley, Ceballos, Navarro, DelaCruz, Lopez, Enciso, Sherman, Simms, and Seabron

The Estate argues each of the named County defendants knew Decedent was in need of serious medical attention and decompensating. (Doc. no. 97 at 8). Defendants argue that / / / / /

3:18-cv-2282-L-MSB

the Estate fails to allege how each individual specifically acted with reckless disregard. (Doc. no. 87-1 at 13-15).

Lieutenant Coyne, Sergeant Lawson, and Sergeant Douthitt were supervisory officials at the Central Jail. (FAC ¶193). They knew Decedent was a book-and-release inmate who had been in custody for over 32 hours.  They personally observed his condition deteriorate. (*Id.*). Before incorrectly deciding that he should be forcefully extracted from his cell because his bizarre behavior was caused by methamphetamine-induced excited delirium, Lawson and Douthitt failed to review his medical record in the jail's information management system, which documented his schizophrenia, diabetes, and previous psychiatric hospitalizations. (*Id.* ¶ 193; *see also id.* at 5, ¶ 84; *see also id.* ¶ 86). Although Coyne did review Decedent's medical history as the tactical team was getting ready to extract him, she was unable to discern that he suffered from schizophrenia. (*Id.* ¶ 95). Without confirmation from a medical professional, they decided to assemble a tactical team to forcefully extract Decedent because they believed he was suffering from excited delirium. (*Id.* ¶ 193).

Rodriguez, Seeley, Ceballos, and Navarro knew of Decedent's deteriorating health as they personally observed him decompensate when they checked on him in his temporary holding cell. (*Id.* ¶¶ 74, 77, 79, 81, 84, 189; *see also id.* at 4-5). Nevertheless, they failed to request medical care or evaluation. (*Id.*).

DelaCruz, Lopez, Vrabel, Enciso, Sherman, Simms, and Seabron comprised the tactical team which forcefully extracted Decedent from his cell. (*Id.* ¶¶ 24, 96.) They personally observed that he was acting in a "bizarre and incomprehensible fashion, that he was uncommunicative, and appeared to not understand commands." (*Id.* ¶¶ 97-105, 196; *see also id.* at 4, ¶¶ 84, 86). They were tasked with extracting him based on Coyne, Lawson, and Douthitt's erroneous conclusion that he was suffering from excited delirium.

Coyne, Lawson, and Douthitt argue they took reasonable measures to mitigate Decedent's risk of harm by asking nurse practitioner Cavallo to evaluate him and by extracting him from his cell for treatment. However, Coyne, Lawson, and Douthitt

concluded that Decedent was suffering from excited delirium and needed to be extracted before they heard from Cavallo and independently of her opinion. (*See* FAC ¶ 87). The tactical team was already being assembled based on their independent conclusion when Cavallo was called to evaluate Decedent. (*See id.* ¶ 89).

Rodriguez, Seeley, Ceballos, Navarro, and the members of the tactical team contend the FAC lacks sufficient factual allegations to establish their subjective awareness of the risk to Decedent and their knowing disregard of it, or to establish that their conduct caused Decedent's injuries. In order to state a cognizable claim of deliberate indifference to medical needs, the Estate must allege conduct akin to reckless disregard. *Gordon*, 888 F.3d at 1125. However, "a pretrial detainee need not prove those subjective elements about the officer's actual awareness of the level of risk." *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016). "[H]eightened fact pleading of specifics [is not required], but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. As alleged, Rodriguez, Seeley, Ceballos, Navarro, and Seabron knew Decedent was in need of medical treatment because they personally observed Decedent exhibiting symptoms of decompensation. (*See* FAC ¶¶ 77, 79, 81, 84-85). None of them called for medical assistance. Although DelaCruz, Lopez, Vrabel, Enciso, Sherman, and Simms did not check on Decedent in his cell, his decompensated condition was apparent to them at the time of extraction. (*See od.* ¶¶ 97-105.) Instead of calling for medical treatment, they piled on top of him before forcibly extracting him from his cell.

Each named defendant personally observed Decedent's condition and ignored his medical needs, causing him to decompensate to the point of requiring a tactical team extraction for treatment. Based on the Estate's allegations, a reasonable Sheriff's deputy would have obtained medical and psychiatric evaluation and/or care for Decedent to prevent the reasonably foreseeable consequence of his decompensation. The Estate has sufficiently alleged that (1) each named defendant deliberately ignored Decedent's need for a medical or psychiatric evaluation and failed to request it; (2) the lack of medical care put Decedent at substantial risk of harm because he was suffering from schizophrenic

decompensation and hypoglycemia; (3) each individual defendant knew that Decedent needed medical care because they personally observed his decompensation and failed to mitigate the risk by not requesting medical assistance; and (4) by failing to obtain medical care for Decedent, they prompted and then carried out the extraction, resulting in his death.

### 5.   Coast Medical Defendant Cavallo

Defendant Cavallo argues she is not liable because (1) she had no role in determining the conditions of Decedent's confinement, and (2) she adequately addressed Decedent's medical needs by recommending he be extracted for treatment. (Doc. no. 85-1 at 6).

As the tactical team assembled, Coyne, Lawson, and Douthitt called Cavallo, a nurse practitioner, to evaluate Decedent. (FAC ¶ 59). Cavallo observed Decedent through his cell door and recognized his behavior was "spooked" and "almost animalistic." (*Id.* ¶ 90). Without reviewing Decedent's medical record, she decided he was suffering from excited delirium from drug use. (*Id.* ¶¶ 91-92). Although Cavallo was concerned Decedent could be suffering from psychosis, she did not request a psychiatric evaluation from Central Jail's on-call emergency psychiatrists. (*Id.* ¶¶ 91-93).

