1
2
3
4
5
6
7

8              **UNITED STATES DISTRICT COURT**

9             **SOUTHERN DISTRICT OF CALIFORNIA**

10   THE ESTATE OF PAUL SILVA, by and )   Case No.  18cv02282 L (MSB)
     through it's successors-in-interest       )
11   LESLIE ALLEN and The Estate of        )   **ORDER GRANTING IN PART**
     MANUEL SILVA et al,                        )   **AND DENYING IN PART**
12                                                          )   **DEFENDANT CITY OF SAN**
                      Plaintiffs,                    )   **DIEGO'S MOTION FOR**
13                                                          )   **SUMMARY JUDGEMENT OR**
              v.                                         )   **SUMMARY ADJUDICATION**
14                                                          )   **[ECF NO. 199]**
     CITY OF SAN DIEGO, et al,             )
15                                                          )
                      Defendants.                 )
16                                                          )
                                                           )
17   _____)

18
19
20
21
22
23
24
25
26
27
28

1

Pending before the Court is Officer Andrew Murrow, Officer Thomas Derisio, Sgt. Louis Maggi, and City of San Diego ("City Defendants") motion for summary judgment. Plaintiffs opposed the motion and Defendants replied. The Court decides the matter on the papers submitted and without oral argument.  *See* Civ. L. R. 7.1(d.1).  For the reasons stated below, Defendants' motion is granted in part and denied in part.

# I.    BACKGROUND

## A.    Factual Allegations

This action arises out of the contact, arrest, booking, and subsequent death of Plaintiffs' son, Paul Silva ("Paul" or "Decedent").   Silva suffered from schizophrenia. (First Am. Compl. "FAC" ¶¶ 32, 51 [ECF. No. 79]). Although he was 39 years old, he lived with his father, Manuel Silva, and visited his mother, Leslie Allen, each morning. (*Id*. ¶ 33).

On February 19, 2018, while visiting Allen, Silva acted out and refused to go home. (*Id*. ¶ 34). Allen called the San Diego Police Department's Psychiatric Emergency Response Team ("PERT") and requested assistance for a mental health emergency, also known as a California Welfare and Institution's Code § 5150 psychiatric hold ("5150 hold").  (*Id*. ¶¶ 35, 39). Allen had called PERT to assist Paul in the past.  On each prior occasion, "a PERT officer would speak to Paul calmly, and Paul would comply with all of their requests." (*Id*. ¶ 38). However, due to the President's Day holiday on February 19, 2018, PERT was unavailable. (*Id*.  ¶ 35).

On February 20, 2018, Allen again called the San Diego Police Department ("SDPD") to request PERT assistance for Silva. (*Id*.) In the dispatch log, the call was classified as a "5150 Mental Case" and the type of call was "CW-CHECK THE WELFARE." (*Id*. at 39). During this call, Allen told dispatch that Silva was cooperative with police because he was scared of officers. (*Id*. at ¶ 40).

After three hours, Allen called SDPD again, telling them that Silva needed to go to the hospital because he was having a schizophrenic breakdown and was "running around between cars in the middle of the street." (*Id.* at ¶ 42). Silva's behavior became increasingly concerning, so a half an hour later, Allen contacted SDPD again, reporting that Silva was getting worse and that he needed to go to the hospital. (*Id.* at ¶ 43).

San Diego police officers Derisio, Murrow, and Maggi responded to Allen's 5150 call without PERT personnel. (*Id.* ¶ 45). Allen informed Derisio that Paul (1) did not use illicit drugs, (2) required hospitalization to treat his schizophrenia, and (3) was not taking his psychiatric medication. (*Id.* ¶ 44). Despite Allen's statements that Silva was having a schizophrenic episode because he was off his medication, and that he was not on drugs, the officers decided that Silva must have used narcotics. (*Id.* at ¶ 45). Officer Murrow administered a field sobriety test, and Murrow concluded that Silva failed the test. (*Id.* ¶ 45). After arresting Silva, Murrow transported him first to SDPD headquarters, then to the Central Jail, a County-owned facility, to be booked. (FAC ¶ 49). Murrow did not inform County personnel of Paul's psychiatric condition. (*Id.* ¶ 55).

Registered nurse Anthony Adraneda conducted Paul's intake interview at the Central Jail at approximately 11:21 AM on February 20, 2018. Paul informed Adraneda that he suffered from diabetes and schizophrenia and had been previously hospitalized in a psychiatric hospital. (*Id.* at 51). Adraneda reviewed Paul's medical records in the Central Jail's information management system and saw that his records showed a history of schizophrenia and self-reported psychiatric hospitalizations. (*Id.* at 52). Adraneda was aware that Paul had been prescribed psychiatric medication and had not been taking it. (*Id.*) Although Paul was a "book and release" inmate, Adraneda informed him he would refer him to a psychiatric doctor. (*Id.* at 52).

"Book and release" inmates are arrested and booked for being under the influence of a controlled substance and are placed in "sobering cells" to be monitored for a maximum of 8 hours. (*See id*. ¶¶ 58, 69). Paul remained in County custody for the next 36 hours.  During his 36 hours in the Central Jail, Sheriff's deputies saw Paul running around his cell, throwing himself to the ground, yelling incoherently, staring out the window with his mouth wide open, holding his arms out pointing toward the window and walls, and crawling and rolling on the floor. (*Id*. ¶ 210). Paul was not placed in a sobering cell, as required for book-and-release inmates, but was instead moved from temporary holding cell to temporary holding cell with "no shower, no toilet paper, no soap, no toothbrush, no clean clothes, and no bed [or blankets]." (*Id*. ¶ 61). He was not given a medical referral or treatment for diabetes or his schizophrenia. (*Id*. at ¶ 67). "When Paul arrived at the hospital, he was hypoglycemic with his blood sugar level at 30.").

At 7:46 p.m., approximately 9 hours after Paul had been booked, Paul was exhibiting symptoms of decompensation but was not offered any medical assistance. (*Id*. ¶¶ 76). At 1:35 AM on February 21, 2018, a "cell check" was conducted by a deputy who looked in but Paul was still not offered any medical assistance. (*Id*. ¶ 77). At 2:28 AM, Lieutenant Laura Coyne reviewed the Central Jail log after Paul had been in temporary holding cells for 16 hours. Coyne did not take action to release him or request medical care. (*Id*. ¶ 78). At 8:07 AM, Sergeants Ceballos and Navarro went into Paul's cell when he was placing items under the door and moving them around. Paul had been held for approximately 22 hours without sleep. Ceballos and Navarro did not assist him. (*Id*. ¶ 79). At 2:16 PM, Ceballos was the supervisor on the floor and knew that Paul had been denied access to adequate resources for over 28 hours. He still did not act. (*Id*. ¶ 81).