Decedent's medical records in the jail's information management system included an encounter note from approximately two years prior stating that Decedent was schizophrenic and had been scheduled for a follow-up appointment with a psychiatrist. (*Id.* ¶ 92). Based on this note, it is plausible to infer a reasonable nurse practitioner would (1) review the patient's medical record before making an evaluation, and (2) schedule a psychiatric evaluation for a patient with a history of mental health disorders. Cavallo did neither. Had Cavallo reviewed Decedent's medical record, she would have seen that Decedent had a history of schizophrenia and suicide attempts. If she had requested psychiatric assistance for Decedent pursuant to her concerns that he was suffering from psychosis, Decedent could have received emergency medical care instead of being forcibly extracted by a tactical team.

Based on the foregoing, the Estate has sufficiently alleged that (1) Cavallo delayed Decedent's medical care by incorrectly diagnosing him with excited delirium and agreeing

to have the tactical team forcibly extract him; (2) Cavallo's assessment put Decedent at substantial risk of harm because it called for a extraction rather than emergency medical care; (3) despite being concerned that Decedent was suffering from psychosis, Cavallo did not mitigate his risk by reviewing his medical records or requesting on-call emergency psychiatric assistance; and (4) by failing to do so, Cavallo's independent evaluation was the catalyst to Decedent's forced extraction and ultimate death.

## C.   **Fourth Cause of Action (Excessive Force and Failure to Intercede)**

Cavallo moves to dismiss the Estate's claim of excessive force and failure to intercede. The Estate argues Cavallo had a duty to intercede and provide medical assistance when the tactical team used excessive force to extract Decedent from his cell. Conversely, Cavallo contends she is not liable because there is no duty for medical staff to intercede and provide sufficient medical care.

The duty to intercede with respect to excessive force is limited to correctional officers. *See Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) ("[P]olice officers have a duty to intercede when their fellow officers violate the constitutional right of a suspect or other citizen."). The following elements apply to a pretrial detainee's failure to protect claim under the Fourteenth Amendment for any individual acting under the color of law: (1) defendant made an intentional decision with respect to the conditions of confinement; (2) those conditions put the detainee at substantial risk of serious harm; (3) defendant did not take objectively reasonable and available measures to mitigate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of defendant's conduct obvious; and (4) by not taking such measures, defendant caused the detainee's injuries. *Castro*, 833 F.3d at 1071.

Cavallo was a nurse practitioner contracted by the Sheriff's Department to provide medical services at the Central Jail. She acted under color of state law when she evaluated Decedent and is subject to liability under § 1983. *See West v. Atkins*, 487 U.S. 42, 50 (1988)

/ / / / /

20

(finding private medical professionals under contract with the state to provide medical services at a jail subject to liability under § 1983).

The elements required for failure to protect claims are identical to those required by claims of deliberate indifference to medical needs. *See Castro*, 833 F.3d at 1071; *Gordon*, 888 F.3d at 1125. As follows from the reasoning above, the Estate has sufficiently alleged that Cavallo failed to protect Decedent from the tactical team's use of excessive force which resulted in his death.

### D.   Fifth Cause of Action (Wrongful Death - 42 U.S.C. § 1983)

Coast Medical Defendant Cavallo and County Defendants Adraneda, Coyne, Lawson, Douthitt, Rodriguez, DelaCruz, Vrabel, Enciso, Sherman, Simms, and Seabron seek to dismiss the Estate's § 1983 wrongful death claim. A § 1983 wrongful death claim for conduct that occurred prior to death can survive the subsequent death of the victim at least where survival is authorized under an applicable state law. *See Byrd v. Guess,* 137 F.3d 1126, 1131 (9th Cir. 1998) ("It is undisputed that survival actions are permitted under § 1983 if authorized by the applicable state law."). California law allows survivor actions based on the decedent's individual claims that he would have been entitled to assert for his own injuries. *See* Cal. Code Civ. Proc. § 377.10 *et seq*.

Defendants construe the Estate's wrongful death claim as redundant of its claims of deliberate indifference to medical needs and excessive force. They request dismissal of the wrongful death claim to the extent it is based on the Fourth and Fourteenth Amendment violations. (Docs. no. 85-1 at 9; 87-1 at 15).

As discussed above, the Estate FAC established § 1983 liability against the named defendants by way of the Fourteenth Amendment for denial of critical medical care, use of excessive force, and/or failure to protect Decedent. The Estate seeks exemplary damages and attorney fees for its claim of deliberate indifference to medical need and general, compensatory, and punitive damages for its excessive force and failure to protect claim. (FAC ¶¶ 206, 224). The wrongful death remedies overlap to the extent the Estate requests general damages but differ in that the Estate requests special damages. (*See id.* ¶ 232). Even

without this distinction, the wrongful death claim would not be dismissed as redundant.  A plaintiff may allege alternative statements of claims and state as many separate claims as he or she has. Fed. R. Civ. P. 8(d). Accordingly, Defendants' argument for dismissal of the wrongful death claim as redundant is rejected.

### E.   Sixth Cause of Action (Right of Association)

Decedent's parents Allen and Silva assert a § 1983 claim alleging violation of their right of association against City Defendants Murrow, Derisio, and Maggi; County Defendants Adraneda, Coyne, Lawson, Douthitt, Rodriguez, DelaCruz, Lopez, Vrabel, Enciso, Sherman, Simms, and Seabron; and Coast Medical Defendant Cavallo. Each of them moves to dismiss.

"The substantive due process right to family integrity or to familial association is well established." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir.2011). Parents have a fundamental liberty interest in the companionship of their adult children and have a cause of action under the Fourteenth Amendment when the police kill an adult child without legal justification. *See Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008). "[V]iolation of the right to family integrity is subject to remedy under § 1983." *Rosenbaum*, 663 F.3d at 1079. To state a claim, a plaintiff must allege that the defendant's conduct "shock[ed] the conscience." *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1154 (9th Cir. 2012).