Between 7:41 PM and 7:51 PM, 33 hours after Paul was booked, Deputy Julio Rodriguez, Deputy Ryan Seabron, and Deputy Suarez visited him to complete the required book-and-release paperwork. (*Id*. ¶ 84). Silva complied with Deputy Rodriguez's instructions, but when Rodriguez reached for his handcuffs, Silva ran to the back of his cell. (*Id*.) Rodriguez, Seabron, and Suarez did not release him, provide medical care, or move him to a cell more suitable for long-term stays. (*Id*. ¶ 84).

By 10:55 PM, Silva was running from wall to wall in his cell and placing his body against the walls and on the floor. (*Id*. at ¶ 85). Sergeant Lawson told Silva to come to the door of the cell to be placed in handcuffs, but Silva did not respond. (*Id*.) At 10:59 PM, Sergeant Michael Lawson instructed Seabron to use pepper spray to force Paul to comply. (*Id*. ¶ 86). Because the pepper spray did not affect him, Silva continued to pace in his cell. (*Id*.) Lawson and Sergeant John Douthitt concluded Paul was suffering from excited delirium and proposed a tactical team extraction. Coyne, the watch commander on duty, agreed. (*Id* ¶ 87). None of them reviewed Paul's medical history before deciding to use a tactical team to extract Paul from his cell. (*Id*.)

Nurse practitioner Keri Cavallo evaluated Paul immediately before the extraction. *(Id.* at ¶ 89). Without looking at his medical history or requesting that a physician or psychiatrist evaluate him, Cavallo agreed with Lawson that Paul was experiencing excited delirium and should be taken to the hospital. (*Id*.). Cavallo did not request that Silva be admitted into the jail's internal hospital for a psychiatric or medical evaluation. (*Id*. at 91).

The tactical team tasked with extracting Paul was led by Douthitt and included Rodriguez and Deputies Seabron, Charles DelaCruz, Diego Lopez, Aaron Vrabel, Jorge Enciso, Tanner Sherman, Christopher Simms, and Seabron. (FAC ¶ 96). The team used various tactics. For example, (1) Vrabel shot water-filled pepper balls and forcibly pressed underneath Paul's jaw; (2) Simms tasered Paul multiple times; (3) DelaCruz wrapped Paul's arms behind his back and struck his face and shoulder; (4) Seabron restrained Paul's arm and pinned his legs down; (5) Sherman pushed Paul's head to the ground; and (6) Enciso pinned Paul against the wall using a body shield capable of producing an electrical shock. (*Id*. ¶¶ 99-101). In short, the tactical team piled on top of Paul and placed downward force and pressure on his head, midsection, arms, and legs. (*Id*. ¶ 105). By the end of the extraction, Paul was handcuffed but immobile.

At approximately 11:58 PM, paramedics found a pulse and transported Paul to UCSD Medical Center. (*Id*. ¶¶ 108).  Silva was in a coma for several weeks before he succumbed to his injuries. (*Id*. at ¶ 112). Although he sustained significant neurological injuries and kidney failure, the ultimate cause of death was lack of oxygen to the brain resulting from cardiopulmonary arrest during restraint. (*Id*. ¶ 113).  The manner of death was determined to be homicide. (*Id*.)

## B.   Legal Claims and Parties

Paul's parents, Leslie Allen and Manuel Silva, and the Estate of Paul Silva, filed a complaint alleging federal constitutional claims under 42 U.S.C. § 1983, as well as violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., the Rehabilitation Act, 29 U.S.C. § 794(a), and related state laws.  Upon the passing of Manuel Silva, the Court granted an unopposed request to substitute Sarah Newstead, Administrator of the Estate of Manuel Silva, as a party.

The Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343(3) and (4), *et. seq.* as well as supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

Pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, in which they argue that Plaintiffs lack standing to pursue all claims except Plaintiff Allen and Silva's right of association; and that City Defendants are entitled to summary judgment (1) for all injuries and damages sustained after Officer Murrow released Decedent into the County's care and custody, (2) on the First cause of action because there was probable cause to arrest Decedent, (3) on the Third cause of action because they were not deliberately indifferent to a serious medical need, (4) on the Fifth cause of action for wrongful death under 28 U.S.C. § 1983, (5) on the Sixth cause of action for right of association because there was no constitutional violation, and the officers' conduct does not shock the conscious, (6) on the Seventh and Eighth causes of action for failure to train and failure to supervise as to Defendant Maggi, (7) on the Tenth and Eleventh causes of action under *Monell*, (8) on the state law causes of action for negligence, violation of the Bane Act, and wrongful death, and (9) on the Sixteenth and Seventeenth causes of action for violations of the ADA and Rehabilitation Act. Defendants further claim that Officer Murrow, Officer Derisio and Sgt. Maggi are entitled to qualified immunity.

## II.   **LEGAL STANDARD**

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The

moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

If the moving party meets the initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elect. Indus. Co., Ltd. v Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

The court must draw all inferences from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

"[T]he district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). The court is not obligated "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (*citing Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995)).

//

//

III.   **<u>DISCUSSION</u>**

To state a claim under 42 U.S.C. § 1983 for violation of federal constitutional rights, a plaintiff must allege: (1) that the conduct complained of was committed by a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a federal constitutional or statutory right. *Jensen v. Lane Cnty*., 222 F.3d 570, 574 (9th Cir.2000). A public employee acts under color of state law within meaning of § 1983 "while acting in his or her official capacity or while exercising responsibilities pursuant to state law." *McDade v. West*, 223 F.3d 1135, 1139 (9th Cir. 2000).

State officials may be sued under § 1983 in their individual capacities for damages. *Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985). In order to be individually liable under § 1983, an individual must personally participate in an alleged rights deprivation. *Avalos v. Baca*, 596 F.3d 583, 587 (9th Cir.2010). Plaintiffs must establish causation to "demonstrate that the defendant's conduct was the actionable cause of the claimed injury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir.2008). A plaintiff must prove both actual and proximate cause. *Leer v. Murphy,* 844 F.2d 628, 634 (9th Cir. 1988).

The Court looks to traditional tort law to determine causation, including whether intervening causes have broken the chain of proximate causation. *See Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996). "An unforeseen and abnormal intervention ... breaks the chain of causality, thus shielding the defendant from [section 1983] liability." *Id*. However, if the intervening actions were foreseeable, the chain of causation is not broken. *Id*.; *Nicholson v. City of Los Angeles*, 935 F.3d 685, 691-92 (9th Cir. 2019)("the chain of causation is not broken where the intervening decision was foreseeably influenced by the defendant.")

Similarly, state law causes of action require proof that a defendant's conduct was a substantial factor in causing the harm. *Rutherford v. Owens-Illinois, Inc*., 16 Cal. 4th 953, 968-69 (1997). When determining whether a defendant's conduct was

9

a substantial factor, the question is whether there was a sufficient connection between a defendant's conduct and the injury. *Novak v. Continental Tire North America*, 22 Cal.App. 5th 189, 196 (2018).