As alleged in the operative complaint, each named defendant shocked the conscience by acting with deliberate indifference to Decedent's medical needs. City Defendants Murrow, Derisio, and Maggi arrested Decedent without probable cause despite knowing he needed to be transported to a medical facility for psychiatric treatment. *See Lee v. City of Los Angeles*, 250 F.3d 668, 684-86 (9th Cir. 2001) (holding plaintiff mother sufficiently pleaded deliberate indifference when son was falsely arrested and extradited to New York). Coast Medical Defendant Cavallo and County Defendants Adraneda, Coyne, Lawson, Douthitt, Rodriguez, DelaCruz, Lopez, Vrabel, Enciso, Sherman, Simms, and Seabron knew Decedent was in need of medical care at the Central Jail yet failed to request

treatment for him. *See Lolli v. County of Orange*, 351 F.3d 410, 419-20 (9th Cir. 2003) (holding that reasonable jury could find deliberate indifference when officers denied medical attention to diabetic pretrial detainee); *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 851–52 (1998) (finding deliberate indifference to a detainee's basic human and medical needs "constitutionally shocking" action). Allen and Silva have sufficiently alleged a violation of their right of association against each named defendant.

## F.    Seventh Cause of Action (Failure to Properly Train - 42 U.S.C. § 1983)

The Estate asserts a § 1983 cause of action for failure to train against City Defendants Zimmerman and Maggi; County Defendants Gore, Lee, Joshua, Coyne, Lawson, and Douthitt; and Coast Medical Defendant O'Brien. Each of them moves to dismiss.

To establish supervisory liability for failure to train, plaintiffs must allege that the supervisory defendant "was deliberately indifferent to the need to train subordinates, and the lack of training actually caused the constitutional harm or deprivation of rights." *Flores v. County of Los Angeles* 758 F.3d 1154, 1159 (9th Cir. 2014). Under this standard, the supervisor must have "disregarded the known or obvious consequences that a particular omission in their training program would cause employees to violate citizens' constitutional rights." *Id.* "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

A "pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). However, it is not necessary to allege a pattern of similar violations to show deliberate indifference" when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

/ / / / /

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force . . . can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Canton*, 489 U.S. at 390 n.10.

Although *Canton* and *Connick* discuss municipal liability for failure to train, the Ninth Circuit applies the same standard for supervisory officials sued in their individual capacity. *See Flores.* 758 F.3d at 1159 (9th Cir. 2014).

### 1.   City Defendants Zimmerman and Maggi

The Estate contends Zimmerman and Maggi failed to train Murrow and Derisio on how to properly respond to 5150 calls for psychiatric assistance, as well as how to properly convey critical medical information to County jails. Zimmerman and Maggi argue they had no personal involvement in the constitutional deprivations at issue and that the Estate fails to allege facts supporting a causal connection between their alleged wrongful conduct and Decedent's death.

The Estate alleges Zimmerman and Maggi failed to properly train their subordinates on various issues relevant to the performance of an officer's duties: (1) how to respond to a 5150 call and assist mentally ill individuals; (2) how to distinguish symptoms of mental illness from signs of substance abuse; (3) the necessity of transporting mentally ill persons to medical facilities for treatment instead of incarcerating them; (4) how to assess whether probable cause for arrest is present in order to avoid unlawful arrests of mentally ill persons; and (5) how to properly communicate critical medical information to jail personnel. (FAC ¶¶ 240-241). As a consequence of failure to train officers on lawful arrests and proper 5150 response procedures, Murrow and Derisio wrongfully arrested Decedent and caused his confinement in the Central Jail. (*Id.* ¶ 242). Further, as a consequence of failure to train officers on how to communicate critical medical information, Murrow failed to convey to the Central Jail intake personnel that Decedent was picked up during a 5150

24

response and was suffering from a schizophrenic episode due to lack of medication. (*See id.* ¶¶ 55, 165, 242).

The Estate argues Zimmerman and Maggi are liable under a single-incident theory. They knew employees required training how to properly respond to 5150 calls given their frequency. (*See* FAC ¶ 241 ("The Department received over 30,000 calls for '5150' alone over a three-year period."). Despite this knowledge, they failed to train their subordinates on arrests without probable cause, proper 5150 response procedures, and proper coordination and communication of critical medical information to jail personnel. This plausibly falls within the narrow range of the "single-incident" liability hypothesized in *Canton. See Canton*, 489 U.S. at 390 n.10. It is plausible that, absent adequate training, police officers are unlikely to be familiar with the constitutional constraints on arrests of mentally ill individuals, detainee medical issues, or the statutory requirements imposed on law enforcement by California Welfare and Institutions Code § 5150. Accordingly, the Estate has adequately alleged that (1) Zimmerman and Maggi were deliberately indifferent in their failure to train subordinate police officers; and (2) their failure to train resulted in Decedent's unlawful arrest and denial of medical care, causing him to decompose and ultimately die due to the application of excessive force.

### 2.   County Defendants Gore, Lee, Joshua, Coyne, Lawson, and Douthitt

Defendants Gore, Lee, Joshua, Coyne, Lawson, and Douthitt argue this Court must limit the Estate's failure to train claim to the County pursuant to *Monell* municipal liability. *See Monell,* 436 U.S. at 658. This argument is rejected because liability for failure to train can extend to supervisory defendants sued in their individual capacities under § 1983. *See Flores.* 758 F.3d at 1159 (9th Cir. 2014).

The Estate alleges Gore knew that his deputies' inadequate cell checks caused multiple instances of detainee deaths or injuries. (*See, e.g., id.* ¶ 132 (alleging five instances of detainee deaths caused by inadequate cell checks). Despite knowledge of this causal connection, he did not sufficiently train them how to perform proper cell checks. (*See id.*).

Gore, Lee, and Joshua knew that a significant number of detainee deaths were caused by inadequate medical care for detainees with serious medical and psychiatric needs, including the deaths of Adrian Correa, Daniel Sisson, Bernard Victorianne, Ronnie Sandoval, Heron Moriarty, Kristopher NeSmith, Jerry Cochran, and Ruben Nunez. (FAC ¶ 123). To highlight Gore, Lee, and Joshua's failure to train, the Estate points to a 2018 study by Disability Rights California, a nonprofit agency, which identified deficiencies in the San Diego County's practices relating to mentally ill detainees. (*Id.* ¶ 127). Because of these deficiencies, a substantial number of mentally ill detainees were deprived of timely access to psychiatric care. (*Id.* ¶ 129). For example, the 2018 study found that San Diego County jails do not have an effective system for communicating and coordinating care for a detainee's "decompensating condition, potential risk of suicide or self-harm, and mental health treatment needs." (*Id.* ¶ 126).