Where, as here, a plaintiff seeks damages against state officials, a strong presumption is created in favor of an individual capacity suit because an official capacity suit for damages would be barred. *See Mitchell v. Washington*, 818 F.3d 436, 442 (9th Cir. 2016). Accordingly, the Court applies an individual capacity analysis in its evaluation of claims relating to non-municipal parties.

A. *Fourth and Fourteenth Causes of Action- Excessive Force/Failure to Intervene and Unruh Civil Rights Act*

Defendants have withdrawn their argument regarding Silva and Allen's standing, therefore the Court denies the request for summary judgment as to this claim as moot.

B. *First Cause of Action- Probable Cause for Arrest*

In the First cause of action, Plaintiffs contend that "Paul Silva had a firmly established right under the Fourth Amendment to be free from arrest without probable cause. Defendants Murrow, Derisio, and Maggi arrested Paul without probable cause despite the fact that he had committed no crime." (FAC at ¶ 159). The Complaint goes on to allege that "Murrow, Maggi, and Derisio had no reason and no legal basis to arrest Paul Silva. Based on the dispatch records and the statements of Leslie Allen, Defendants knew Paul's behavior was symptomatic of Paul's mental health condition and his failure to take his psychotropic medication. They knew that Paul's behavior was not symptomatic of illicit drug use." (*Id*. at ¶164).

"A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Dubner v. City and County of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001). "Probable cause exists when, under the totality of the circumstances

10

known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime." *Dubner*, 266 F.3d at 966. If probable cause exists, it provides a complete defense. *Hutchinson v. Grant*, 796 F.2d 288, 290 (9ᵗʰ Cir. 1986).

"Where the facts or circumstances surrounding an individual's arrest are disputed, the existence of probable cause is a question for the jury." *Harper*, 533 F.3d 1010, 1022 (9th Cir. 2008). "[I]n a § 1983 action the factual matters underlying the judgment of reasonableness generally mean that probable cause is a question for the jury . . and summary judgment is appropriate only if no reasonable jury could find that the officers did or did not have probable cause to arrest." *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9ᵗʰ Cir. 1984)(internal citations omitted).

Defendants Murrow, Derisio and Maggi argue that there was probable cause to arrest Silva for being under the influence of methamphetamine because "he had drug paraphernalia on him, he had an unkempt appearance, was very talkative, was speaking rapidly, sweating profusely, speaking loudly with rapid speech, emitted bad body odor and bad breath" (Mot. at 21). Defendants also contend that probable cause existed because Silva performed poorly on the field sobriety evaluation conducted by Officer Murrow, Silva admitted he had used methamphetamine in the past, and Murrow was told that Silva had recently used drugs. (*Id*. at 21-22). Summary judgment is appropriate as to Officer Derisio because he did not personally participate in the arrest, according to Defendants. (*Id*. at 23).

In response, Plaintiffs argue that Murrow decided to detain and investigate Silva for a drug crime within 21 seconds of making contact based on the wrongful premise that possession of a marijuana pipe was an admission of the crime. (Oppo. at 37). Plaintiffs further contend that Defendants ignored all objective and obvious evidence tending to show Silva was not high on stimulants, including Silva's calm and compliant demeanor when initially approached, his clear skin and normal teeth, and multiple layers of clothing in hot weather. (*Id*. at 40, 42). Plaintiffs contend that

the results of Silva's field drug tests showed he was not under the influence of methamphetamine. (*Id*. at 39-40).  Instead of arresting Silva for being under the influence of methamphetamine, Plaintiffs claim that a reasonable officer would have known Silva was mentally ill and not under the influence of a stimulant. (*Id*. at 43).

Under the totality of the circumstances known to Officer Murrow, who made the arrest, a reasonable jury could find that Officer Murrow did not have probable cause to arrest Silva for being under the influence of methamphetamine. Despite having considerable evidence that Silva was experiencing a psychotic break due to his untreated schizophrenia, the officers spent little or no time focused on his mental condition, instead relying on the sparse and unreliable evidence that Silva was on methamphetamine.[1]

Plaintiff's expert, Dr. Grace Telesco, opined that a "reasonable police officer would have known Paul Silva was mentally ill at the time of his arrest" due to Leslie Allen's report to 911 that he was a schizophrenic off his medications, Allen's request to 911 that  PERT team evaluate Silva and hospitalize him, and his general appearance which included him wearing multiple layers of clothing, including a "small woman's leopard print sweater that does not fit over his large belly." (Plaintiffs Appendix of Evidence "Pl.App'x" at 159 Telesco Dec. ¶ 6). Telesco further noted that it should have been evident that Silva was mentally ill and required hospitalization because he carried bags of trash, repeatedly talked about needing to go to the library to return a book, and that he needed to take the broken bottle he had to recycling. (*Id*.)

---

[1] Plaintiffs raise a claim of wrongful detention in their Opposition, arguing that Silva's spontaneous declaration that he had a marijuana pipe could not have formed the basis for probable cause to detain because possession of a device used for marijuana ingestion is not a crime under Health and Safety Code section 11364.  (Oppo. at 42). But  there is no claim in the FAC for wrongful detention, therefore, this claim is not properly before the Court in this summary judgment action.

1    Officer Murrow acknowledged that he was told by 911 dispatch that Silva

2    was not using drugs, that he had schizophrenia and was not on his medications and

3    that it was not a call regarding an individual suspected of being under the influence

4    pursuant to section 11550, "but that the person was schizophrenic," indicating it

5    was a call for psychiatric help.  (Pl. App'x. at 202, Murrow Testimony 86:3-13,

6    86:16-18 [ECF No. 217-3.])  When approached by Murrow, Silva told Murrow he

7    was not on drugs, but admitted he had a marijuana pipe. (Plotkin-Wolfe Dec., Ex 5,

8    Murrow BWC at 2:16-18). Rather than asking questions about Silva's mental

9    health, Officer Murrow concluded that he would "detain Decedent to investigate if

10   he was under the influence of a controlled substance" because "he was in

11   possession of drug paraphernalia." (Murrow Dec. at ¶ 25 [ECF No.217-3.]

12   However, Murrow should have known that possession of a marijuana pipe is

13   not a crime because he completed the San Diego Police Department training course

14   that covered detection of narcotic use in individuals. The course materials clearly

15   state that possession of drug paraphernalia is a crime when an individual possesses

16   "a device for injecting or smoking a controlled substance *other than marijuana*."

17   (Tyler Wolfe Dec. at ¶ 8, Ex. 1 at 82(emphasis added). Because being in possession

18   of a marijuana pipe is not possession of drug paraphernalia, a prudent person would

19   not have concluded that Silva was committing a crime based on this fact. *Dubner*,

20   266 F.3d at 966.