Gore, Coyne, Lawson, and Douthitt knew the County jails frequently booked or housed mentally ill individuals. (*Id.* ¶ 252). They failed to properly train deputies on various issues relevant to the constitutional rights of such detainees with mental health disorders: (1) the appropriate use of force; (2) the ability to determine when a mentally ill detainee needs medical care; (3) the necessity of professional medical assessments and appropriate treatment; (4) how to effectively communicate commands to mentally ill detainees; and (5) the duty to treat mentally ill detainees "fairly" and "humanely." (*Id.*).

According to the allegations, it is reasonable to infer that Gore knew the cell check training was inadequate because there were multiple instances of detainee harm caused by inadequate cell checks. (*See, e.g.,* FAC ¶ 132). Similarly, given the pattern of harm perpetuated by inadequate communication and coordination of detainee treatment, Gore, Lee, and Joshua were on notice that training was inadequate. (*See, e.g., id.* ¶ 123). For example, the 2018 study found a "significant number of failures *on the part of San Diego County Jails* from intake of inmates, housing placements, communication between custodial staff and mental health staff, monitoring of the mentally ill, to coordination of care." (*Id.* ¶ 131) (emphasis added). As alleged, it was foreseeable that inadequate training

would result in constitutional deprivations to mentally ill detainees like Decedent, yet Gore, Lee, and Joshua failed to implement appropriate changes. Further, the Estate sufficiently alleged that the need for training on the lawful use of force on mentally ill detainees was obvious. *See Connick*, 563 U.S. at 64.

For the foregoing reasons, the Estate has sufficiently alleged that (1) Gore, Lee, Joshua, Coyne, Lawson, and Douthitt were deliberately indifferent in their failure to train their subordinates; and (2) as a consequence of their inadequate training, the County correctional and medical staff foreseeably violated Decedent's constitutional rights and actually or proximately caused his death.

### 3.    Coast Medical Defendant O'Brien

The Estate contends O'Brien failed to train Cavallo on how to evaluate and treat detainees as well as the policies and protocols specific to the provision of medical treatment at the Central Jail. O'Brien argues he is not liable because Cavallo's actions were appropriate and did not cause or contribute to Decedent's death. As discussed above, the Estate sufficiently alleges that Cavallo's unlawful actions caused or contributed to Decedent's death.

The Estate alleges O'Brien, as the President and CEO of Coast Hospitalist and Coast Correctional, which contract with the Sheriff's Department to provide nurse practitioners to work at San Diego County jails, had a duty to ensure Cavallo was properly trained on: (1) the evaluation and treatment of detainee-patients at the Central Jail; (2) the ability to contact the Central Jail's on-call after-hours emergency psychiatrists; and (3) how to admit a detainee into the Central Jail's Psychiatric Security Unit for involuntary medication. (FAC ¶ 250). It is clear that a failure to train a nurse practitioner on these matters would likely result in a constitutional violation as they are directly related to mentally ill detainees' constitutional rights.

The Estate further alleges that, as a result of inadequate training, Cavallo failed to consult Decedent's medical history, incorrectly concluded he was suffering from excited delirium, and "stood by" as the tactical team used excessive force to extract him, killing

him in the process. (*Id.* ¶ 251). The Estate has adequately alleged that O'Brien's failure to train resulted in Cavallo's deliberate indifference to Decedent's medical needs, causing his death.

### G.   Eighth Cause of Action (Failure to Properly Supervise and Discipline - 42 U.S.C. § 1983)

The Estate asserts a § 1983 cause of action for failure to supervise and discipline as to City Defendants Zimmerman and Maggi; County Defendants Gore, Lee, Joshua, Coyne, Lawson, and Douthitt; and Coast Medical Defendant O'Brien. Each of them moves to dismiss.

A claim of failure to supervise and discipline is subject to the same standard as a failure to train claim: a plaintiff must allege that the supervisory defendant's conduct was sufficiently inadequate to constitute deliberate indifference to the detainee's rights. *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989). This requires the plaintiff to allege that the supervisory defendant was on actual or constructive notice that the failure to supervise or discipline would likely result in a constitutional violation. *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). The plaintiff must also allege that the supervisory defendant's action or inaction was the actual or proximate cause of the constitutional violation. For the reasons discussed in the context of failure to train, the Estate has sufficiently alleged a claim of failure to supervise and discipline against Maggi, Gore, Lee, Joshua, Coyne, Lawson, Douthitt, and O'Brien.[5]

The Estate alleges that although these Defendants knew of prior incidents of misconduct and civil rights violations by their subordinates involving similar facts as the pending case, they failed to supervise the subordinates regarding communication of critical medical information and required level of care for persons with serious psychiatric and medical conditions; instead, they acquiesced in or even condoned the unlawful behavior

---

[5]     The Estate agrees to dismiss its claim of failure to supervise and discipline against Zimmerman. (Doc. no. 96 at 25).

by failing to retrain, discipline, or correct the abusive behavior of their subordinates. (FAC ¶¶ 259, 260-61, 265, 267-68, 270-71). The Estate also alleges that Defendants knew, or should have known, that their supervision and discipline policies regarding subordinates who violated the civil rights of detainees was so inadequate that it was obvious that a failure to correct would result in further incidents. (*Id.* ¶ 272). Finally, the Estate alleges that the constitutionally deficient supervision and lack of discipline was deliberately indifferent to Decedent's rights and caused his suffering and death. (*Id.* ¶ 273).

The Estate has pled sufficient facts to show that these Defendants were on notice of the alleged shortcomings in their supervision and disciplinary measures based on a history of similar constitutional violations caused by their subordinates' conduct. (*See, e.g., id.* ¶¶ 259, 265, 267-68). Despite this knowledge, Defendants failed to implement corrective measures to prevent further constitutional deprivations to mentally ill individuals like Decedent. (*See, e.g., id.* ¶¶ 257-58, 260-61, 263-66, 269, 271). The lack of supervision and discipline was the "moving force" behind the misconduct by their subordinates, resulting in the violation of Decedent's constitutional rights as well as his pain, suffering, and death. (*See id.* ¶¶ 256-73). The Estate sufficiently alleges that each named Defendant, excluding Zimmerman, is liable for his or her deliberate indifference in failing to supervise and discipline subordinates.