21   A reasonable jury could also find that there is a genuine issue of material fact

22   regarding Murrow's probable cause determination based on Silva's appearance and

23   profuse sweating. Although profuse sweating can be a sign of methamphetamine

24   use, in Silva's case it could also have been attributable to his being dressed too

25   warmly for the weather and his fear of police. It was warm outside, as noted by

26   Officer Murrow, but Silva was wearing two bulky winter jackets over a small

27   leopard print woman's sweater which was tight over his large frame and stomach.

28   (Plotkin-Wolfe Dec. Ex. 5, Murrow BWC 34:6-7; Murrow Dec. at ¶ 21).  Allen told

13

dispatch that Silva was afraid of police, and the body worn camera footage shows an increase in sweating and agitation as Murrow tells Silva he is being arrested. (Plotkin-Wolfe Dec., Ex. 5 Murrow BWC at 5:9-10; 22:5-17.) A panicked Silva urgently and repeatedly said that he did not want to go to jail because it was dangerous in jail (Plotkin-Wolfe Dec. Ex. 5, Murrow BWC at 24:23-24) and pleaded "[j]ust please don't hurt me." (*Id*. at 25:17-18). Murrow ignored other factors and unreasonably concluded that Silva's appearance and profuse sweating were an indication of methamphetamine use.

Murrow also claims that probable cause existed because Silva "was very talkative, was speaking rapidly . . . speaking loudly with rapid speech," but he did not attempt to determine if Silva was rambling incoherently due to his untreated schizophrenia. Officer Murrow's body worn camera footage shows a calm, compliant, and almost child-like Silva who was eager to follow directions. But Silva made strange comments such as repeatedly stating his mother "almost got hit with a pipe" last night (Plotkin-Wolfe Dec., Ex 5 at 4:13-14,19-20;7:11-12) and that he had a library book he needed to return to the Skyline library (*Id*. at 3:12;6:18). Silva also had a broken bottle, jagged side up, in his pants, but made incoherent statements about being unable to recycle the broken bottle because the recycling center was closed. (Plotkin-Wolfe Dec., Ex 5 at 10:12-11:1-15, 4-12). By concluding that Silva's speech was indicative of methamphetamine use instead of a product of a schizophrenic breakdown, Murrow ignored the totality of the circumstances. *Dubner*, 266 F.3d at 966.

Moreover, the results of the field sobriety tests Officer Murrow conducted did not provide probable cause for Silva's arrest. Officer Murrow checked Silva for (1) "eye flutter"; (2) conducted a 30-second time interval "Romberg" test; (3) took Silva's pulse; (4) conducted a horizontal gaze nystagmus test ("HGN"); and (5) examined Silva's pupil sizes. (Murrow Dec., at ¶¶ 27-29 [ECF No. 199-5.])

Maggi told Murrow that Silva had no "eye flutter," which is a common indicator that an individual has taken a stimulant, however, in Murrow's deposition, he stated that Silva exhibited eye flutter. (Murrow Dec. at 76:4-12 [ECF No 217-3]; Plotkin-Wolfe Dec., Ex. 5, Murrow BWC at 12:19). When questioned further, Murrow admitted that he was unsure whether Silva had eye flutter at the time.

Murrow administered the 30-second Romberg test, asking Silva to close his eyes and tell him when 30 seconds had transpired. (Murrow Dec. at ¶ 27).  Silva counted very quickly up to thirty, but stopped when only 4 seconds had elapsed, despite stating he understood what was asked of him. (*Id.*) The officers concluded this was evidence of methamphetamine use but Plaintiff's expert toxicologist, Kent Olson, stated that the "30-second interval test is not helpful in identifying methamphetamine intoxication because time perception is altered in schizophrenia."  (Pl. App'x at 146, Olson Report at 4[ECF No. 217-2.])

Officer Murrow took Silva's pulse which was elevated to 114, and Murrow interpreted this as an indication that Silva was under the influence of methamphetamine. (Murrow Dec. at ¶ 28). Yet, Officer Murrow testified that he understood an elevated pulse could be the result of an individual being "overly excited when they interact with police." (Pl. App'x, Murrow Dep. at 40:14-16).

Officer Murrow then administered the horizontal gaze nystagmus ("HGN") test which measures involuntary rapid eye movement of the eyeball and noted that Silva had "nystagmus prior to 45 degrees in both eyes," yet Plaintiff's expert noted that "[n]ystagmus is not a finding associate with stimulant use but can be present in patients with schizophrenia." (Pls. App'x at 146, Olson Report at 4).

Finally, Officer Murrow stated that Silva had *constricted* pupils, an indicator of stimulant use, but he also testified that one of the signs or symptoms of methamphetamine use would be *dilated* pupils. (Pl. App'x at 182, 202, Murrow Dep. at 85:10-12; 24:13-16 [ECF No. 217-3.]) Murrow's contradictory report raises a genuine issue of material fact regarding this basis for probable cause.

In light of the above, Plaintiff has produced sufficient evidence to show that the officers did not have knowledge or "reasonably trustworthy information sufficient to lead a person of reasonable caution to believe" that they should arrest Silva for being under the influence of methamphetamine. *United States v. Lopez,* 482 F.3d 1067, 1072 (9th Cir.2007).

To support the officers' decision to arrest Silva for controlled substance use and not for a 5150 hold, the officers claim there was no evidence that Silva was dangerous to himself and others. The record contains contradictory evidence as to this point. Allen reported to dispatch that Silva had not been taking drugs and emphasized that he needed to go to the hospital because "he's a danger to himself," was "running around in between cars in the middle of the street," was "getting crazier and crazier, and [she was] afraid that he's going to break something," explaining that "he's on the verge of, you know, getting violent," and that he "started a fire between the cars." (Plotkin-Wolfe Dec. Ex 1 at 5:11-13, 18-19; Ex. 2, 2:10,17-18; Ex. 4, 2:21; 3:18-21, 5:8-9, 6:11-13). Allen told 911 dispatch she "got in my car and *locked myself in*" because Silva said he would "break the window." (*Id*. Ex 4 at 10:14-16 (emphasis added); Ex. 6 17:11-15).

In contrast, Officer Murrow testified that "[Silva] did not do or say anything that the indicated he was a danger to himself, a danger to others, or gravely disabled." (Murrow Dec. at ¶35). Similarly, Officer Derisio who interview Allen, stated "Ms. Allen did not share any information with my [sic] that led me to believe that Decedent was a danger to himself or anyone else" from which he concluded that he "did not believe we had the probable cause required to take Decedent into custody under W&I 5150." (Derisio Dec. at ¶18). Sgt. Maggi also stated that "[b]ased on my interactions with Decedent, my observations of Officer Murrow's interactions with Decedent, and the information provided to me by Officer Derisio, I did not believe that Decedent was a danger to himself, a danger to others, or

gravely disabled." (Maggi Dec. at ¶ 33). Maggi testified that Allen "did not report Decedent threatening anyone or himself." (Maggi Dec. at ¶ 29).