### H.   <u>Ninth Cause of Action (Failure to Properly Investigate - 42 U.S.C. § 1983)</u>

The Estate brings a claim of failure to investigate against City Defendant Zimmerman and County Defendants Gore, Lee, Joshua, Coyne, Lawson, and Douthitt. Each of them moves to dismiss.

To state a claim for failure to investigate against supervisory defendants, a plaintiff must allege that the defendant either: personally participated in the alleged deprivation of constitutional rights (*Starr*, 652 F.3d at 1207); knew of the violations and failed to act to prevent them (*id.*); or promulgated or implemented "a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989). "For a policy to be the

moving force behind the deprivation of a constitutional right, the identified deficiency in the policy must be closely related to the ultimate injury," and the plaintiff must establish "that the injury would have been avoided had proper policies been implemented." *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1190 (9th Cir. 2006).

Upon information and belief, the Estate alleges that Gore implemented a *de facto* policy of "allowing homicide investigators to intimidate witnesses; to ask leading questions, suggesting the answers; and to summarize the interviews of inmates in their investigation files in a manner that distort the actual recorded statements of witnesses." (FAC ¶ 278). The Estate further alleges that Gore, Lee, Joshua, Coyne, Lawson, and Douthitt engaged in a pattern of failing to properly investigate misconduct or take remedial measures against correctional and medical staff for alleged constitutional violations. (*Id.* ¶¶ 269-70, 279-80). Gore, Lee, Joshua, Coyne, Lawson, and Douthitt were aware of the deficiencies of their investigations based on a history of preventable deaths in San Diego County jails caused by medical neglect and excessive force. (*Id.* ¶¶ 283-84). They took no action to prevent harm to detainees, including Decedent. (*Id.* ¶¶ 282-84). As a consequence of this systemic failure to properly investigate, the correctional and medical staff named in this case were deliberately indifferent including to Decedent's constitutional rights, thus causing his pain, suffering, and death. (*Id.* ¶ 287).

Gore, Lee, Joshua, Coyne, and Lawson knew their investigative policies and practices were deficient because there was a pattern of detainee constitutional violations associated with their failure to conduct proper investigations. (*See id.* ¶¶ 280-84). This created a culture in which correctional and medical staff felt no obligation to adhere to the law because they felt protected from legal consequences. (*See id.* ¶ 285). It is reasonable to infer that Gore's *de facto* policy would obviously result in constitutional violations such as deliberate indifference to Decedent's serious medical needs. Viewing the facts in the light most favorable to the Estate, it is plausible that Defendants' failure to investigate was the moving force behind the culture which led to Decedent's death. Accordingly, the Estate

/ / / / /

sufficiently alleged its failure to investigate claim against Gore, Lee, Joshua, Coyne, Lawson and Douthitt.[6]

## I.   Tenth Cause of Action (*Monell* Liability – Failure to Train)

All Plaintiffs assert a *Monell* failure to train claim against the City and the County. To state a claim for municipal liability, a plaintiff must allege that action pursuant to official municipal policy caused the injury. *Monell*, 436 U.S. at 691. "The 'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. Cincinnati*, 475 U.S. 469, 479–80 (1986). Official municipal policy includes "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61.

A "policy is a deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Long*, 442 F.3d at 1185. Such policy or practice must be a "moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). An official municipal policy may be either formal or informal. *City of Saint Louis v. Praprotnik*, 485 U.S. 112, 131 (1988) (acknowledging that a plaintiff could show that "a municipality's actual policies were different from the ones that had been announced.").

For example, a municipality's failure to train its employees may create liability pursuant to § 1983 when the "failure to train amounts to deliberate indifference to rights of persons with whom the [employees] come into contact." *Canton*, 489 U.S. at 388 (1989). Where deliberate indifference is proved, "failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be

---

[6]   The Estate voluntarily dismissed its claim for failure to properly investigate against Zimmerman. (Doc. no. 96 at 25).

held liable if it actually causes injury." *Id.* at 390. This means that plaintiffs "must demonstrate a 'conscious' or 'deliberate' choice on the part of a municipality in order to prevail on a failure to train claim." *Price v. Sery*, 513 F.3d 962, 973 (9th Cir. 2008). A plaintiff must allege facts showing the municipality disregarded the "known or obvious consequence" that a particular omission in their training would cause municipal employees to violate citizens' constitutional rights. *See Connick*, 563 U.S. 51 at 61.

### 1.    The City

Plaintiffs allege that the City failed to train police officers on the proper protocol in the frequent and recurring situation of responding to 5150 calls, and that the failure to train was deliberately indifferent to Decedent's constitutional rights. (FAC ¶¶ 289, 293, 295).

As discussed above in the context of the Seventh Cause of Action, the Estate alleges sufficient facts showing that Zimmerman, the Police Department Chief and its policy maker, failed to train the City's police officers. (*See id.* ¶¶ 240-43). Because official municipal policy includes the acts of its policy-making officials, *Connick*, 563 U.S. at 61, Plaintiffs adequately alleged the City's liability for failure to train police officers about the constitutional restraints on lawful arrests of mentally ill citizens. (*See id.* ¶¶ 240-43). Like Zimmerman, the City knew the Police Department's training policies were inadequate yet did not address the deficiencies, resulting in Decedent's wrongful arrest, denial of medical needs, and death. (*Id.* ¶¶ 290-291). The City's deficient training caused Decedent's "pain and suffering, loss of life, loss of enjoyment of life, and death," as well as Allen and Silva's "loss of the love, companionship, comfort, care, society, training, guidance, and past and future support" of their son. (*Id.* ¶ 296). Plaintiffs sufficiently allege a failure to train claim against the City.