The officers' testimony contradicts Allen's testimony and her contemporaneous reports to police dispatch. Because "the facts or circumstances surrounding [Silva's] arrest are disputed, the existence of probable cause is a question for the jury." *Harper*, 533 F.3d at1022.

In light of the above, the Court finds that Plaintiffs have raised genuine issues of material fact whether Officer Murrow had probable cause to arrest Silva and the Court denies Defendants' motion for summary judgment on this claim. *Lopez,* 482 F.3d at 1072; *Dubner*, 266 F.3d at 966. Plaintiff has not demonstrated that Maggi or Derisio made the decision to arrest Silva, therefore, summary judgment is granted as to these Defendants.

### C.   Third Cause of Action- Deliberate Indifference

In the Complaint, Plaintiffs allege:

Defendants Murrow, Derisio, and Maggi were made aware that Paul suffered from schizophrenia and that he needed to be hospitalized to receive psychiatric care. They knew they were responding to a "5150" mental health call that required a welfare check. They knew that Paul's behavior was symptomatic of mental illness and consistent with Ms. Allen's repeated statement that Paul was off of his medication.

Murrow failed to adequately communicate to the Jail Staff that Paul suffered from schizophrenia and required mental health care. Murrow failed to tell Jail staff that he made contact with Paul Silva as a result of a "5150" mental health call that requested officers check the welfare of Paul Silva.

(FAC at ¶ 181, 183.)

The Due Process Clause of the Fourteenth Amendment guarantees that pretrial detainees receive constitutionally adequate medical and mental health care. *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1122 (9th Cir. 2018). To plead a pretrial detainee's medical care claim against an individual defendant, the Estate must

allege: "(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved— making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." *Id*. at 1125. "[C]laims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard." *Id*. at 1124-25. "[T]he plaintiff must prove more than negligence but less than subjective intent— something akin to reckless disregard." *Id*. at 1125.

"The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Johnson v. Duffy*, 588 F.2d 740, 743-744 (9th Cir. 1978). "An unforeseen and abnormal intervention ... breaks the chain of causality, thus shielding the defendant from [section 1983] liability." *Van Ort*, 92 F.3d at 837.

Defendants argue that there is no evidence that Officer Murrow knew Silva had a serious medical need, but instead he reasonably believed that Silva was under the influence of a controlled substance.[2] (Mot. at 25-26). Officer Murrow contends there was no need for him to communicate information to jail staff that Silva himself reported. (*Id*. at 27). Even if there was a medical need, Officer Murrow claims that he did not ack with reckless disregard to that need because the County

---

[2] Neither Officer Derisio nor Sgt. Maggi made the decision to arrest Silva, therefore claims of deliberate indifference as to these Defendants fail, and summary judgment is granted.

was equipped to provide any needed services. (*Id*. at 29).  The required element of causation cannot be proven, according to Officer Murrow, because his conduct was not the "but for" cause of Silva's injuries and death. (*Id*. at 29).

In response, Plaintiffs argue that Officer Murrow "failed to provide critical information the Jail staff would need to assess and house Paul and ensure he would receive medical care for the acute condition Paul was exhibiting."  (Oppo. at 49).  By failing to communicate this information, Officer Murrow made an intentional decision, which resulted in jail staff failing to place him in a cell where he could be closely monitored, and instead he was allowed to decompensate for over 30 hours "while jail staff waited in futility for Paul to sober up." (*Id*. at 51).

The first and second elements of deliberate indifference are met here because the evidence shows that Officer Murrow made an intentional decision to arrest Silva for being under the influence of methamphetamine, rather than as a mental health hold, and this decision put Silva at substantial risk of not receiving the appropriate medical care for his schizophrenia. *Gordon,* 888 F.3d 1125.

Officer Murrow also did not take objectively reasonable and available measures to mitigate that risk by informing the intake nurse upon arrival at the County Jail that he had responded to a call for a 5150 with a report that the individual was off his schizophrenia medications, instead passing Silva off to jail officials as an individual under the influence of a controlled substance.  Defendant claims that there was no need to inform the intake nurse of Silva's schizophrenia because it was self-reported, but Silva's ability to provide accurate information was doubtful based on the dispatch information that he was a schizophrenic off his medications, his spontaneous irrational utterings, and his inappropriate attire for the weather. Officer Murrow failed to report any information about Silva's untreated schizophrenia, which tracked Silva into a holding cell for controlled substance use, instead of a cell where he would have been more closely monitored.  Silva had a right to receive adequate medical care once he was in Murrow's custody, whether it

19

was medical or psychiatric, and by omitting the critical information that was conveyed to him that Silva was an untreated schizophrenic, Officer Murrow set in motion a series of events that resulted in jail officials waiting for Silva to sober up, when in fact, he was experiencing psychological decompensation. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983).

However, Plaintiff has produced no evidence to support the conclusion that Officer Murrow knew or should have known that failing to inform the intake nurse that Silva was an untreated schizophrenic would result in the County neglecting him and performing a forceable extraction that caused Silva's death. Instead, the actions of the County were "[a]n unforeseen and abnormal intervention ... [that] breaks the chain of causality, thus shielding the defendant from [section 1983] liability." *Van Ort*, 92 F.3d at 837.

For the above reasons, Plaintiffs have failed to demonstrate a genuine issue of material fact regarding the causation element of deliberate indifference, and summary judgment is appropriate on this claim.

### D.    Fifth Cause of Action- Wrongful Death section 1983

Defendants argue that the Estate does not have standing to bring this claim, and Plaintiffs do not oppose this argument, therefore the Court grants summary judgment as to this claim.

### E.    Sixth Cause of Action- Right of Association

In the Complaint, Plaintiffs allege that:

> The aforementioned acts and/or omissions of Defendants in being deliberatively indifferent to serious medical needs, health and safety; violating Paul Silva's civil rights; falsely arresting him and using excessive and unnecessary force caused the untimely and wrongful death of Paul Silva, and deprived Plaintiffs Manuel Silva and Leslie Allen of their liberty interest in the parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the United States Constitution.

> There was no legitimate penological interest in failing to communicate critical medical information and denying access to medical care to an inmate in obvious medical distress. Defendants' actions shock the conscience.

20

(FAC at ¶¶ 235, 236)

"The substantive due process right to family integrity or to familial association is well established." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir.2011). Parents have a fundamental liberty interest in the companionship of their adult children and have a cause of action under the Fourteenth Amendment when the police kill an adult child without legal justification. *See Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008). "[V]iolation of the right to family integrity is subject to remedy under § 1983." *Rosenbaum*, 663 F.3d at 1079. "Official conduct that 'shocks the conscience' in depriving parents of that interest is cognizable as a violation of due process." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). An officers' conduct shocks the conscience if the officer acts with either (1) deliberate indifference, or (2) a "purpose to harm . . . unrelated to legitimate law enforcement objectives." *Porter*, 546 F.3d at 1137. Where actual deliberation is practical, the "deliberate indifference" standard applies. *Wilkinson*, 610 F.3d at 554. In contrast, the "purpose to harm" standard applies where an officer "makes a snap judgment because of an escalating situation." *Id*.