### 2.    The County

Plaintiffs allege the County's correctional and medical staff lacked training on the proper communication of critical health information and coordination of adequate medical care for mentally ill detainees. (*Id.* ¶¶ 297, 300, 301). Plaintiffs further allege the County failed to train its correctional staff on the use of force. (*Id.* ¶¶ 305).

As discussed above, the Estate adequately alleges a failure to train claim against Gore, Lee, Joshua, Coyne, Lawson, and Douthitt. (*See id.* ¶¶ 114-56). Similar to the County supervisory defendants, the County knew its training was inadequate but failed to implement changes. (*See id.* ¶¶ 131, 298-304). The County's failure to provide proper training about the medical needs of and use of force against mentally ill detainees caused Decedent's "pain and suffering, loss of life, loss of enjoyment of life, and death," as well as Allen and Silva's "loss of the love, companionship, comfort, care, society, training, guidance, and past and future support" of their son. (*Id.* ¶¶ 306-07). Accordingly, Plaintiffs sufficiently allege a failure to train claim against the County.

## J.     Eleventh Cause of Action (*Monell* Liability - Unconstitutional Policy, Custom, or Practice)

The City and the County move to dismiss Plaintiffs' *Monell* claim of unconstitutional policies, customs, and practices.

### 1. The City

Plaintiffs allege that as a matter of policy, custom, and practice, the City and its policymakers (1) falsely arrested citizens, including those in need of medical or psychiatric help; (2) denied medical care to mentally ill citizens; (3) inadequately supervised, trained, controlled, assigned, and disciplined police officers; (4) maintained grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining, and controlling misconduct by police officers; and (5) failed to fund, utilize, and request the specialized services of PERT. (FAC ¶¶ 313, 317). The implementation of these unconstitutional policies, customs, and practices resulted in the "collective inaction" and "callous indifference" of the City's police officers, causing Maggi, Murrow, and Derisio to wrongfully arrest Decedent and deny hospitalization for psychiatric treatment. (*Id.* ¶ 314).

The City argues its policies on how to respond to 5150 calls and how to deal with mentally ill citizens because it has specialized personnel, PERT, to deal with situations involving mental health issues were adequate. (Doc. no. 86-1 at 21-23).The Court is not

persuaded.  As discussed above, Plaintiffs adequately allege that the City was deliberately indifferent in its failure to properly train police officers in dealing with mentally ill citizens. Furthermore, Plaintiffs allege the City had a policy, custom or practice of underfunding PERT.  (*Id.* ¶317.) In combination, these allegations show that the City was aware of the need for specialized approach to mentally ill citizens, but failed to adequately fund the service, while at the same time also failing to properly train the police officers. Plaintiffs therefore sufficiently allege a *Monell* claim based on unconstitutional policies, procedures, and customs.

### 2.  The County

Plaintiffs allege that the County's policies, procedures or customs perpetuated the use of excessive force, deliberate indifference to detainees' serious medical needs, and ultimately to in-custody deaths. (*See* FAC ¶ 315).

Although the County maintained an investigative body, the Citizens' Law Enforcement Review Board, with the responsibility to investigate in-custody deaths in County jails (*id.* ¶ 149), it also maintained a *de facto* policy of (1) failing to notify the board of in-custody deaths; (2) failing to adequately fund and staff the board; (3) failing to train the board's members on how to conduct proper investigations; (4) failing to investigate in-custody deaths; and (5) allowing summary dismissal of in-custody deaths without investigation. (*Id.* ¶¶ 319-21). In its 25 years of existence, the board has never inspected a jail facility despite its authority and responsibility to do so. (*Id.* ¶ 151). The board has publicly stated that "death cases and other complex investigations often take more than one year to complete," and has a pattern of dismissing death cases without sufficient review "based on a one-year time limitation for imposing officer discipline for misconduct." (*Id.* ¶ 153). The County has access to state funding under the Mental Health Services Act, it has failed to invest it in the board. (*Id.* ¶ 154).

As discussed above, Plaintiffs adequately allege that the County has failed to train its correctional and medical staff on the proper communication of critical health information and coordination of adequate care for mentally ill detainees, failed to properly

supervise them, and failed to discipline them for violations. Although it has established a board to investigate the widely known problem of in-custody deaths, it has also failed to enable the board to carry out its stated responsibilities. Based on the foregoing, Plaintiffs have sufficiently alleged that the County's unconstitutional policies, customs, and practices were deliberately indifferent to Decedent's constitutional rights.

## IV.   STATE LAW CLAIMS

### A.   Twelfth Cause of Action (Wrongful Death – CCP §377.60)

County Defendants and Coast Medical Defendants move to dismiss Allen and Silva's state law claim for wrongful death. California Code of Civil Procedure § 377.60 establishes a statutory cause of action in favor of specified heirs of an individual who dies as a result of the "wrongful act or neglect" of another. Under the statute, the specified heirs are entitled to damages on their own behalf for the loss they have sustained by reason of the victim's death. *See Jacoves v. United Merchandising Corp.*, 9 Cal. App. 4th 88, 105 (1992). "The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Quiroz v. Seventh Ave. Center*, 140 Cal. App. 4th 1256, 1263 (2006).

### 1.   County Defendants

County Defendants argue they are statutorily immune from liability for injury proximately caused by the failure of County employees to furnish or obtain medical care based on California Government Code § 845.6.

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody;  but . . . a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care.

Cal. Gov. Code § 845.6. To state a claim, a plaintiff must allege that "(1) the public employee knew or had reason to know of the need (2) for immediate medical care, and (3) / / / / /

failed to reasonably summon such care." *Jett v. Penner*, 439 F.3d 1091, 1098–99 (9th Cir. 2006).

Allen and Silva's wrongful death claim against County Defendants is based on the same allegations as the Estate's claim of deliberate indifference to Decedent's serious medical needs. For the same reasons the Court concluded the Estate alleges sufficient facts to state a § 1983 claim of deliberate indifference against County employees Adraneda, Coyne, Lawson, Douthitt, Rodriguez, DelaCruz, Lopez, Vrabel, Enciso, Sherman, Simms, and Seabron, it follows that Allen and Silva have sufficiently pled a wrongful death claim against the County and its employees. *See Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1081-1082 (9th Cir. 2013) (holding that the bar for a deliberate indifference claim is significantly higher than that of a negligence claim).