The proper standard is "deliberate indifference" because Silva's arrest was a slow-moving event with no exigent circumstances. "Deliberate indifference occurs when 'the official acted or failed to act despite his knowledge of a substantial risk of serious harm.'" *Solis v. County of Los Angeles*, 514 F.3d 946, 957 (9th Cir. 2008). As shown above, Plaintiffs have failed to show that Murrow knew there was a substantial risk of serious harm to Silva as a result of the arrest for methamphetamine use and Murrow's failure to tell jail staff about Silva's untreated schizophrenia, therefore, the Court grants Defendants summary judgment motion as to the right of association claim.

//

//

21

1
2

F.    Seventh and Eighth Causes of Action- Failure to Train and Supervise against Sgt. Maggi

3      Plaintiffs have voluntarily dismissed Claim Seven of the Complaint,

4  therefore, the Court denies Defendants' summary judgment motion as to this claim

5  as moot. Defendants challenge Claim Eight, failure to supervise. (Oppo. at 28 [ECF

6  No. 225.]) The Complaint alleges in claim Eight that:

7      Maggi failed to properly supervise and discipline defendant Murrow and
       Derisio in the performance of their duties in responding to 5150 mental
8      health calls that request welfare checks of individuals who suffer from
       psychiatric conditions; in evaluating mentally ill citizens who require
9      hospitalization and treatment; and in making false arrests.
10

11  (FAC ¶257).

12      A supervisor can be held liable in his or her individual capacity under § 1983

13  only if (1) he or she personally participated in the constitutional violation, or (2)

14  there is a "sufficient causal connection between the supervisor's wrongful conduct

15  and the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir.

16  1989). "A supervisor is only liable for constitutional violations of his subordinates

17  if the supervisor participated in or directed the violations, or knew of the violations

18  and failed to act to prevent them. There is no *respondeat superior* liability under

19  section 1983." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). A claim of

20  failure to supervise requires that the plaintiff allege that the supervisory defendant's

21  conduct was sufficiently inadequate to constitute deliberate indifference to the

22  detainee's rights. *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989).

23  This requires the plaintiff to allege that the supervisory defendant was on actual or

24  constructive notice that the failure to supervise or discipline would likely result in a

25  constitutional violation. *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011).

26  Plaintiff must show an underlying constitutional violation to proceed with a claim

27  of failure to supervise. *See* Ninth Circuit Model Jury Instruction 9.4.

28

22

Defendants argue that summary judgment is appropriate because (1) Plaintiffs have not shown a deprivation of constitutional right, (2) they fail to show that Maggi acted with deliberate indifference, and (3) they produce no evidence that Maggi failed to supervise Officers Derisio and Murrow. (Reply at 15).

Plaintiffs counter that Sgt Maggi "directly participated in the investigation and arrest of Paul Silva" and he failed to properly supervise Murrow "in the proper way to investigate a call for 5150" and "in drug recognition techniques." (Oppo. at 52). Sgt. Maggi further failed in his duties to supervise by not directing Derisio in the proper way to take accurate witness statements and failing to supervise him regarding the requirement that he turn on his body worn camera to prevent misinformation from being transmitted. (*Id*. at 52).

The evidence demonstrates that Sgt. Maggi personally participated in the investigation and approved of the decision by Officer Murrow to arrest Silva for being under the influence rather than detain him under 5150. Sgt. Maggi arrived shortly after Officer Murrow and began asking Silva questions and giving directions both to Silva and to Officer Murrow. He told Silva to take off his bulky jacket and asked if he had weapons. (Plotkin-Wolfe Dec. Murrow BWC Ex. 5 at 3:14-16, 5:4). He directed Officer Murrow to "[g]o ahead and stand him up" after which Officer Murrow directed Silva to stand up. (*Id*. at 5:18, 20.)  Maggi asked Silva whether he was on medication, or was supposed to be on medication, and whether Silva had talked to his doctor recently. (*Id*. at 8:20-25,9:11-12). He then asked whether Silva self-medicated by taking street drugs, directing the inquiry toward controlled substance use. (*Id*. at 9:22-24).

Sgt. Maggi also personally participated in the administration of the field sobriety test when he asked Murrow if Silva had eye flutter. (*Id*. at 12:13-14, 19). After Officer Murrow finished the test, Sgt. Maggi asked Silva "when's the last time you used methamphetamine?" (*Id*. at 15:12-13). Sgt. Maggi also confirmed to Derisio that the officers were investigating controlled substance use rather than a

psychiatric hold under 5150 when Derisio told Maggi he thought it was "more 115 than 5150." (Plotkin-Wolf Dec. Ex. 6 Maggi BWC at 16:18-20).  Sgt. Maggi told Officer Murrow that "there is recent use" which contributed to Officer Murrow's decision to arrest Silva for being under the influence of a controlled substance. (Plotkin-Wolf Ex. 5 at 19:13).

The evidence demonstrates that Sgt. Maggi personally participated in the events leading up to Silva's arrest including his conclusion that it was more drug related than psychiatric, yet Plaintiffs must also demonstrate that Sgt. Maggi acted with deliberate indifference to Silva's rights. The body worn camera footage shows that Maggi watched as Murrow asked Silva questions and as Murrow conducted the field sobriety test, but Maggi did not re-direct Murrow's focus to Silva's mental health crisis at any time. (Plotkin-Wolf Ex. 5, 6).  Maggi stepped aside briefly to speak to Derisio during the sobriety test, and then conveyed Derisio's information about Silva's recent drug use to Murrow.  (Plotkin-Wolf Ex. 5 at 19:13). Maggi allowed Murrow to disregard or overlook the evidence that Silva was having a schizophrenic breakdown and instead supported Murrow's decision to arrest of Silva for being under the influence of methamphetamine. By doing so, Maggi was aware that the totality of the circumstances did not support Murrow's actions, and he failed to act to prevent the constitutional violation. *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989). Therefore, summary judgment is denied as to Defendant Maggi on this claim.

However, Plaintiffs have not shown Sgt. Maggi failed to supervise Derisio in the techniques to use for accurate witness statements. Although Sgt. Maggi could have asked further questions when Derisio informed him that "there was recent use," to clarify what this meant, he did not fail to supervise Derisio in the interview with Allen because Maggi was across the street speaking with Silva at that time. Drawing inferences from these facts in the light most favorable to Plaintiffs, there is

insufficient evidence to support the failure to supervise cause of action against Maggi for his supervision of Derisio. *See Matsushita*, 475 U.S. at 587.

//

G.   *Tenth and Eleventh Causes of Action- Monell Claims*

Plaintiff voluntarily dismisses these causes of action against Defendants. Therefore, the Court denies summary judgment as to the *Monell* claims as moot. (Oppo. at 28).