However, Plaintiffs do not allege that Gore, Lee, and Joshua knew or had reason to know of Decedent's need for immediate medical care. Allen and Silva therefore cannot state a wrongful death claim against them.

### 2.   Coast Medical Defendants

Coast Medical Defendants argue Allen and Silva's wrongful death claim is barred by the statute of limitations. (Doc. no. 85-1 at 10). They contend wrongful death claims against healthcare providers are analyzed under California's one-year statute of limitations for negligence against health care providers. *See* Cal. Civ. Proc. Code § 340.5.

Cavallo's interaction with Decedent occurred on February 21, 2018. The initial complaint was filed on October 2, 2018, within the one-year statute of limitations. (*See* doc. no. 1). However, Coast Medical Defendants were named for the first time in the amended complaint filed August 9, 2019. (*See* doc. no. 79.)

Under Rule 15, an amendment to a pleading relates back to the date of the original pleading when the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out in the original pleading, or when the amendment changes the party against whom a claim is asserted. Fed. R. Civ. P. 15(c)(1). The Court therefore finds that the allegations against the Coast Defendants relate back to the original complaint.

Accordingly, Allen and Silva's wrongful death claim against Coast Medical Defendants is not barred by the statute of limitations.

### B.   Thirteenth Cause of Action (Negligence)

All Defendants more to dismiss the Estate's negligence cause of action. To state a claim under California law, a plaintiff must allege (1) a legal duty to use due care; (2) a breach of such legal duty; and (3) the breach as the proximate or legal cause of the resulting harm. *Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009).

### 1.   City Defendants

City Defendants argue the negligence claim should be dismissed because it asserts "conclusory grouped allegations." *See Ortez v. Washington County, State of Or.*, 88F.3d 804, 809-810 (9th Cir. 1996). Although the Estate does not specifically allege the elements of a negligence claim, it incorporates by reference all prior allegations in the operative complaint. (FAC ¶ 331). For example, the negligence claim is based on the same allegations as the claims of arrest without probable cause, deliberate indifference to serious medical needs, and failure to train. As discussed above, Plaintiffs adequately alleged those claims. For the same reasons the Court finds the allegations provide City Defendants with sufficient notice of the basis for negligence. *See Lemire*, 726 F.3d at 1081-1082.

### 2.   County Defendants

County Defendants argue they are statutorily immune from liability pursuant to California Government Code § 845.6. For the reasons stated above in the context of wrongful death, the Estate sufficiently alleges negligence against the County and its employees Adraneda, Coyne, Lawson, Douthitt, Rodriguez, DelaCruz, Lopez, Vrabel, Enciso, Sherman, Simms, and Seabron, but not against Gore, Lee, and Joshua.

### 3.   Coast Medical Defendants

Based on the same statute of limitations argument as their motion to dismiss the wrongful death claim, Coast Medical Defendants argue for dismissal of the negligence claim. (Doc. no. 85-1 at 10). The argument is rejected for the same reasons stated above. / / / / /

### C.      Fourteenth Cause of Action (Violation of California's Unruh Act)

Coast Medical Defendants move to dismiss the Estate's claim under the Unruh Act because a County jail is not a "business establishment" within the meaning of the statute. The Unruh Act entitles plaintiffs to "full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b). The statute's plain language leaves no doubt that courts should read "business establishments" in the "broadest sense possible." *Isbister v. Boys Club of Santa Cruz, Inc*., 40 Cal. 3d 72, 78 (1985). Although the Unruh Act does not apply to correctional facilities, a private contractor working within a prison qualifies as a business establishment operating for profit. *See O'Connor v. Village Green Owners Assn*., 33 Cal. 3d 790 (1983).

Coast Medical Defendants do not dispute that Coast Hospitalist and Coast Correctional are private for-profit entities contract with the Sheriff's Department to provide detainee services within County jails for a fee. (*See, e.g.,* FAC ¶¶ 18, 362.) By providing services for a fee, they perform a customary business function in that they are engaged in an "overall function to protect and enhance economic value." *O'Connor*, 33 Cal. 3d at 795 (finding that a non-profit hospital was a business establishment because it charged its patrons significant fees for its services). Any business or organization may be deemed a "business establishment" if it performs "customary business functions" and fulfills a "businesslike purpose." *Id.* at 796.

The Estate adequately alleged that this customary business function renders Coast Medical Defendants a "business establishment" under the broad terms of the Unruh Act. Accordingly, it can state a claim against them for violation of the Unruh Act.

### D.      Fifteenth Cause of Action (Violation of California's Bane Act)

The City, Maggi, Murrow, and Derisio move to dismiss the Estate's claim under the Bane Act on the basis that it fails to allege specific intent to violate Decedent's constitutional rights.

The Bane Act authorizes an action for damages, injunctive relief, and other "appropriate equitable relief" against a person or persons who "interferes by threats,

intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured" by federal or state law or the United States or California constitutions. Cal. Civ. Code. § 52.1. To plead a Bane Act claim, a plaintiff must allege that the defendant interfered with his or her constitutional or statutory rights and that the interference was accompanied by actual or attempted threats, intimidation, or coercion. *Id.*

The plaintiff must also allege a "specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Reese v. County of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018). The Bane Act does not require a showing of "threats, intimidation and coercion" separate from the underlying constitutional violation. *Cornell v. City and County of San Francisco,* 17 Cal. App. 5th 766, 799 (2017); *Reese*, 888 F.3d at 1043. The City, Maggi, Murrow, and Derisio do not seek to dismiss the Estate's claim of arrest without probable cause.

> [W]here, as here, an unlawful arrest is properly pleaded and proved, the egregiousness required by Section 52.1 is tested by whether the circumstances indicate the arresting officer had a specific intent to violate the arrestee's right to freedom from unreasonable seizure, not by whether the evidence shows something beyond the coercion "inherent" in the wrongful detention.