H.   *State Law Causes of Action- Twelfth, Thirteenth and Fifteenth Causes of Action - Negligence and Bane Act Claims*

1.   State Law Negligence

In the Thirteenth Cause of Action, Plaintiffs allege that "Defendants had a duty to Paul Silva to act with ordinary care and prudence so as not to cause harm or injury to another" but they failed in their duty by (1) failing to comply with professional and legal standards when they evaluated and assessed Silva's medical condition, (2) "improperly, negligently, wrongfully, and recklessly subjected Paul Silva to arrest for a criminal charge instead of taking him to a mental health care facility," and (3) "improperly, negligently, wrongfully, and recklessly failed to provide necessary medical documentation and information to San Diego Central Jail regarding Paul's serious medical need." (FAC at ¶¶ 332-334, 336).

To state a claim for negligence under California law, a plaintiff must allege (1) a legal duty to use due care; (2) a breach of such legal duty; and (3) the breach as the proximate or legal cause of the resulting harm. *Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009). The chain of causation may be broken by an intervening cause that is unforeseeable or extraordinary. *Id*. at 572.

Defendants contend that the claims for negligence and wrongful death against the City must be dismissed because the City cannot be held liable under these theories under the Government Claims Act unless provided by statute, but none applies here. (Mot. at 40). Further, Defendants argue that the City Defendants

25

cannot be held liable for negligence because (1) the officers exercised the standards required of police officers; (2) the officers had probable cause to arrest Decedent; (3) Decedent did not have a serious medical condition at the tiem of his arrest; (4) no PERT clinicians were available; and (5) there was no need to provide information the County already had." (*Id.*) Defendants claim that "the officers exercised the standards required of police officers in evaluating the W&I 5150 call," and that even if the officers had medical training, Plaintiffs experts acknowledge that the signs and symptoms of someone under the influence of a central nervous system stimulant and experiencing a schizophrenic are so similar that trained medical professionals have trouble telling them apart. (*Id.* at 41-42).

Plaintiffs counter that the City can be held liable under the theory of respondeat superior as expressed in California Government Code § 820.4.  (Oppo. at 62). In addition, Plaintiffs argue that the negligence claim survives because Plaintiffs have sufficiently shown that Defendants violated Silva's constitutional rights. (*Id.*).

First, it is unclear from the allegations whether Plaintiffs are claiming negligence as to both the City and to the individual officers. The Government Claims Act narrows liability against the City to statutory liability, and none is pleaded here. *See* Cal.Gov't Code § 815(a)("Except as otherwise provided by statute: (a) A public entity is not liable for an injury, whether such an injury arises out of an act or omission of the public entity or a public employee or any other person.")  Accordingly, summary judgment is granted as to the City because it cannot be held liable for either negligence or wrongful death on a theory of direct liability. *AE ex rel. Hernandez v. County of Tulare*, 666 F.3d 631, 638 (9th Cir. 2012)("California public entities are not subject to common law tort liability; all liability must be pursuant to statute.").

Second, Officer Murrow had a duty to respect Silva's Fourth Amendment rights to be free from arrest without probable cause. As shown above, Plaintiff has

raised genuine issues of material fact with regard to probable cause, therefore, Plaintiffs' have satisfied the first two elements of a negligence cause of action, duty and the breach of that duty.[3] *See Corales*, 567 F.3d at 572. However, Plaintiffs fail to demonstrate that Silva's arrest was the proximate or legal cause of the resulting harm, and instead the actions of the County Jail personnel were the unforeseeable intervening cause of Silva's decompensation and the tactical team intervention. *Id*. As a result, Defendants summary judgment motion is granted as to the state law negligence cause of action.

### 2. Bane Act Claim

Plaintiffs allege in the Fifteenth Cause of Action that "Paul Silva had a Constitutional right not to be arrested without probable cause. Murrow, Derisio, and Maggi arrested Paul through the use of intimidation and coercion by accusing him of being under the influence of a controlled substance when he was not." (FAC at ¶ 367).

The Bane Act authorizes an action for damages, injunctive relief, and other "appropriate equitable relief" against a person or persons who "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured" by federal or state law or the United States or California constitutions. Cal. Civ. Code. § 52.1. To plead a Bane Act claim, a plaintiff must allege that the defendant interfered with his or her constitutional or statutory rights and that the interference was accompanied by actual or attempted threats, intimidation, or coercion. *Id.* The plaintiff must also allege a "specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Reese v. County of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018).

---

[3] The Court declines to address Plaintiffs contention that Officer Murrow violated Silva's constitutional rights when he failed to tell Jail officials about Silva's schizophrenia, as this claim has already been dismissed above.

The body worn camera footage from both Officer Murrow and Sgt. Maggi do not show any threats, intimidation or coercion on the part of the officers. Instead, Officer Murrow and Sgt. Maggi treated Silva respectfully and spoke to him in calm voices. Plaintiffs claim that Sgt. Maggi coerced Silva by asking him when he last used methamphetamine, but this does not constitute coercion for purposes of a Bane Act claim because there is no evidence that it was "intentionally coercive and wrongful, i.e., a knowing and blameworthy interference with the plaintiffs' constitutional rights." *See Gant v. County of Los Angeles*, 772 F.3d 608, 624 (9th Cir. 2014) (*quoting Shoyoye v. County of Los Angeles*, 203 Cal.App.4th 947, 137 Cal.Rptr.3d 839, 850 (2012)). For these reasons, the Court grants Defendants summary judgment motion and dismisses the Bane Act claim.

### 3. Wrongful Death

In the Twelfth Cause of Action, Plaintiffs allege that "Defendants committed wrongful acts which proximately caused the death of Paul Silva. Specifically, Defendants deprived Paul Silva of his rights under the United States Constitution to be free from the punishment without due process and cruel and unusual punishment." (FAC at ¶¶ 325-327.)

The elements of a wrongful death claim under California law are: (1) wrongful act or neglect on the part of one or more persons, (2) the resulting death of another person, and (3) pecuniary losses suffered by the heirs. *Quiroz v. Seventh Ave. Ctr.,* 140 Cal. App. 4th 1256, 1263-64 (2006). Where a wrongful death claim is premised on negligence, a plaintiff must establish that defendants owed a duty of care; defendants breached their duty; and defendants' breach caused plaintiff's injury. *Hayes v. County of San Diego*, 736 F.3d 1223, 1231 (9th Cir. 2013).

Because summary judgment is granted as to the state law claims, there is no basis for the state law wrongful death claim, and the Court grants Defendants summary judgment motion as to this cause of action.