*Cornell*, 17 Cal. App. 5th at 801.

The Estate alleges that Decedent "had a Constitutional right not to be arrested without probable cause. Murrow, Derisio, and Maggi arrested him through the use of intimidation and coercion by accusing him of being under the influence of a controlled substance when he was not." (FAC ¶ 367). Allen repeatedly informed the dispatch as well as the arresting officers before arresting Decedent, that Decedent was not under the influence but was acting irrationally because he was experiencing a schizophrenic episode. (*See id.* ¶¶ 40-47.) The laboratory test at the police station, before Decedent was transferred to the Central Jail, confirmed that he was not under the influence.  (*Id.* ¶ 49.)

The Estate plausibly alleged that Maggi, Murrow, and Derisio had a specific intent to violate Decedent's right to be free of unlawful arrest. *See Reese*, 888 F.3d at 1045 ("[A]

1   reckless disregard for a person's constitutional rights is evidence of a specific intent to

2   deprive that person of those rights."). As such, the Court finds the Estate has sufficiently

3   alleged the named defendants are liable for violation of the Bane Act.

4   **V.   ADA AND REHABILITATION ACT**

5       The Estate asserts its final causes of actions under the ADA and the Rehabilitation

6   Act against the City and the County. Both defendants move to dismiss.

7       Title II of the ADA provides that "no qualified individual with a disability shall, by

8   reason of such disability, be excluded from participation in or be denied the benefits of the

9   services, programs, or activities of a public entity, or be subjected to discrimination by any

10  such entity." 42 U.S.C. § 12132. Similarly, § 504 of the Rehabilitation Act provides that

11  "[n]o otherwise qualified individual with a disability shall, solely by reason of her or his

12  disability, be excluded from the participation in, be denied the benefits of, or be subjected

13  to discrimination under any program or activity receiving Federal financial assistance." 29

14  U.S.C. § 794(a).

15      Both the ADA and the Rehabilitation Act apply in the context of arrests and

16  correctional facilities. *See City & Cty. of San Francisco v. Sheehan*, 575 U.S. 600, 135 S.

17  Ct. 1765, 1773 (2015) (ADA applies to arrests); *Pierce v. Cty. of Orange*, 526 F.3d 1190,

18  1214 (9th Cir. 2008) (ADA and Rehabilitation Act apply to correctional facilities); *see also*

19  *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210, (1998) ("services, programs, or

20  activities" as used in 42 U.S.C. § 12132 includes medical programs in prison). "[T]here is

21  no significant difference in the analysis of rights and obligations created by the two Acts."

22  *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002).

23      To plead a failure to accommodate under the ADA or the Rehabilitation Act, a

24  plaintiff must allege that a public entity knew of the disability but failed to provide

25  reasonable accommodations. *See Robertson v. Las Animas Cty. Sherriff's Dep't*, 500 F.3d

26  1185, 1196 (9th Cir. 2007). An entity's "deliberate refusal" to accommodate disability-

27  related needs violates the ADA and the Rehabilitation Act. *See United States v. Georgia*,

28  546 U.S. 151, 157 (2006) ("[T]he alleged deliberate refusal of prison officials to

accommodate [plaintiff's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted [an ADA violation].”). However, inadequate or negligent medical treatment alone does not constitute an unlawful failure to accommodate. *Simmons v. Navajo Cty.*, 609 F.3d 1011, 1022 (9th Cir.2010) (overruled on other grounds).

## A.   The City

The Estate alleges the City failed to make reasonable accommodations to Decedent's medical needs based on his mental health during his arrest. (FAC ¶ 382). The City's police officers denied him the benefits of its services, programs, or activities by assuming his schizophrenic symptoms were symptoms of drug use, although they knew they were responding to a 5150 call and were told by Allen that Decedent was not under the influence but was experiencing a schizophrenic episode. (*See id.* ¶¶ 383, 384). They administered a sobriety test they knew Decedent was certain to fail due to his schizophrenia. (*Id.* ¶ 384). They then failed to take him to a medical facility for treatment, “thereby failing to accommodate [his] disability, and denying him a service, benefit, or program.” (*Id.*).

One of the categories of disability claims applicable to arrests is a “wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity. *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014). The Estate's claim falls within this category: the officers wrongly arrested Decedent because they misperceived the symptoms of his schizophrenia as the effects of methamphetamine use, although they were on notice of his disability. (FAC ¶¶ 381-384, 387). They further decided to deny him transportation to a medical facility although they knew he needed psychiatric treatment. (*Id.*). Accordingly, the Estate has sufficiently alleged the City intentionally discriminated against Decedent in violation of the ADA and the Rehabilitation Act. *See Vinson*, 288 F.3d at 1152 n.7.

## B.   The County

The Estate alleges the County failed to make reasonable accommodations to meet Decedent's basic needs, including access to medical treatment, showers, bedding, and

hygienic items. (FAC ¶ 384). The Estate's ADA and Rehabilitation Act claims are based on the same allegations as the Estate's claims of violation of due process and deliberate indifference to Decedent's serious medical needs. For the same reasons the Court concluded the FAC alleges sufficient facts to state the aforementioned § 1983 claims, it follows that the Estate has sufficiently pled that the County violated Decedent's rights under the ADA and the Rehabilitation Act.

## VI.   CONCLUSION

For the reasons stated above, it is ordered as follows:

1.   The Coast Medical Defendants' motion to dismiss (doc. no. 85) is denied.

2.   The City Defendants' motion to dismiss (doc. no. 86) is denied. Plaintiffs have voluntarily dismissed the eighth and ninth causes of action against Shelley Zimmerman.

3.   The County Defendants' motion to dismiss (doc. no 87) in granted as to the twelfth and thirteenth causes of action against William Gore, Barbara Lee, and Alfred Joshua only. The motion is denied in all other respects. To the extent the motion is granted, leave to amend is denied as futile.

**IT IS SO ORDERED.**

Dated:  November 25, 2020

Hon. M. James Lorenz
United States District Judge