//

//

I. *Sixteenth and Seventeenth Causes of Action- Violation of ADA and Rehabilitation Act*

In the Sixteenth Cause of Action, Plaintiffs allege that "Paul Silva was a disabled individual suffering from a mental impairment that substantially limited one or more major life activities. Paul Silva was a 'qualified individual with a disability' for purposes of the Americans with Disabilities Act and the Rehabilitation Act" yet:

> Defendant CITY denied Paul medical treatment by failing to take Paul to the hospital. CITY employees assumed Paul's symptoms of schizophrenia were symptoms of drug use. SDPD officers administered a field sobriety test that a schizophrenic patient cannot pass . . . Knowing that the call was for a "5150," SDPD officers administered a test that Paul was certain to fail. These officers then failed to take Paul to a hospital, thereby failing to accommodate Paul's disability, and denying him a service, benefit, or program.

(FAC at ¶¶ 378, 384).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, § 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "To recover monetary damages under Title II of the ADA or the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001).

Both the ADA and the Rehabilitation Act apply in the context of arrests and correctional facilities. *See City & Cty. of San Francisco v. Sheehan*, 575 U.S. 600,

608 (2015) (ADA applies to arrests); *Pierce v. Cty. of Orange*, 526 F.3d 1190, 1214 (9th Cir. 2008) (ADA and Rehabilitation Act apply to correctional facilities); *see also Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210, (1998) ("services, programs, or activities" as used in 42 U.S.C. § 12132 includes medical programs in prison). "[T]here is no significant difference in the analysis of rights and obligations created by the two Acts." *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002).

"Courts have recognized at least two types of Title II claims applicable to arrests: (1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and (2) reasonable accommodation, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Sheehan v. City & Cty. Of San Franscisco,* 743 F.3d 1211, 1232 (9th Cir. 2014), reversed in part on other grounds by *Cty and Cnty of San Francisco, Calif,* 575 U.S 600.

To plead a failure to accommodate under the ADA or the Rehabilitation Act, a plaintiff must allege that a public entity knew of the disability but failed to provide reasonable accommodations. *See Robertson v. Las Animas Cty. Sherriff's Dep't*, 500 F.3d 1185, 1196 (9th Cir. 2007). An entity's "deliberate refusal" to accommodate disability-related needs violates the ADA and the Rehabilitation Act. *See United States v. Georgia*, 546 U.S. 151, 157 (2006) ("[T]he alleged deliberate refusal of prison officials to accommodate [plaintiff's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constituted [an ADA violation]."). However, inadequate or negligent medical treatment alone does not constitute an unlawful failure to accommodate.

30

*Simmons v. Navajo Cty.*, 609 F.3d 1011, 1022 (9th Cir.2010) (overruled on other grounds).

Defendants request summary judgment on these claims because they contend Silva had no present disability when he was arrested, there was no disparate impact on Silva, and Silva did not request a reasonable accommodation. (Mot. at 46).

Plaintiffs counter that they can prevail under the ADA on a theory of wrongful arrest because (1) Silva was disabled, (2) the officers knew or should have known that he was disabled, and (3) the officers arrested him because of legal conduct related to his disability. (Oppo. at 30). In addition, Plaintiffs argue that Defendants did not provide reasonable accommodations under the ADA which would have been to take Silva in for mental health treatment as the police had done before. [4] (*Id.* at 32).

The evidence demonstrates that Silva was a disabled individual at the time of the arrest because his mother, Leslie Allen, reported to SDPD dispatch that he was diagnosed with schizophrenia, thus satisfying the first element.  The second element is satisfied because Officer Murrow, Officer Derisio and Sgt. Maggi stated they were aware that the dispatch call was to check on the welfare of an individual who was schizophrenic and off his medications, indicating their knowledge of Silva's disability.

However, Plaintiffs have not demonstrated that Officer Murrow discriminated against Silva *because* of his schizophrenia, as required to constitute disability discrimination. *See Sheehan*, 743 F.3d at 1233. Plaintiffs argue that "a reasonable accommodation under the ADA was for Defendant to take Paul in for mental health treatment as the police had done before", but Officer Murrow transported him to the County Jail where both medical and psychiatric services

---

[4] Plaintiffs claim that Defendants violated Silva's ADA and Rehabilitation Act rights by failing to communicate his mental health condition to jail staff, but they fail to support this claim with any authority or facts, and it is not alleged in the FAC, therefore, the Court finds it moot.

were ostensibly provided. Though he did not take Silva to a psychiatric hospital, the ADA "prohibits discrimination because of disability, not inadequate treatment for disability." *Simmons*, 609 F.3d 1022. Consequently, summary judgment is granted as to Plaintiffs ADA and Rehabilitation Act claims because Plaintiffs have failed to raise a genuine issue of material fact.

### K.   *Qualified Immunity*

Courts engage in a two-part inquiry when determining questions of qualified immunity at summary judgment. "The first asks whether the facts, [t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a [federal] right [.]'" *Tolan v. Cotton*, 572 U.S. 650, 655-656 (2014). The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Id*. at 656. "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). "[Q]ualified immunity operates 'to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.'" *Id*. "The linchpin of the qualified immunity analysis is the reasonableness of the officer's conduct in the particular case at hand." *Id*. at 1075 An otherwise competent officer will be liable under § 1983 if he or she makes an unreasonable decision or an unreasonable mistake as to law or fact. *Liberal v. Estrada*, 632 F.3d 1064, 1078 (9th Cir. 2011).

Here, as demonstrated above, there are factual disputes about whether Officer Murrow had probable cause to arrest Silva for being under the influence of methamphetamine, and the evidence shows that Sgt. Maggi failed to supervise Murrow in the arrest of Silva, therefore, Plaintiffs have satisfied the first prong of the qualified immunity standard.

Moreover, it is well established that "an arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under §

1983," therefore, Plaintiffs have met their burden to satisfy the second element. arrest. *Borunda v. Richmond*, 885 F.2d 1384, 1391 (9th Cir.1988). Accordingly, Defendant Murrow's request for qualified immunity is denied.[5]

Similarly, the failure to supervise is a clearly established right. *Starr*, 652 F.3d at 1210; *Dubner*, 266 F.3d at 968. As explained above, the evidence shows that there is a genuine issue of material fact whether Sgt. Maggi failed to properly supervise Murrow in the arrest of Silva, therefore, the Court denies Defendants Maggi motion for qualified immunity. *Borunda*, 885 F.2d at 1391.

IV.     *Conclusion and Order*

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART Defendant's Motion for Summary Judgment as to Claims One and Eight; GRANTS Claims Three, Five, Six, Twelve, Thirteen, Fifteen, Sixteen, Seventeen, and DENIES as to Claims Four, Fourteen, Seven, Ten, and Eleven.

**IT IS SO ORDERED.**

Dated:  December 15, 2022

Hon. M. James Lorenz
United States District Judge

---

[5] Plaintiffs have provided insufficient evidence to show Officer Derisio violated Silva's constitutional rights, therefore, qualified immunity is granted as to Officer Derisio. *Borunda*, 885 F.2d at 1391.